No. 2014-1478

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

SINO LEGEND (ZHANGJIAGANG) CHEMICAL CO. LTD.; SINO
LEGEND HOLDING GROUP, INC.; SINO LEGEND HOLDING
GROUP LTD.; PRECISION MEASUREMENT INTERNATIONAL
LLC; RED AVENUE CHEMICAL CO. LTD.; SHANGHAI LUNSAI
INTERNATIONAL TRADING COMPANY; RED AVENUE GROUP
LIMITED; AND SINO LEGEND HOLDING GROUP INC. OF
MARSHALL ISLANDS,

*Appellants*,

– v. –

INTERNATIONAL TRADE COMMISSION,

*Appellee*,

and

SI GROUP, INC.,

*Intervenor*.

Appeal from the United States International Trade Commission,
Investigation No. 337-TA-849

## NON-CONFIDENTIAL BRIEF FOR APPELLANTS SINO
## LEGEND (ZHANGJIAGANG) CHEMICAL CO. LTD., ET AL.

Andrew J. Pincus
Gary M. Hnath
Paul W. Hughes
James F. Tierney
MAYER BROWN LLP
1999 K Street, N.W.
November 10, 2014    Washington, D.C. 20006
(202) 263-3000

*Counsel for Appellants*

# CERTIFICATE OF INTEREST

Counsel for Appellants Sino Legend Chemical Co., Ltd., *et al*., certifies the following:

1.    The full name(s) of every party or amicus represented by us are:

> Sino Legend (Zhangjiagang) Chemical Co., Ltd.
> Sino Legend Holding Group, Inc.
> Sino Legend Holding Group, Ltd.
> Precision Measurement International LLC
> Red Avenue Chemical Co. Ltd.
> Shanghai Lunsai International Trading Company
> Red Avenue Group Limited
> Sino Legend Holding Group Inc. of Marshall Islands

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

Not applicable.

3.    All parent corporations and all publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by us are:

Not applicable.

4.    The names of all law firms and the partners and associates that appeared for appellants in the trial court or are expected to appear in this Court are:

Mayer Brown LLP
Andrew J. Pincus
Gary M. Hnath
Paul W. Hughes
James F. Tierney

Sidley Austin LLP
Brian R. Nester
Paul Zegger
Peter S. Choi
Michael R. Franzinger
James High
Fitz Collings
Richard J. O'Brien
Samuel N. Tiu

June He Law Offices
Ruixue Ran

Dated: November 10, 2014                    Respectfully submitted,


                                            /s/ Andrew J. Pincus
                                            Andrew J. Pincus
                                            MAYER BROWN LLP
                                            1999 K Street, NW
                                            Washington, DC 20006

# TABLE OF CONTENTS

Certificate of Interest ................................................................................i

Table of Authorities ..................................................................................v

Statement of Related Cases ....................................................................xi

Jurisdictional Statement ..........................................................................1

Issues Presented ........................................................................................1

Statement of the Case ..............................................................................2

    A.  Factual Background. ........................................................................2

    B.  The Chinese Court Proceedings. ..................................................4

    C.  Proceedings Below. .......................................................................12

Summary of the Argument ....................................................................16

Standard of Review ................................................................................21

Argument ................................................................................................22

I.  Section 337(a)(1)(A) Does Not Apply Extraterritorially And
    Therefore Does Not Provide A Remedy When The Alleged
    Misappropriation Of Trade Secrets Occurred Outside The
    United States. ..................................................................................22

    A.  *Kiobel* prescribes a two-part inquiry different from the
        *TianRui* majority's analysis. .....................................................24

    B.  *Kiobel*'s analysis demonstrates that Section 337(a)(1)(A)
        does not apply extraterritorially. ...........................................25

        1.  The statutory text is silent regarding extraterritorial
            application. .................................................................26

        2.  No legislative history provides the necessary clear
            indication of extraterritorial reach. ...........................34

        3.  No deference is due to the ITC. ..................................36

    C.  The claim in this case is extraterritorial and therefore
        beyond the ITC's statutory authority. ...................................39

    D.  Extending Section 337(a)(1)(A) to extraterritorial conduct
        risks severe foreign policy repercussions. ...........................43

II.  The ITC Erred In Holding That A Prior Judgment Of A
    Chinese Court—Resolving The Same Claims Among The Same
    Parties—Is Irrelevant In A Section 337 Proceeding. ..............47

A.  The ITC erred in holding international comity principles categorically inapplicable to Section 337 proceedings....................48

B.  The Chinese judgment, which resulted from SI Group's voluntary initiation of lawsuits in China, should be afforded comity. .................................................................54

III. The ITC Erred In Imposing A Ten Year Exclusion Order....................61

Conclusion.......................................................................................65

*On pages 3-5, 7-12, 57, 62, and 63, confidential information has been re-dacted pursuant to the protective order issued by the International Trade Commission.  Pages 7-12, 57, and 63 quote decisions of the Chinese courts that were filed under seal pursuant to the protective order.  Pages 3-5 and 62 quote material from a labor contract that was filed under the protective order.*

# TABLE OF AUTHORITIES

## CASES

*In re Amtorg Trading Corp.*,
  75 F.2d 826 (C.C.P.A. 1935) .................................................. 30, 46

*Balintulo v. Daimler AG*,
  727 F.3d 174 (2d Cir. 2013) ......................................................... 40

*Baloco v. Drummond Co., Inc.*,
  __ F.3d __, 2014 WL 4699481 (11th Cir. 2014) ......................................... 40

*Baystate Techs., Inc. v. Bentley Sys., Inc.*,
  946 F. Supp. 1079 (D. Mass. 1996) ........................................... 62

*Belize Telecom Ltd. v. Gov't of Belize*,
  528 F.3d 1298 (11th Cir. 2008).................................................. 53

*Cardona v. Chiquita Brands Int'l, Inc.*,
  760 F.3d 1185 (11th Cir. 2014).................................................. 40

*In re Certain Processes for the Manufacture for Skinless Sausage
  Casings and Resulting Product*,
  Inv. No. 337-TA-148/169, 1984 WL 273789 (1984) ............................... 38, 39

*Chem. Eng'g Corp. v. Essef Indus., Inc.*,
  795 F.2d 1565 (Fed. Cir. 1986) .................................................. 58

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984).......................................................... 21, 37

*China Tire Holdings Ltd. v. Goodyear Tire & Rubber Co.*,
  91 F. Supp. 2d 1106 (N.D. Ohio 2000) ........................................ 60

*In re Compania Naviera Joanna S.A.*,
  531 F. Supp. 2d 680 (D.S.C. 2007) ............................................ 60

*Crocs, Inc. v. Int'l Trade Comm'n*,
  598 F.3d 1294 (Fed. Cir. 2010).................................................. 21

*Cunard S.S. Co. v. Salen Reefer Servs. AB*,
  773 F.2d 452 (2d Cir. 1985) .................................................... 52

# TABLE OF AUTHORITIES
## (continued)

*Daimler AG v. Bauman,*
   134 S. Ct. 746 (2014) ................................................................. 43

*E&L Consulting, Ltd. v. Doman Indus. Ltd.,*
   360 F. Supp. 2d 465 (E.D.N.Y. 2005) ......................................... 53

*ECT Int'l, Inc. v. Zwerlein,*
   597 N.W.2d 497 (Wis. Ct. App. 1999) ......................................... 62

*EEOC v. Arabian American Oil Co.,*
   499 U.S. 244 (1991) ..................................................................... 46

*Ermini v. Vittori,*
   758 F.3d 153 (2d Cir. 2014) ......................................................... 60

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.,*
   542 U.S. 155 (2004) ..................................................................... 45

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000) ..................................................................... 21

*Finanz AG Zurich v. Banco Economico S.A.,*
   192 F.3d 240 (2d Cir. 1999) ......................................................... 52

*Finnigan Corp. v. Int'l Trade Comm'n,*
   180 F.3d 1354 (Fed. Cir. 1999) ................................................... 21

*Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc.,*
   180 F.3d 896 (7th Cir. 1999) ....................................................... 54

*Folex Golf Indus., Inc. v. China Shipbuilding Indus.,*
   2013 WL 1953628 (C.D. Cal. 2013) ............................................. 59

*Grimes v. Allied Stores Corp.,*
   768 P.2d 528 (Wash. Ct. App. 1989) ........................................... 64

*Guimei v. Gen. Elec. Co.,*
   91 Cal. Rptr. 3d 178 (Ct. App. 2009) ........................................... 60

*Hilton v. Guyot,*
   159 U.S. 113 (1895) ............................................................... 48, 58

vi

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Hubei Gezhouba Sanlian Indus., Co., Ltd. v. Robinson Helicopter Co.,*
425 F. App'x 580 (9th Cir. 2011) ................................................ 59

*In the Matter of: Certain Angolan Robusta Coffee,*
1976 WL 41418, USITC Inv. No. 337-TA-16 (1976) ................................... 41

*In the Matter of: Chicory Root-Crude & Prepared
Notice of Termination of Investigation,*
1977 WL 52340, USITC Inv. No. 337-TA-27 (1977) ................................... 42

*Int'l Nutrition Co. v. Horphag Research Ltd.,*
257 F.3d 1324 (Fed. Cir. 2001) ............................................*passim*

*Jacobs Vehicle Sys., Inc. v. Yang,*
2013 WL 4833058 (M.D.N.C. 2013) ............................................ 60

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.,*
412 F.3d 418 (2d Cir. 2005) ............................................ 53

*King.com Ltd. v. 6 Waves LLC,*
2014 WL 1340574 (N.D. Cal. 2014) ............................................ 60

*Kiobel v. Royal Dutch Petroleum Co.,*
133 S. Ct. 1659 (2013).............................................*passim*

*Kyocera Wireless Corp. v. Int'l Trade Comm'n,*
545 F.3d 1340 (Fed. Cir. 2008) ............................................ 21, 22

*Liu Meng-Lin v. Siemens AG,*
763 F.3d 175 (2d Cir. 2014) ................................................ 37

*Mastafa v. Chevron Corp.,*
2014 WL 5368853 (2d Cir. 2014)................................................ 40

*Merial Ltd. v. Cipla Ltd.,*
681 F.3d 1283 (Fed. Cir. 2012)................................................ 48

*Microsoft Corp. v. AT&T Corp.,*
550 U.S. 437 (2007)................................................ 22, 25

*Morrison v. Nat'l Australia Bank Ltd.,*
561 U.S. 247 (2010)................................................ 22, 31, 38, 46

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Motorola Mobility, LLC v. Int'l Trade Comm'n,*
   737 F.3d 1345 (Fed. Cir. 2013) ................................................... 21

*Nalco Co. v. Chen,*
   2013 WL 4501425 (N.D. Ill. 2013) ........................................ 60

*Naoko Ohno v. Yuko Yasuma,*
   723 F.3d 984 (9th Cir. 2013) ................................................ 58

*Piper Aircraft Co. v. Reyno,*
   454 U.S. 235 (1981) ............................................................. 59

*Quanzhou Joerga Fashion Co. v. Brooks Fitch Apparel Grp., LLC,*
   2012 WL 4767180 (S.D.N.Y. 2012) .......................................... 60

*Robert Bosch, LLC v. Pylon Mfg. Corp.,*
   719 F.3d 1305 (Fed. Cir. 2013) ................................................ 23

*Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.,*
   466 F.3d 88 (2d Cir. 2006) ................................................... 52

*Schneider Nat'l Carriers, Inc. v. Carr,*
   903 F.2d 1154 (7th Cir. 1990) ................................................ 55

*Silicon Image, Inc. v. Analogix Semiconductor, Inc.,*
   2008 WL 166950 (C.D. Cal. 2008) ........................................... 62

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,*
   549 U.S. 422 (2007) ............................................................. 59

*Soc'y of Lloyd's v. Turner,*
   303 F.3d 325 (5th Cir. 2002) ................................................ 58

*Sosa v. Alvarez-Machain,*
   542 U.S. 692 (2004) ............................................................. 27

*Souryal v. Torres Advanced Enter. Sol'ns, LLC,*
   847 F. Supp. 2d 835 (E.D. Va. 2012) ........................................ 37

*Sullivan v. Finkelstein,*
   496 U.S. 617 (1990) ............................................................. 36

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Tang v. Synutra Int'l, Inc.*,
  2010 WL 1375373 (D. Md. 2010) .................................................. 60

*Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*,
  482 F.3d 1330 (Fed. Cir. 2007) .................................................. 23

*TianRui Grp. Co. v. Int'l Trade Comm'n*,
  661 F.3d 1322 (Fed. Cir. 2011) ............................................*passim*

*United States v. Chao Fan Xu*,
  706 F.3d 965 (9th Cir. 2013) .................................................... 41

*United States v. Villanueva*,
  408 F.3d 193 (5th Cir. 2005) .................................................... 31

*Young Engineers, Inc. v. U.S. Int'l Trade Comm'n*,
  721 F.2d 1305 (Fed. Cir. 1983) ....................................... 51, 52, 53

## STATUTES

8 U.S.C. § 1324 ...................................................................... 31

15 U.S.C. § 78aa ............................................................... 34, 46

18 U.S.C.
  § 175c ............................................................................ 33
  § 470 ............................................................................. 33
  § 1039 ........................................................................... 33
  § 1351 ........................................................................... 33
  § 1837 ........................................................................... 32
  § 2285 ........................................................................... 33
  § 2331 ........................................................................... 33
  § 3271 ........................................................................... 33

19 U.S.C. § 1337 .........................................................*passim*

21 U.S.C.
  § 331 ............................................................................. 33
  § 337a ........................................................................... 34

22 U.S.C. § 2780 .................................................................. 33

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

28 U.S.C.
   § 1295.................................................................................1
   § 1350......................................................................... 23, 27

42 U.S.C. § 2000e ............................................................. 47

## OTHER AUTHORITIES

Defend Trade Secrets Act of 2014, S. 2267, 113th Cong. (2d Sess. 2014) ...... 46

H.R. Rep. No. 1781, 76th Cong., 3d Sess. (1940) ............................................ 30

U.S. Tariff Comm'n, *Sixth Annual Report* (1922) ..................................... 35, 41

## STATEMENT OF RELATED CASES

No appeal in this case was previously before any court. No case is pending in this Court or any other that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The United States International Trade Commission (the "ITC" or "Commission") instituted an investigation of appellants under Section 337 of the Tariff Act of 1930, codified as amended at 19 U.S.C. § 1337.

The Commission issued its limited exclusion order on January 15, 2014, triggering the 60-day presidential review period pursuant to 19 U.S.C. § 1337(c) & (j). The presidential review period thus expired on March 14, 2014. This petition was filed on May 12, 2014, within the 60-day period allowed by 19 U.S.C. § 1337(c).

This Court has jurisdiction under 28 U.S.C. § 1295(a)(6).

## ISSUES PRESENTED

1. Whether 19 U.S.C. § 1337(a)(1)(A) applies extraterritorially to an alleged theft of trade secrets occurring wholly outside the United States.

2. Whether the ITC violated fundamental principles of comity by declaring irrelevant the judgment of a Chinese court in a case involving the same private parties that adjudicated the same claims of trade secret misappropriation at issue before the ITC.

3. Whether the ITC erred in issuing a ten-year limited exclusion order even though the contractual agreement prohibiting disclosure of the

1

alleged trade secrets lapsed after three years under the governing principles of Chinese law.

## STATEMENT OF THE CASE

### A.    Factual Background.

Certain synthetic rubbers used in products such as tires are manufactured by "pressing together layers of various rubber compounds." A212. In order to improve the stability of these layered products, the synthetic rubbers contain so-called "tackifiers"—compounds that increase the strength of the adhesive bonds between the layers. A211-12.

Petitioner Sino Legend (Zhangjiagang) Chemical Co. Ltd. ("Sino Legend")[1], a chemical manufacturer located in Zhangjiagang, China (A207), developed a process for producing a type of phenolic resin for use as a "tackifier" that would be more cost-effective and of higher quality than those offered by competitors. A107, A211-12. Its development process, which began in late 2005, involved collaboration with another resin manufacturer, Sumitomo Bakelite Durez. As part of that relationship, Sino Legend representatives visited Sumitomo's facilities, where they learned about aspects of the resin production process that were later in-

---

[1]   We refer collectively to all appellants as "Sino Legend." The other appellants were named in the investigation below based on allegations or findings of ownership, control, or involvement in some aspect of the manufacturing or importation. A170-76, A553-57.

corporated into Sino Legend's own process. A123-24, A783-84. Sino Legend

began commercial production of the tackifier at issue in 2007. A143.

Intervenor SI Group, a chemical manufacturer in Schenectady, New

York, has for some time produced resins like Sino Legend's, including SP-

1068, the resin for which it sought protection in this investigation. A304,

A829. SI Group has not obtained any patents covering SP-1068 or the

long-understood processes used in its production. A621.

SI Group initially served overseas customers by exporting SP-1068

from the United States, using foreign distributors. SI Group ultimately

shifted its production model from exports to manufacturing entirely in

China, forming a Chinese subsidiary, SI Shanghai Limited ("SI Shang-

hai"). C.Y. Lai served as General Manager when the SI Shanghai facility

was "starting up." A597-98. In 2004, SI Shanghai began manufacturing

SP-1068 in China. *Cf.* A598.

Also in 2004, Lai hired Jie (Jack) Xu to work for SI Shanghai. A598-

99. Xu's employment contract, governed by Chinese law, imposed a duty to

keep technical information or trade secrets confidential for three years

[[███████████████████████████████]]:

[[█████████████████████████████]]





]]

A1298 (emphasis in original). Xu was promoted to Plant Manager of the Chinese plant in June 2006. A598.

After Lai's employment with SI Shanghai ended in February 2005, he accepted an administrative consulting position with appellant Shanghai Red Avenue Chemical Co. Ltd. A597-98. Xu resigned from SI Shanghai to accept a job with appellant Sino Legend in early 2007. A602-03.

## B.   The Chinese Court Proceedings.

Nearly four years before SI Group filed its ITC complaint, it brought multiple actions in China involving the very same alleged misappropriation of trade secrets.

In November 2008, SI Group contacted the Shanghai Municipal Bureau of Public Security ("PSB") to request a criminal investigation into its allegations of trade secret misappropriation by Sino Legend. A4667-79. The PSB engaged a third-party technical appraisal agency, the Shanghai Municipal Science Advisory Service Center, to assist in the technical investigation by reviewing documents, obtaining and assessing product

4

samples, and evaluating SI Shanghai's and Sino Legend's manufacturing processes. A4636, A4667. The PSB announced in September 2009 that it was terminating its criminal investigation for lack of evidence—as a Chinese court later put it, [[█████████████]]—of criminal wrongdoing by Sino Legend. A4669.

Next, in February 2010, SI Shanghai filed a pair of complaints in the Shanghai No. 2 Intermediate People's Court asserting trade secret misappropriation. A4669.

The Chinese court held a full evidentiary hearing on SI Shanghai's claims on February 17, 2011. A4670. Sino Legend presented evidence that its manufacturing process did not involve the use of SI Shanghai's purported trade secrets. *Id.* For its part, SI Shanghai presented evidence that, it contended, supported its allegations of trade secret misappropriation. *Id.* SI Shanghai withdrew those complaints on March 8, 2011, shortly before the Chinese court was scheduled to resolve the case. *Id.*

Three weeks later, on March 31, 2011, SI Group and SI Shanghai filed a second pair of civil actions against Sino Legend in the same court. A4670-71. It asserted claims for misappropriation of twenty trade secrets, including all 17 of the individual claims and the overall process claim at issue in the present case. *Compare* A111-42 *with* A4634-35. SI Group pro-

5

vided a substantial amount of evidence, including 109 different documents and other written submissions. A4636-38. Sino Legend responded with 218 submissions. A4639-43.

Under procedures applicable to trade secret misappropriation claims in Chinese courts, the court engages an independent expert to provide advice regarding technical issues. *Cf.* A4540. The Shanghai court chose the MIIT Appraisal Institute—agreed to and confirmed by both parties—for this role. A4634, A4645. The court provided the parties with a list of fourteen possible MIIT experts, and the parties ultimately selected five independent experts with relevant technical expertise to serve on the expert appraisal panel. A4645. The MIIT panel then performed field investigations at the factory sites and interviewed the relevant employees. A4645-46. Subsequent to these investigations, the appraisal panel held a technical hearing, at which SI Group and Sino Legend both appeared to answer questions and present arguments. A4646. On May 14, 2013, the MIIT appraisal panel issued four reports to the court, which then served the reports on the parties. *Id.*

Unhappy with the MIIT reports, SI Group requested a second appraisal, but the court denied this request, explaining that it could not opine on the appraisal report separate from its adjudication of the merits

6

of the case. A4647. SI Group subsequently sought to terminate the two civil actions on the ground that it wished to add a new defendant, Chengyi Lai. *Id.* The court also denied this request, explaining that [[ ███████████████ ███████████████████████████████████ ]] *Id.* The court noted that, if SI Group wished to bring a claim against Chengyi Lai, it could do so by way of a separate action. A4648.

The court emphasized that permitting another withdrawal of the lawsuits would be unfair to Sino Legend, particularly after SI Group had *already* withdrawn and then reinstituted legal proceedings; [[ ███████ █████████████████████████████████████████ █████████████████████████████████████████ █████████████████████████████████████████ ]] A4648 (emphasis added).

The court heard argument on May 29, 2013. A4648. Although the court had issued subpoenas to SI Group and SI Shanghai, neither appeared. *Id.* As the court explained, [[ ███████████████████████ ███████████████████████████████ ]] *Id.* The court nonetheless [[ ██████████████████████████████████████ ████████████████████████████████████████ ]] *Id.*

The court—which was composed of three members—issued its decision on June 17, 2013. *See* Civil Judgment by Shanghai No. 2 Intermediate People's Court of the People's Republic of China (2011) HEZMW (Z) CZ No. 50 (A4633). The court first held that Jack Xu had a binding non-disclosure agreement with SI Shanghai. A4649. Reviewing the July 6, 2004 "Labor Contract" between Xu and SI Shanghai, the court found that the confidentiality obligation lasted [[█████████████████████ █████████████████]] *Id.*

Next, the court considered the claimed trade secrets pursuant to [[████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████]] A4674.

The MIIT appraisal report had concluded that nine of SI Group's twenty trade secrets were protectable, in whole or in part (Nos. 4, 6, 9, 10, 11, 12, 15, 16, 20). A4655. The balance, according to the independent report, were not protectable. *Id.* With respect to misappropriation, the MIIT report found that Sino Legend's process used claimed secrets 1, 3, 5, 8, and 19, as well as the part of 6 that was not protectable. A4661. It found that the other claimed secrets were not misappropriated. A4661-62. In sum, the

appraisal report concluded that Sino Legend did not misappropriate any of the trade secrets that were protectable.

The court considered SI Group's objections to the independent appraisal report, but ultimately adopted the report's findings: the [[ ███████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ]] A4680. Accordingly, [[ ████████████████████████████████████████████ ████████████████████ ]] *Id.*

SI Group and SI Shanghai then appealed to the Shanghai Higher People's Court, which affirmed the judgment. *See* Civil Judgment by Shanghai Higher People's Court of the People's Republic of China (2013) HGMS (Z) ZZ No. 93 (A4507). Representatives of SI Group and SI Shanghai participated in the appellate proceeding. A4507. In fact, SI Group introduced the ALJ's initial determination from this case in urging the appellate court to reverse. A4553.

In a detailed opinion (the English translation spans 58 pages, (A4507-64), issued on October 12, 2013, the three-judge appellate court affirmed the determination and reasoning of the lower court. It first con-

cluded that the trial court was correct to adopt the MIIT appraisal and

hold that there was no misappropriation:



A4560.

The court also rejected SI Group's efforts to dismiss the action below

in order to add a new party. The court specifically found that SI acted in

[[■■■■■■■]] by bringing the motion only after it learned that the MIIT

expert report would be adverse to its position:





A4562 (emphasis added). The court also concluded that SI Group acted in bad faith in attempting to dismiss the lawsuit:



*Id.* (emphasis added).

For these reasons, the appellate court found that the trial court act-ed appropriately when [[                                        

                              ]] A4562-63. Although a default judgment would have

been appropriate in these circumstances, the trial court [[

]] A4563.

Altogether, the appellate court concluded that [[

]] *Id.*

### C.    Proceedings Below.

Notwithstanding the pendency of its civil actions in China, SI Group filed a Section 337 complaint with the U.S. International Trade Commission in May 2012, which it amended on June 13, 2012. The complaint alleged misappropriation of seventeen alleged individual trade secrets, as well as the overall production process, all of which were at issue in the Chinese proceedings. *Compare* A111-42, *with* A4634-35.

The Commission instituted its investigation on June 20, 2012. A207; *see also Certain Rubber Resins and Processes for Manufacturing Same*, Institution of Investigation Pursuant to 19 U.S.C. 1337, 77 Fed. Reg. 38083 (June 26, 2012).

1. ALJ Robert K. Rogers, Jr., issued his final initial determination on June 17, 2013. The ALJ declined to accord comity to, or stay the proceedings in light of, the then-pending Chinese litigation, in which a deci-

sion was scheduled to be issued on June 17, 2013, and was issued on that date—the very same day the ALJ issued his initial determination.

The ALJ concluded that the Chinese proceeding was immaterial because it did not relate to "importation into the United States of the accused products and harm to the domestic industry as a result of that importation." A223. The ALJ also rejected Sino Legend's contention that Section 337 does not apply to conduct outside the United States, relying on this Court's decision in *TianRui Grp. Co. v. Int'l Trade Comm'n*, 661 F.3d 1322, 1328 (Fed. Cir. 2011). A223-24.

On the merits, the ALJ concluded that seven putative trade secrets were not protectable, but that another eleven were protectable and were misappropriated by Sino Legend. A919-20. He also found injury to the domestic industry. A920.

With respect to the appropriate remedy, Sino Legend explained that Article 9 of Xu's contract provided a three year limitation on his confidentiality obligations, which thus expired in 2010. A890. Sino Legend contended that any remedy must take into account its ability to lawfully obtain the alleged trade secrets upon the conclusion of Xu's confidentiality agreement. A890-92. The ALJ rejected this position, however (A912), concluding instead that confidentiality language contained within SI Shang-

hai's general handbook overrode the specific provision in Xu's employment agreement. A321. The ALJ recommended that the Commission issue a general exclusion order under Section 337(d) for a period of ten years. A912.

2. Sino Legend filed a petition for review on July 1, 2013, and SI Group filed a contingent petition for review the same day. A1083-84.

On July 16, 2013, Sino Legend provided notice of supplemental authority to the ITC, bringing to the ITC's attention the final decision and judgment of the Shanghai No. 2 Intermediate People's Court of the People's Republic of China. A4625. On October 19, 2013, Sino Legend filed an additional notice of supplemental authority, alerting the ITC to the Chinese appellate court's decision affirming the judgment. A4501.

The Commission issued its Opinion on January 15, 2014. The ITC rejected Sino Legend's contention "that 'abstention and international comity warrant dismissal of [SI Group's] trade secret claims' because a Chinese court has held that Sino Legend did not misappropriate [SI Group's] alleged trade secrets under Chinese law." A105. According to the Commission, "abstention and international comity do not relieve the Commission of its statutory responsibility to determine whether there is a violation of Section 337." *Id*. The Commission separately rejected the contention that

14

comity should factor into its selection of a remedy: without any elaboration or explanation, the Commission stated that "the Chinese litigation does not preclude issuance of a remedy in this investigation which is an investigation." A187.

With respect to extraterritoriality, the ITC cited this Court's decision in *TianRui* in holding that "the question of whether there is a violation of Section 337 by reason of misappropriation of trade secrets is governed by (U.S.) federal common law, even where that misappropriation occurs abroad." A105. It thus rejected Sino Legend's argument that Section 337 does not reach extraterritorial conduct of non-U.S. parties. *Id*.

The Commission ultimately concluded that twelve alleged trade secrets were non-protectable and thus could not form the basis for SI Group's allegations; the Commission thus reversed the ALJ's finding that five trade secrets were protectable. A116-17, A118-19, A121-26, A128-41. The Commission affirmed the ALJ's findings that five additional alleged trade secrets (A111-15, A117-18, A119-21, A126-28), as well as the overall process (A141-42), were both protectable and misappropriated.

The ITC issued a limited exclusion order for a period of ten years. It asserted that "the totality of asserted trade secrets would take at least 10 years to independently develop." A184. This determination rested on the

ALJ's conclusion that Jie Xu's labor contract imposed permanent confidentiality obligations. A321.

## SUMMARY OF THE ARGUMENT

This case involves a foreign dispute that has no legitimate connection to the United States. In nonetheless adjudicating this matter—and in failing to defer to the result reached by a Chinese court involving the same parties and the same claims—the International Trade Commission exceeded its authority. Its decision should be reversed.

I. The Commission erred in applying Section 337 extraterritorially to an alleged misappropriation of trade secrets that occurred wholly outside the United States.

We recognize that a divided panel of this Court previously considered and rejected the argument that the presumption against extraterritorial application limits Section 337(a)(1)(A) to conduct occurring within the United States. *See TianRui Grp. v. Int'l Trade Comm'n*, 661 F.3d 1322 (Fed. Cir. 2011). But that decision is irreconcilable with intervening Supreme Court authority—the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013), which specified an analysis different from that applied by the *TianRui* majority and rejected arguments essentially identical to those accepted by the *TianRui* majority.

16

In light of this intervening authority, we respectfully suggest that this Court is not bound by the prior panel decision. Alternatively, the full Court should address the issue in order to eliminate the conflict with Supreme Court precedent.

*Kiobel* provides that a statute applies extraterritorially only when it "evinces the requisite clear indication of extraterritoriality." *Kiobel*, 133 S. Ct. at 1666. Here, the text of Section 337(a)(1)(A) is silent; it is wholly unlike statutes that reach abroad (including the neighboring provision in Section 337(a)(1)(B)), which expressly specify their extraterritorial effect. And Congress provided no other "clear indication" that Section 337(a)(1)(A) reaches conduct that occurs wholly outside the United States.

Because Section 337(a)(1)(A) does not overcome the presumption against extraterritorial application, it does not apply to the claims in this case, which assert that Sino Legend misappropriated trade secrets outside the United States. Instead, Section 337(a)(1)(A) only reaches unfair conduct that takes place in the United States and is tied directly to articles imported into the United States, such as prices charged in the US market for imported goods in violation of antitrust principles or trade secret theft that takes place within this country and is used to manufacture goods imported the U.S.

The policy rationale underlying the presumption against extraterritorial application of U.S. law—avoiding conflicts that inevitably would result from interference with the sovereign authority of other countries—is strongly implicated here. By applying Section 337 to a dispute between two Chinese companies involving the actions of Chinese employees in China, the Commission's decision reached far outside our borders to police business practices abroad. The legality of that conduct, which occurred wholly within China, is a matter for the Chinese courts to decide under the standards prescribed by Chinese law.

II. The ITC compounded its error by refusing to accord international comity to a final judgment of a Chinese court that, *in a lawsuit SI Group itself initiated*, addressed the same trade secret claims between the same parties.

SI Group brought several lawsuits in Chinese courts alleging misappropriation of the trade secrets at issue here. Under its standard practice, a Chinese court appointed a panel of independent appraisal experts to investigate the alleged trade secret misappropriation. After extensive site visits, interviews, and an adversarial hearing in which both SI Group and Sino Legend participated, the appraisal experts concluded that Sino Legend did not misappropriate any of SI Group's protectable secrets. Having

18

considered SI Group's objections to those findings, a Chinese court adopted the report, and that decision was subsequently affirmed on appeal.

The ITC, however, rejected Sino Legend's request to afford comity to that Chinese judgment. In the ITC's view, its obligations under Section 337 render foreign judgments *irrelevant* to its investigations.

That ruling was error. Comity is a defense available in cases before the ITC, and courts routinely defer to foreign proceedings in adjudicating claims under other federal statutory regimes. The regular application of comity principles, moreover, serves important national interests in promoting amiable diplomatic relations. The ITC's categorical holding that Section 337 requires it in all instances to ignore the decisions of foreign governments, by contrast, creates needless conflict with foreign courts.

SI Group has no basis for objecting to an extension of comity to *this* Chinese judgment. After all, the judgment was the product of a legal proceeding that SI Group voluntarily initiated. Having asked a Chinese court to resolve this dispute, SI Group cannot escape the judgment merely because it dislikes the result. It would be profoundly unfair *not* to afford comity to the Chinese court's judgment under these circumstances.

III.    Finally, the ITC committed legal error by issuing a ten-year exclusion order. The Commission reasoned that this was the period of time

19

it would take for Sino Legend to lawfully obtain the trade secrets by independently developing them. The ITC discounted entirely Sino Legend's contention that it could lawfully obtain the trade secrets after three years, when Jie Xu's confidentiality obligations lapsed.

The Commission interpreted a provision in SI Shanghai's general handbook as imposing a *permanent* confidentiality obligation on Jie Xu. Under Chinese law, which expressly governs the contract, the specific three-year confidentiality term in the employment agreement itself controls over the general company handbook—indeed, that is what the Chinese courts specifically held in the case initiated by SI Group. (Applying U.S. law would produce the same result.) Thus, the ITC's view that Xu had a permanent obligation to SI Group is flatly wrong as a matter of law.

The conflicts between the Chinese and U.S. legal systems reflected in this case—the failure to afford comity to the Chinese courts' decisions and the differing results regarding the duration of the contractual confidentiality obligation—are a direct result of the extraterritorial application of Section 337, and provide a clear example of the discord that inevitably results when U.S. law is extended to conduct within the territory of another sovereign. That is why the Supreme Court in *Kiobel* applied a stringent standard—much more stringent than the *TianRui* majority—in determin-

ing whether Congress had clearly indicated its intent to apply U.S. law extraterritorially.

## STANDARD OF REVIEW

The Court "reviews the Commission's legal determinations without deference and its factual findings for substantial evidence." *Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345, 1348 (Fed. Cir. 2013); *see also Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1362 (Fed. Cir. 1999) ("We review the Commission's legal determinations de novo."). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1302 (Fed. Cir. 2010) (quotation omitted).

With respect to construction of Section 337 itself, because review is pursuant to the Administrative Procedure Act (*see* 19 U.S.C. § 1337(c)), the Court applies the framework established by *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984). *See Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1355 (Fed. Cir. 2008). If "Congress has directly spoken to the precise question at issue," "the court 'must give effect to the unambiguously expressed intent of Congress.'" *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132 (2000)).

If the statute is "ambiguous," the Court must determine whether "the agency's interpretation is reasonable." *Id.* (quotation omitted).

## ARGUMENT

I.  **Section 337(a)(1)(A) Does Not Apply Extraterritorially And Therefore Does Not Provide A Remedy When The Alleged Misappropriation Of Trade Secrets Occurred Outside The United States.**

SI Group's theory in this case is straightforward: Sino Legend, a Chinese company, hired a Chinese employee, Jie Xu, from SI Group's Chinese subsidiary, and then allegedly misappropriated trade secrets in China and used them to manufacture products in China. In concluding that it had authority to adjudicate this dispute—and thus exclude the products at issue—the ITC exceeded its statutory authority.

Federal statutes are presumed not to apply extraterritorially. This bedrock canon of statutory interpretation "reflects the 'presumption that United States law governs domestically but does not rule the world.'" *Kiobel*, 133 S. Ct. at 1664 (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)). The doctrine "provides that '[w]hen a statute gives no clear indication of an extraterritorial application, it has none.'" *Id.* (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 248 (2010)).

A divided panel of this Court in 2011 held that "the presumption against extraterritoriality does not govern" claims under Section 337

22

based on trade secret misappropriation occurring outside the United States. *TianRui*, 661 F.3d at 1329. Judge Moore dissented, explaining that the presumption against extraterritoriality applied because the statute does not contain a clear indication of contrary congressional intent. *Id.* at 1338.

We respectfully submit that the decision in *TianRui* warrants reconsideration—either by the panel, or by the *en banc* Court[2]—in light of *Kiobel*, an intervening decision of the Supreme Court holding that the Alien Tort Statute, 28 U.S.C. § 1350, does not apply extraterritorially. Past panel precedent does not bind the Court where, as here, that precedent is irreconcilable with "an intervening … Supreme Court decision." *Teva Pharms. USA, Inc. v. Novartis Pharms. Corp.*, 482 F.3d 1330, 1338 (Fed. Cir. 2007).

The unambiguous guidance from the Supreme Court confirms that the strong presumption against the extraterritorial application of U.S. law

---

[2]    Both because of the intervening decision in *Kiobel*, as well as our separate arguments regarding the Commission's error in refusing to extend comity to a Chinese judgment (*see infra*, 47-61) and its erroneous remedy (*infra*, 61-64), we have not sought an *en banc* hearing. We nonetheless note that the Court may, if it believes appropriate, set a case for *en banc* hearing on its own initiative. *See, e.g., Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1308 (Fed. Cir. 2013) (the Court "sua sponte granted a rehearing en banc").

applies to Section 337(a)(1)(A). Even if *Kiobel* were not sufficient by itself to undermine *TianRui*, the *en banc* Court should reconsider that precedent because it is starkly inconsistent with the long line of Supreme Court decisions culminating in *Kiobel*.

### A.  *Kiobel* prescribes a two-part inquiry different from the *TianRui* majority's analysis.

*Kiobel* held that a court determining whether the application of a federal statute is impermissibly extraterritorial must first examine whether the law in question "evince[s] a 'clear indication of extraterritoriality'"—based on the text and other tools of statutory interpretation. *Kiobel*, 133 S. Ct. at 1665; *see also id*. at 1666-69 (applying test). If it does not, and the statute therefore does not apply outside the United States, the court must assess whether the particular claims at issue "touch and concern the territory of the United States ... with sufficient force to displace the presumption against extraterritorial application." *Id*. at 1669.

*TianRui* did not undertake either of these inquiries. Rather, the majority based its decision that "the presumption against extraterritoriality does not govern this case" on a series of observations about the statutory language, the facts of the case before it, and the legislative history. The majority did not tie those observations to the two separate inquiries specified in *Kiobel*.

24

Evaluated under Kiobel's two-part test, it is clear that the claim in this case is impermissibly extraterritorial.

### B. *Kiobel*'s analysis demonstrates that Section 337(a)(1)(A) does not apply extraterritorially.

The Supreme Court has long adhered to the "canon of statutory interpretation known as the presumption against extraterritorial application," which provides that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Kiobel*, 133 S. Ct. at 1664.

To determine whether a statute rebuts the presumption, a court may consider the "text of the statute," the "historical background against which [it] was enacted," and any risk of "foreign policy consequences." *Kiobel*, 133 S. Ct. at 1665-66, 1669.

The *TianRui* majority applied the wrong legal standard by describing the presumption as merely "a tool for ascertaining congressional intent," and indicating that a clear statement of congressional intent is not required. 661 F.3d at 1329. The *Kiobel* Court—in stark contrast—emphasized the absence from the text and background of the Alien Tort Statute of the "requisite clear indication of extraterritoriality." 133 S. Ct. at 1666.

Judged against this standard, Section 337(a)(1)(A)—like the law before the Supreme Court in *Kiobel*—remains subject to the presumption

against extraterritoriality. There simply is no clear indication of congressional intent to the contrary.

>    1.    *The statutory text is silent regarding extraterritorial application.*

Section 337(a)(1)(A) authorizes the ITC to adjudicate:

> Unfair methods of competition and unfair acts in the importation of articles (other than articles provided for in subparagraphs (B), (C), (D), and (E)) into the United States, or in the sale of such articles by the owner, importer, or consignee, the threat or effect of which is—

> (i) to destroy or substantially injure an industry in the United States;

> (ii) to prevent the establishment of such an industry; or

> (iii) to restrain or monopolize trade and commerce in the United States.

19 U.S.C. § 1337(a)(1)(A). Far from offering a "clear indication" of extraterritorial application, there is "*nothing* in the plain language of the statute that indicates that Congress intended it to apply to unfair acts performed entirely abroad." *TianRui*, 661 F.3d at 1339 (Moore, J., dissenting). Indeed, the *TianRui* panel did not point to any "statutory language that expresses the *clear* intent for it to apply to extraterritorial unfair acts." *Id.*

The *TianRui* majority observed that the focus of the statute "is on an inherently international transaction—importation"—and held that fact

sufficient to overcome the presumption. *TianRui*, 661 F.3d at 1329. But *Kiobel* rejected that precise line of argument.

The Alien Tort Statute ("ATS"), at issue in *Kiobel*, creates federal subject matter jurisdiction over suits by aliens for torts "in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The ATS was designed to provide a remedy for "offenses against the law of nations," including "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 715 (2004). And in applying the ATS today, the Supreme Court has held that claims must rest "on the present-day law of nations," which are those "norm[s] of international character accepted by the civilized world." *Id.* at 725. Thus, the very subject of the ATS is transnational—injuries to aliens resulting from violations of *international* law.

Yet the Supreme Court (subsequent to this Court's decision in *TianRui*) refused to afford extraterritorial reach to the ATS, notwithstanding its inherently transnational subject matter. *See Kiobel*, 133 S. Ct. at 1666-67. Although the text of the ATS legislates with respect to the "law of nations," the Court explained that "nothing in the text of the statute suggests that Congress intended causes of action recognized under it to have extraterritorial reach." *Id.* at 1665. Instead, extending the ATS abroad

would have the likely result of "generat[ing]" "diplomatic strife. *Id*. at 1669.[3]

*Kiobel* thus teaches that a court may not find clear congressional intent to extend a statute extraterritorially merely because the law deals with a subject that is, by nature, international. Even when Congress legislates in the realm of foreign affairs, a statute does not apply extraterritorially unless there is a clear statement to that effect. The subject matter of Section 337(a)(1)(A) therefore provides no basis for extending its reach to conduct outside the U.S.

Moreover, as in *Kiobel*, the words Congress employed in Section 337—referring to "[u]nfair methods of competition and unfair acts *in the importation* of articles"—further undercut the claim of extraterritorial application. "[I]n the importation" is a restrictive term evidencing an intent to *limit* the provision's reach to conduct tied to the United States. Congress's use of that phrase, rather than a broader formulation such as "re-

---

[3] The presumption is so strong that *Kiobel* applied it even though the ATS was specifically designed to reach piracy, which "typically occurs on the high seas," and the "high seas" are "foreign soil for purposes of the presumption against extraterritorial application." 133 S. Ct. at 1667. The Court found that Congress's clear intention to cover pirates—and thus reach extraterritorially in part—is not "a sufficient basis for concluding that other causes of action under the ATS reach conduct that does occur within the territory of another sovereign." *Id*.

lating to the manufacture or importation of imported articles," certainly does not demonstrate the requisite clear intent to apply the statute extraterritorially, subjecting to U.S. law acts performed in the territory of another sovereign nation as long as those acts are in some way related to the imported goods.

The *TianRui* majority also relied on the statutory requirement of domestic injury: "Because foreign conduct is used only to establish an element of a claim alleging domestic injury and seeking a wholly domestic remedy, the presumption against extraterritoriality does not apply." 661 F.3d at 1329. But, again, that statutory text fails *Kiobel*'s requirement of clarity.

Congress's decision to limit the remedy to situations in which there is injury to a domestic industry provides no clear indication that Congress intended the statute to apply to conduct occurring anywhere in the world. After all, purely domestic conduct—such as a price-fixing agreement among U.S. importers—might not injure a domestic industry if, for example, there was no relevant domestic industry. This restriction on the statute's scope provides no evidence that Congress intended it to apply extraterritorially.

29

That conclusion is strongly reinforced by Section 337(a)(1)(B), a neighboring provision of the same statute that authorizes the ITC to exclude goods imported into the United States that infringe a valid U.S. patent. In particular, (1)(B) covers the "importation into the United States … of articles that … are *made* … by means of[] a process covered by the claims of a valid and enforceable United States patent." 19 U.S.C. § 1337(a)(1)(B)(ii). Because articles imported into the United States are "made" outside the United States, this provision expresses clear congressional intent for the ITC to adjudicate whether processes that produce goods outside the United States infringe U.S. process patents.

This language is not accidental: in *In re Amtorg Trading Corp.*, 75 F.2d 826, 834 (C.C.P.A. 1935), this Court's predecessor "held that [Section] 337 could not be used to exclude from importation goods produced by a process patented in the United States but carried out abroad." *TianRui*, 661 F.3d at 1340 (Moore, J., dissenting). Congress responded by enacting what is now (1)(B), in order to provide a remedy for "'owners of American process patent[s]'" who "'are helpless to prevent the infringement abroad of their patent rights.'" *Id*. (quoting H.R. Rep. No. 1781, 76th Cong., 3d Sess. 4 (1940)). Thus, (1)(B) was specifically designed to reach infringement of U.S. process patents that occurs abroad.

30

As Judge Moore explained in *TianRui*, this is powerful evidence that

Section 337(a)(1)(A) does not reach conduct abroad:

> Congress could have legislated generally to grant extraterrito-
> rial application to any "unfair acts" in [Section] 337, but did
> not. Congress *only* changed the statute to create a remedy for
> extraterritorial use of process patents. This delicate legislative
> touch indicates that Congress intended to give special treat-
> ment solely to process patents, and not to other categories of
> "[u]nfair methods of competition and unfair acts in the impor-
> tation of articles."

*TianRui*, 661 F.3d at 1340-41 (Moore, J., dissenting); *accord Morrison*, 561

U.S. at 265 ("when a statute provides for some extraterritorial application,

the presumption against extraterritoriality operates to limit that provision

to its terms").

The *TianRui* panel also relied on out-of-circuit authority giving ex-

traterritorial reach to a very different statute—8 U.S.C. § 1324(a), which

criminalizes, in part, attempts to bring a person into the United States un-

lawfully. There, unlike here, Congress made plain its intent to render the

statute extraterritorial: it specifically amended the statute to "change from

the phrase 'brings into' to the phrase 'brings to'" in order to capture "activ-

ity taking place outside of the United States." *United States v. Villanueva*,

408 F.3d 193, 198 (5th Cir. 2005). The sharp contrast between the statute

at issue there and Section 337(a)(1)(A) *supports* our showing that the text

here falls far short of what *Kiobel* requires. *See also TianRui*, 661 F.3d at

31

1339 (Moore, J., dissenting) (noting the "express statutory language indicating … extraterritorial application").

The *TianRui* panel also attempted to bolster its holding by pointing to the Economic Espionage Act, which, in the panel's view, showed Congress has "recognized that misappropriation of U.S. trade secrets can, and does, occur abroad." *TianRui*, 661 F.3d at 1330 n.4. But the Economic Espionage Act is a model of what a clear textual indication of extraterritorial application looks like. The statute provides—in a section titled "[a]pplicability to conduct outside the United States"—that "[t]his chapter also applies to conduct occurring outside the United States if" one of two conditions are met. 18 U.S.C. § 1837. Either the offender must be a U.S. citizen or resident alien, or an act in furtherance of the offense was committed in the United States. *Id.*

That express extraterritorial application is plainly missing from Section 337(a)(1)(A). As Section 1837 shows, when Congress intends for U.S. law to apply abroad, the statute says so expressly. And, when Congress extends U.S. law to regulate conduct abroad, it often moderates the extraterritorial effect by including limitations that carefully calibrate the scope of the statute—such as limitations to conduct involving U.S. persons or conduct that has some domestic nexus.

The Economic Espionage Act is hardly unique; Congress has expressly extended scores of statutes extraterritorially—and almost always includes important limitations. *See*, *e.g.*, 18 U.S.C. § 175c (use of smallpox as a biological weapon abroad); *id.* § 470 (counterfeiting activities outside the United States); *id.* § 1351 (fraud in foreign labor contracting outside the United States); *id.* §§ 2331-2339 (international terrorism outside the United States); *id.* § 3271 (trafficking in persons outside the United States by government employees); 22 U.S.C. § 2780 (restrictions relating to transactions outside the United States with nations that support terrorism).

In fact, many statutes discuss "extraterritorial jurisdiction" directly. *See*, *e.g.*, 18 U.S.C. § 1039(f) ("There is extraterritorial jurisdiction over an offense" relating to fraudulently obtaining certain phone records.); *id.* § 2285(c) ("There is extraterritorial Federal jurisdiction over an offense under this section"). When Congress wishes for a statute to reach abroad, it does not hide that intent.

A particularly instructive example is found in the food and drug laws, which prohibit adulteration or misbranding of foods, drugs, medical devices, and tobacco products sold in the United States. *See* 21 U.S.C. § 331. Congress specifically provided that "[t]here is extraterritorial juris-

33

diction over any violation of this chapter" *if* "such article was intended for import into the United States or if any act in furtherance of the violation was committed in the United States." *Id*. § 337a. When Congress wants to apply U.S. legal standards to govern the manufacture of goods abroad that are destined for U.S. import, it thus says so expressly.

Similarly, when Congress wishes to empower a regulatory agency to reach conduct abroad that results in domestic injury, it gives the agency that express power. For example, Congress has authorized the Securities and Exchange Commission to investigate and prosecute fraudulent conduct occurring outside the United States when, in part, the foreign conduct "has a foreseeable substantial effect within the United States." 15 U.S.C. § 78aa(b)(2). Congress has not accorded the ITC comparable authority with respect to trade secret misappropriation.

In sum, the statutory text here simply does not provide the clear textual evidence of extraterritorial application that *Kiobel* requires.

> ### 2.  *No legislative history provides the necessary clear indication of extraterritorial reach.*

The *Kiobel* Court recognized that it is appropriate to inquire whether "the historical background against which [a statute] was enacted overcome[s] the presumption against application to conduct in the territory of another sovereign." 133 S. Ct. at 1666. It examined in great detail the his-

torical context in which the ATS was enacted, but it did not find the requisite clear indication of extraterritoriality. *Id*. at 1666-68.

The *TianRui* panel cited a single sentence from a 1922 report of the U.S. Tariff Commission stating that Section 337 "'make[s] it possible for the President to prevent unfair practices, even when engaged in by individuals residing outside the jurisdiction of the United States.'" *TianRui*, 661 F.3d at 1331. But that sentence does not provide any clear indication that Section 337(a)(1)(A) reaches extraterritorially.

*First*, the statute *does* reach unfair acts that take place within the United States but are orchestrated by individuals outside the country. Other parts of the 1922 report demonstrate this point: "it would be unfair for 'individuals residing outside the jurisdiction of the United States' to engage in 'unfair price cutting, full line forcing, [or] commercial bribery' when importing their products into the United States." *TianRui*, 661 F.3d at 1341 (Moore, J., dissenting) (quoting U.S. Tariff Comm'n, *Sixth Annual Report* 4 (1922)); *see also* page 41, *infra*.

Indeed, the *TianRui* majority's analysis closely resembles arguments rejected by the Supreme Court in *Kiobel*, which rested on a similar ambiguous sentence cherry-picked from a 1795 Opinion of Attorney General Bradford. The Court stated that the "opinion defies a definitive reading

and we need not adopt one here. … The opinion hardly suffices to counter the weighty concerns underlying the presumption." *Kiobel*, 133 S. Ct. at 1668. The same conclusion applies to the single sentence cited here.

*Second*, the sentence relied on in *TianRui* is not legislative history at all. *See TianRui*, 661 F.3d at 1341 (Moore, J., dissenting). It is a report of the Tariff Commission issued *after* Congress enacted Section 337. The report could not possibly express the intent of the Congress that enacted this statute. *See Sullivan v. Finkelstein*, 496 U.S. 617, 631 (1990) (Scalia, J., concurring) ("[P]ost-enactment history of a statute's consideration and enactment … is a contradiction in terms.") (emphasis omitted).

For these reasons, the one sentence in the 1922 Annual Report cited by the *TianRui* majority is far from the "clear indication of extraterritoriality" that the Supreme Court's test requires to extend (1)(A) abroad. *Kiobel*, 133 S. Ct. at 1669. *See TianRui*, 661 F.3d at 1341 (Moore, J., dissenting) ("Even if this sentence was clear on its face, I cannot conclude that this sentence in this report is sufficient to overcome the presumption against extraterritorial application of the statute.").

### 3.    *No deference is due to the ITC.*

The *TianRui* panel's suggestion (*see* 661 F.3d at 1332) that administrative deference supports the extraterritorial reach of (1)(A) is flatly in-

consistent with *Kiobel*'s holding that a clear expression of *Congress's* intent is needed to overcome the presumption against extraterritoriality. The operative question is whether "*Congress* intended causes of action recognized under [a statute] to have extraterritorial reach." 133 S. Ct. at 1665. An administrative agency cannot supply a clear expression omitted by Congress.

The Second Circuit recently recognized this principle in holding that a provision of Dodd-Frank does not reach conduct abroad: "Given the strong presumption that statutes are limited to domestic application in the absence of clear expression of congressional intent to the contrary, it is far from clear that an agency's assertion that a statute has extraterritorial effect, unmoored from any plausible statutory basis for rebutting the presumption against extraterritoriality, should be given deference." *Liu Meng-Lin v. Siemens AG*, 763 F.3d 175, 182 (2d Cir. 2014). As another court held, "no regulation could supply, on Congress's behalf, the clear legislative intent required to overcome … the presumption against extraterritoriality." *Souryal v. Torres Advanced Enter. Sol'ns, LLC*, 847 F. Supp. 2d 835, 843 (E.D. Va. 2012) (internal quotation marks omitted).

Agency deference is unavailable for a related reason: an agency interpretation is entitled to deference *only* "if the statute is silent or ambig-

uous with respect to the specific issue." *Chevron*, 467 U.S. at 843. The presumption against extraterritoriality holds that a statute applies abroad only when it contains a "'clear indication of an extraterritorial application.'" *Kiobel*, 133 S. Ct. at 1664 (quoting *Morrison*, 561 U.S. at 265). Accordingly, if a court determines that a statute is "silent or ambiguous"—the only circumstances in which it could defer to an agency's reasoning—the court has necessarily resolved the extraterritoriality question. That is because a statute that is silent or ambiguous does not provide the "'clear indication of an extraterritorial application'" that is required. *Id.*

Moreover, the Commission has not engaged in any meaningful administrative interpretation of the statute. So far as we are aware, the ITC has never considered the holdings of *Morrison* or *Kiobel*, much less analyzed the presumption against extraterritorial application of U.S. law as it relates to Section 337(a)(1)(A).

*TianRui* pointed to a decision by an administrative law judge—not the ITC—in *In re Certain Processes for the Manufacture for Skinless Sausage Casings and Resulting Product*, Inv. No. 337-TA-148/169, 1984 WL 273789, at *98 (1984) (initial determination). But, as Judge Moore explained, "[t]he issue of extraterritoriality … was neither raised by the parties nor analyzed by the commission in *Sausage Casings*, which focused on

whether the producer independently developed its process." *TianRui*, 661 F.3d at 1342 n.7 (Moore, J., dissenting). For this reason, "[t]here is no reasonable statutory interpretation deserving deference in *Sausage Casings*." *Id*. Accordingly, there is no reasoned construction of (1)(A) to which the Court could defer.

In short, the ITC has engaged in no meaningful statutory construction to which the Court may defer, but even if it had, deference is not appropriate in this context.

### C. The claim in this case is extraterritorial and therefore beyond the ITC's statutory authority.

If a statute does not extend extraterritorially and "all the relevant conduct [regarding the particular claim] took place outside the United States," then the statute plainly cannot apply to that claim. *Kiobel*, 133 S. Ct. at 1669. But even the occurrence in the United States of *some* conduct relevant to the claim often is not a sufficient basis for a claim to proceed. The *Kiobel* Court explained that "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id*.

The post-*Kiobel* application of this test by courts of appeals in the context of the Alien Tort Statute provides useful guidance for its application to Section 337(a)(1)(A). The Second Circuit concluded that in light of

the statute's focus on violations of international law, the question whether a claim seeks extraterritorial application of the statute turns on "the site of the alleged violations of customary international law." *Mastafa v. Chevron Corp.*, __ F.3d __, 2014 WL 5368853, at *9 (2d Cir. 2014). The fact that other conduct not constituting the international law violation may have occurred in the United States is irrelevant. *Id.*; *see also Balintulo v. Daimler AG*, 727 F.3d 174, 189-92 (2d Cir. 2013).

The Eleventh Circuit reached the same conclusion, holding that the location outside the U.S. of the alleged violation of international law was dispositive of the extraterritoriality question. *Cardona* v. *Chiquita Brands Int'l, Inc.*, 760 F.3d 1185, 1189-91 (11th Cir. 2014). The plaintiffs in that case alleged that the defendant's "corporate officers reviewed, approved, and concealed payments and weapons transfers to Colombian terrorist organizations from their offices in the United States." *Id.* at 1194 (Martin, J., dissenting). Nonetheless, the court held the claims extraterritorial because there was no allegation that any "act constituting a tort in terms of the ATS touched or concerned the territory of the United States with any force." *Id.* at 1191; *accord Baloco v. Drummond Co., Inc.*, __ F.3d __, 2014 WL 4699481, at *3-5 (11th Cir. 2014).

These courts applied *Kiobel* by identifying the conduct at the core of the statute's concern and holding that this core conduct must have occurred within the United States in order for the statute's application to be permissible and not extraterritorial. *Accord United States v. Chao Fan Xu*, 706 F.3d 965, 979 (9th Cir. 2013) (key question for determining whether application of RICO was extraterritorial was where the unlawful scheme was "executed and perpetuated").

Section 337(a)(1)(A) is focused on "[u]nfair methods of competition and unfair acts in the importation of articles." "Unfair methods" and "unfair acts" are the core of the statute's focus, and the location of that conduct is therefore determinative for purposes of the extraterritoriality inquiry.

Thus, if multiple manufacturers conspire to manipulate pricing within the U.S. of articles imported into the U.S. market in contravention of established competition law or use bribery within the U.S. to disadvantage domestic competitors, Section 337(a)(1)(A) provides the ITC with a means to review those practices in connection with importation itself. *See* U.S. Tariff Comm'n, *Sixth Annual Report* at 4 (Section 337 applies to "unfair price cutting, full line forcing, [or] commercial bribery").

For example, in *In re Certain Angolan Robusta Coffee*, 1976 WL 41418, USITC Inv. No. 337-TA-16 (Feb. 25, 1976), the Commission considered "price-fixing arrangements for the sale of such coffee *in the United States* and boycotts and refusals to deal with *United States importers and traders* not participating in such price-fixing arrangements." *Id.* at *2 (emphasis added). *See also In re Chicory Root-Crude & Prepared Notice of Termination of Investigation*, 1977 WL 52340, USITC Inv. No. 337-TA-27 (Mar. 30, 1977) (predatory pricing in the United States).

There also would be no question of impermissible extraterritoriality if, for example, an entity misappropriates a trade secret *in the United States* and then uses that secret to produce a product abroad. That is because the conduct being regulated—the misappropriation of a trade secret that constitutes an "unfair practice"—will have occurred in the United States, subjecting it to the authority of U.S. law. *See TianRui*, 661 F.3d at 1337 (Moore, J., dissenting) ("[I]f TianRui came to the United States and stole Amsted's trade secrets here—then [Section] 337 could be used to bar import of any goods made with the stolen technology."). [4]

---

[4]  Of course, there might be a question in that situation whether the unfair practice was "in the importation of articles," but that would be a question regarding the scope of the statute with respect to conduct within the U.S. and not a question of extraterritorial application.

The *TianRui* majority did not apply the *Kiobel* standard for determining when a statute's application would be extraterritorial. It did state, however, that provision's requirement of a "domestic injury" resulting from "the importation of goods into this country" provided what it viewed as the requisite domestic connection. But that is simply another way of arguing that the reference to transnational commerce is sufficient to overcome the presumption against extraterritoriality, because the practical effect of the panel's argument would be worldwide extraterritorial application of the statute. And that result would circumvent *Kiobel*'s holding that extraterritoriality is permissible only if Congress clearly indicated its endorsement of that result.

### D. Extending Section 337(a)(1)(A) to extraterritorial conduct risks severe foreign policy repercussions.

*Kiobel* held that the strong presumption against extending U.S. law to reach foreign conduct stems from the necessity of "avoiding diplomatic strife." 133 S. Ct. at 1669. "[T]he presumption 'serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.'" 133 S. Ct. at 1661. For these same reasons, the Supreme Court restrained the reach of U.S. courts to adjudicate conduct occurring abroad in *Daimler AG v. Bauman*, 134 S. Ct. 746, 763 (2014). The Court found personal jurisdiction unavailable, in part, be-

43

cause of "the risks to international comity" that an "expansive view of general jurisdiction" would "pose[]." *Id*. As the Court explained, "[c]onsiderations of international rapport" are important in determining the reach of U.S. law to conduct that occurs outside the country. *Id*.

Limiting the reach of U.S. abroad also safeguards U.S. interests. An expansive view of the reach of U.S. law "would imply that other nations" could do the same, and thus improperly "hale our citizens into their courts." *Kiobel*, 133 S. Ct. at 1669. "The presumption against extraterritoriality guards against our courts triggering such serious foreign policy consequences, and instead defers such decisions, quite appropriately, to the political branches." *Id*.

These considerations weigh strongly against extraterritorial application of Section 337(a)(1)(A).

Although this case involves trade secret misappropriation, there is no reason why a similar theory could not be advanced based on alleged unfair practices regarding the prices paid in China for raw materials and other inputs used in manufacturing goods for importation into the U.S. Or commercial bribery or other similar practices in connection with the manufacturer's business. The range of conduct occurring in other countries that would be eligible for examination under U.S. legal standards would

run the whole gamut of commercial activities—with a correspondingly significant intrusion on other nations' sovereignty.

Indeed, Judge Moore recognized the expansive implications of the panel majority's ruling:

> Suppose that goods were produced by workers who operate under conditions which would not meet with United States labor laws or workers who were not paid minimum wage or not paid at all—certainly United States industry would be hurt by the importation of goods which can be manufactured at a fraction of the cost abroad because of cheaper or forced labor. Would we consider these business practices unfair? Absent clear intent by Congress to apply the law in an extraterritorial manner, I simply do not believe that we have the right to determine what business practices, conducted entirely abroad, are unfair.

*TianRui*, 661 F.3d at 1338 (Moore, J., dissenting).

Such an extraordinarily expansive expansion of U.S. law plainly would create a very serious risk of retaliation by foreign nations. These policy questions are issues for Congress—not the courts—to resolve.

SI Group's contrary position turns on the assertion that worldwide adoption of U.S. trade secret laws is desirable, but, even if this is true, the way to promote this policy goal is through "the international marketplace for such ideas." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 169 (2004). "Congress, we must assume, would not have tried to impose them, in an act of legal imperialism, through legislative fiat." *Id.*

45

Indeed, rigorous application of the presumption against extraterritorial reach of a statute produces good, considered policy. Congress can—and often does—react to such judicial decisions by crafting statutes with *limited* extraterritorial reach. Congress responded to *Morrison* by providing the SEC (but not private litigants) tailored authority to address some conduct that occurs outside the United States. *See* 15 U.S.C. § 78aa(b). Congress reacted to *EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991), by extending certain anti-discrimination laws to certain U.S. citizens abroad, but not to other employees. 42 U.S.C. § 2000e(f). And, perhaps most relevant here, Congress responded to this Court's decision in *In re Amtorg Trading Corp.*, 75 F.2d at 834, by extending Section 337(a)(1)(B) to foreign conduct infringing U.S. process patents, but not to other kinds of unfair acts.

Indeed, Congress is considering such legislation right now with respect to trade secrets. *See* Defend Trade Secrets Act of 2014, S. 2267, 113th Cong. (2d Sess. 2014).

This is not to say that, under existing law, companies like SI Group are without any Section 337 remedy. To the extent it had a protectable secret, SI Group could have "obtain[ed] a process patent," which, of course, would trigger Section 337(a)(1)(B). *TianRui*, 661 F.3d at 1343 (Moore, J.,

dissenting). The ITC's approach, by contrast, "gives additional incentive to inventors to keep their innovation secret," to the detriment of the "American consumer." *Id*.

In sum, Section 337(a)(1)(A) lacks the clear indication of extraterritorial effect necessary to extend U.S. law to conduct outside the United States, and doing so risks adverse policy consequences never contemplated by Congress. Whether the ITC *should* in fact have authority over trade secret misappropriation occurring abroad is a delicate policy question that must be left to the province of Congress.

## II.    The ITC Erred In Holding That A Prior Judgment Of A Chinese Court—Resolving The Same Claims Among The Same Parties—Is Irrelevant In A Section 337 Proceeding.

This case highlights the problems that result if Section 337(a)(1)(A) is extended to reach conduct abroad. Before SI Group initiated this ITC investigation, it brought several actions in China concerning the very same alleged trade secret misappropriation against the very same defendant. It first requested a criminal investigation but the authorities declined to take action. SI Group then instituted a pair of lawsuits but withdrew them. It then filed two more lawsuits. Ultimately, SI Group received an adverse judgment in the Chinese litigation, holding that there was no trade secret misappropriation. *See* pages 4-12, *supra*. Long-established

comity principles bar SI Group from obtaining any relief in this action after rejection of the same misappropriations claims a lawsuit that it *voluntarily initiated*.

The ITC erred in holding that the Chinese litigation was *irrelevant* to the Section 337 proceeding. International comity principles apply to Section 337 proceedings, and the Chinese judgment—which was the product of SI Group's own decision to seek relief in Chinese courts—should have been considered and respected by the ITC.

### A. The ITC erred in holding international comity principles categorically inapplicable to Section 337 proceedings.

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). The doctrine requires courts to "defer to proceedings taking place in foreign countries," and grant "extraterritorial effect" to those "proceedings" "in the United States." *Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1329 (Fed. Cir. 2001). Federal courts favor "granting comity" "as long as the foreign court abides by 'fundamental standards of procedural fairness.'" *Id.*[5]

---

[5]   The comity doctrine is similar to the "first-to-file" rule long applied by this Court, which "generally favors pursuing only the first-filed action when multiple lawsuits involving the same claims are filed in different ju-

Notwithstanding the Chinese court's rejection on the merits of the very same misappropriation claims pressed before the ITC, the Commission held that "abstention and international comity do not relieve the Commission of its statutory responsibility to determine whether there is a violation of [S]ection 337." A105.[6]

That categorical rejection of comity principles is plainly incorrect.

To begin with, Section 337(c) provides: "All legal and equitable defenses may be presented in all cases." 19 U.S.C.A. § 1337(c). This Court has recognized comity as a "defense." *Int'l Nutrition Co.*, 257 F.3d at 1329. Comity principles therefore apply to Section 337 proceedings.

The ITC's determination, moreover, is squarely inconsistent with this Court's decision in *Young Engineers, Inc. v. U.S. International Trade*

---

risdictions." *Merial Ltd. v. Cipla Ltd.*, 681 F.3d 1283, 1299 (Fed. Cir. 2012). This rule is designed "to avoid conflicting decisions and promote judicial efficiency." *Id.* Extending international comity to an earlier-filed lawsuit abroad advances these same ends.

[6] The ALJ also refused to consider the application of comity principles: "Respondents' alternative argument that the Commission should decline to exercise jurisdiction under the principles of comity and abstention, or stay the proceeding pending completion of the Chinese litigation, is entirely unpersuasive. Although Respondents argue that civil cases have been filed in China and those cases address the alleged misappropriation at issue here, Respondents have failed to show that the civil cases in China address specific issues raised here—importation into the United States of the accused products and harm to the domestic industry as a result of that importation."A223.

*Commission*, 721 F.2d 1305, 1313 (Fed. Cir. 1983). There, the Court held that *res judicata* is available as a defense in a Section 337 proceeding. The Court looked first to Section 337(c), holding that it "reflects a recognition that essentially private rights are being enforced in the proceeding." *Young Eng'rs*, 721 F.3d at 1315. If the Court were to hold *res judicata* principles inapplicable because "the Government is a party" or the available relief differs from that available in purely private litigation, the Court "would effectively negate a significant defense which otherwise could be determinative of private rights." *Id*. The Court thus rejected the contention that a different rule should control because "a [Section] 1337 proceeding is not purely private litigation 'between the parties' but rather is an 'investigation' by the Government." *Id*. at 1315.

Next, the Court observed that where "a complainant's infringement claim has been judicially settled" and a court has concluded that "there is a legal right in the respondent to do the act claimed to be infringing," there is "no legitimate basis for the Commission's finding that such acts are 'unfair.'" *Young Eng'rs*, 721 F.3d at 1315. A prior court determination, favorable for the respondent, may thus negate an essential element of a Section 337(a)(1)(A) claim.

Finally, the Court invoked important policy considerations. Given that "the evils of vexacious litigation and waste of resources are no less serious because the second proceeding is before an administrative tribunal," there was good reason to conclude that "[s]ome adaptation of claim preclusion appears desirable, indeed necessary, in its application to administrative proceedings." *Young Eng'rs*, 721 F.3d at 1315. The Court offered an example from the patent context: "[i]f a patent owner has unsuccessfully attacked an alleged infringer for the same infringing acts in a prior court proceeding, no substantive argument has been advanced as to why the patent owner should be given an opportunity to put forth the same charge of infringement again." *Id*.

These considerations apply with equal force to international comity principles, which in many ways resemble the *res judicata* doctrine. As we have shown, international comity is also long-recognized "defense," and therefore within the clear meaning of Section 337(c). *Int'l Nutrition Co.*, 257 F.3d at 1329.

Moreover, the determination by a foreign court as to whether conduct abroad was unlawful—like the parallel determination by a U.S. court—will typically be dispositive of whether that conduct is "unfair." *Young Eng'rs*, 721 F.3d at 1316. Once a court has concluded that certain

51

practices are lawful in the country where the conduct actually occurred, it would be extraordinary—and contrary to the very purpose of comity—for the ITC to nonetheless deem that conduct "unfair" for purposes of Section 337(a)(1)(A).

International comity also rests on the very same efficiency and finality concerns implicated by *res judicata*. When a party brings an action and loses, it should not be able to get a second bite at the apple by suing in a different country. Not only does international comity produce "the proper respect for litigation in and the courts of a sovereign nation," but it also ensures "fairness to litigants" and "judicial efficiency." *Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.*, 466 F.3d 88, 94 (2d Cir. 2006).

The opinion below does not explain why the ITC held comity principles inapplicable under Section 337. The Commission appears to have concluded that because Section 337 is a federal statute, the ITC may not afford comity to a decision by a foreign court. But U.S. courts regularly apply international comity, for example, in bankruptcy actions, which are creatures of federal law. *See Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 242, 246 (2d Cir. 1999) (holding that district court could dismiss complaint in favor of Brazilian liquidation proceedings "on the ground of

52

comity"); *Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985). Likewise, courts apply comity in antitrust proceedings. *See E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 360 F. Supp. 2d 465, 470, 477 (E.D.N.Y. 2005).

While it is true that the reach of international comity is subject to limits imposed by "public policy" (*Int'l Nutrition Co.*, 257 F.3d at 1329), the ITC identified no public policy reason precluding application of comity principles under Section 337. To the contrary, comity furthers important public policy interests, because it maintains "amicable working relationships between nations." *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 423 (2d Cir. 2005).

Moreover, public policy limits the reach of comity in only the most narrow of categories—where its application is "repugnant to fundamental principles of what is decent and just." *Belize Telecom Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1306 (11th Cir. 2008). There is hardly anything repugnant in holding SI Group bound by the result of a legal proceeding it voluntarily initiated.

And the ALJ's contention—that comity is inappropriate because a Section 337 case considers issues like "harm to the domestic industry" not present in the Chinese proceedings (A222-23)—is a red herring. The issue

53

here is whether the Chinese court's finding of no trade secret misappropri-ation deserves deference. We have not, and do not, contend that the Chi-nese court has a role to play in aspects of Section 337 not addressed in a foreign court proceeding, such as the domestic injury element.

For all of these reasons, the ITC's categorical holding that interna-tional comity principles are inapplicable to Section 337 proceedings should be reversed.

### B. The Chinese judgment, which resulted from SI Group's voluntary initiation of lawsuits in China, should be af-forded comity.

Because the Commission found the Chinese judgment irrelevant, it did not address whether comity should be accorded to the particular Chi-nese judgment here. But SI Group itself *voluntarily initiated* the Chinese legal proceedings that it lost. Any suggestion that it should not be bound by those proceedings must be rejected. It would be profoundly unfair *not* to afford comity to the judgment under these circumstances.

International comity is appropriate where a foreign court "of compe-tent jurisdiction" has heard and resolved the same claims between the parties in a manner that is consistent with "fundamental standards of pro-cedural fairness." *Int'l Nutrition Co.*, 257 F.3d at 1329; *see also Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc.*, 180 F.3d 896, 898 (7th Cir.

1999) (applying "general principles" of abstention in cases involving "international comity"). These preconditions are plainly present here.

At the outset, the "federal and foreign proceedings" are "parallel." *Finova*, 180 F.3d at 898. "'Suits are parallel'"—and therefore are subject to dismissal or abstention on comity grounds—where, as here, "'substantially the same parties are litigating substantially the same issues simultaneously in two fora.'" *Id.* (quoting *Schneider Nat'l Carriers, Inc. v. Carr*, 903 F.2d 1154, 1156 (7th Cir. 1990)). Both the Chinese litigation and the ITC investigation involve the same parties—SI Group and Sino Legend. The two proceedings involve essentially identical claims regarding the alleged misappropriation of the same asserted trade secrets. SI Group even recognized the parallel nature of the cases before the Chinese court: on appeal from the Chinese judgment, it submitted the ITC proceedings as evidence that the lower Chinese court had erred in deciding in favor of Sino Legend. A4553.

And there is no basis for characterizing these particular proceedings in China as fundamentally unfair to SI Group—particularly because SI Group itself initiated them. This is not a situation in which a losing party was haled into a foreign court against its will.

SI Group's principal contention before the ITC was that the Chinese proceedings were unfair because SI Group did not participate during the trial. However, as the Chinese appellate court expressly found, SI Group unilaterally boycotted the trial and acted in bad faith.

Pursuant to the governing procedural rules, the Chinese trial court obtained independent expert reports from a neutral third party, the MIIT Appraisal Institute. A4634, A4645. Both SI Group and Sino Legend participated in choosing the experts on the appraisal panel. A4645. The panel then conducted on-site investigations and interviews and heard argument from both SI Group and Sino Legend. A4646. The appraisal panel prepared lengthy, detailed reports, to which both parties had the opportunity to submit written comments to the court. *Id.*

These reports showed that Sino Legend did not practice any of the protectable trade secrets. A4655, A4661-62. Following its receipt of the reports, SI Group asked for a new appraisal. A4647. The trial court deferred this request, explaining that it was an issue to be resolved in connection with the merits of the underlying claims. *Id.* SI Group then sought to dismiss the suit in order to add a new defendant; the effect of a dismissal would have been to vacate the appraisal report. A4647-48. The trial court rejected this tactic, because SI Group has *already* dismissed and refiled

the lawsuit, and moreover could file a separate action against the additional defendant. A4648.

The trial court found it would have been unfair to Sino Legend to permit such actions by SI Group. A4648. And the appellate court determined that SI Group's requests were made [[█████████████████ ███████████████]] because SI Group took these actions only after learning that the appraisal report was not favorable. A4652; *see also* pages 4-12, *supra*.

After the trial court then subpoenaed the parties for trial, SI Group refused to attend. A4648. As the appellate court later explained, even though the trial court could have entered a default judgment at this point, the three-member trial court nonetheless cross-examined the experts based on SI Group's earlier written submissions. A4562-63; *see also* page 12, *supra*. And it independently concluded that the recommendations of the MIIT appraisal should be adopted. A4680. The trial court therefore issued a judgment in favor of Sino Legend. A4683-84.

SI Group appealed the judgment, and participated in the hearing before the appellate panel. A4507, A4553. That panel also rejected SI Group's arguments on the merits. A4560-63.

In sum, SI Group initiated legal action in China. When it learned it was likely to lose that action, it attempted to withdraw the litigation. Courts in this country "not only look with skepticism, but … flatly reject [a] due process complaint of a party who was given, and waived, the opportunity of making [an] adequate presentation" before a foreign tribunal. *Soc'y of Lloyd's v. Turner*, 303 F.3d 325, 331 n.20 (5th Cir. 2002) (quotation omitted). SI Group has no basis whatsoever to complain about the Chinese proceedings.

Before the Commission, SI Group also attacked the integrity of Chinese courts broadly, arguing that they are inadequate forums for adjudicating trade secret claims. But it was SI Group that voluntarily brought this action to a Chinese court. Any resulting error was, to say the least, invited. *See Chem. Eng'g Corp. v. Essef Indus., Inc.*, 795 F.2d 1565, 1572 (Fed. Cir. 1986) (a party may not "complain on appeal" of "invited error").

In any event, SI Group's assertion is wrong; there is no basis whatever for concluding that Chinese judgments are categorically unworthy of recognition by U.S. courts. Because foreign judicial systems differ markedly from the U.S. system, U.S. courts accord comity to foreign court decisions as long as the parties had a full and fair opportunity to pursue their claims and defenses. *See Hilton*, 159 U.S. at 202-03. A foreign decision will

58

not be deemed unfair unless there were "*outrageous departures* from our own notions of 'civilized jurisprudence.'" *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 1003 (9th Cir. 2013) (emphasis added).

The judicial system in China easily meets the standard for affording comity. In fact, in *TianRui*, the court explained that, because "China has acceded to the Agreement on Trade–Related Aspects of Intellectual Property Rights," there is no "relevant difference between the misappropriation requirements of TRIPS article 39 and the principles of trade secret law applied" by the ITC. 661 F.3d at 1333.

Courts in the United States afford comity by recognizing Chinese courts' monetary judgments. *See Hubei Gezhouba Sanlian Indus. v. Robinson Helicopter Co.,* 425 F. App'x 580, 581 (9th Cir. 2011); *Folex Golf Indus., Inc. v. China Shipbuilding Indus.*, 2013 WL 1953628 (C.D. Cal. 2013).

*Forum non conveniens* decisions provide another example. Dismissal on these grounds requires the presence of an adequate alternative forum. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 245 n.11 (1981). The Supreme Court itself has indicated that Chinese courts satisfy this test: the Court found a "textbook case for immediate *forum non conveniens* dismissal" where it made no sense to "continu[e] litigation" in Pennsylvania "given the proceedings long launched in China." *Sinochem Int'l Co. v. Malay-*

*sia Int'l Shipping Corp.*, 549 U.S. 422, 435 (2007). The merits of the claim, which accrued in China, was "best left for determination by the Chinese courts." *Id.* at 436.

And scores of lower courts have dismissed matters pursuant to *forum non conveniens* in favor of Chinese courts, demonstrating widespread recognition that these tribunals are adequate. *See, e.g., King.com Ltd. v. 6 Waves LLC*, 2014 WL 1340574, at *3-6 (N.D. Cal. 2014); *Jacobs Vehicle Sys., Inc. v. Yang*, 2013 WL 4833058, at *7-9 (M.D.N.C. 2013); *Nalco Co. v. Chen*, 2013 WL 4501425 (N.D. Ill. 2013); *Tang v. Synutra Int'l, Inc.*, 2010 WL 1375373 (D. Md. 2010); *Quanzhou Joerga Fashion Co. v. Brooks Fitch Apparel Grp., LLC*, 2012 WL 4767180 (S.D.N.Y. 2012); *In re Compania Naviera Joanna S.A.*, 531 F. Supp. 2d 680 (D.S.C. 2007); *China Tire Holdings Ltd. v. Goodyear Tire & Rubber Co.*, 91 F. Supp. 2d 1106, 1111 (N.D. Ohio 2000); *Guimei v. Gen. Elec. Co.*, 91 Cal. Rptr. 3d 178, 187 (Ct. App. 2009). The contrary result—holding that Chinese courts are somehow institutionally deficient and thus unworthy of comity—would be extraordinary.

Finally, there is no basis for declining to apply comity principles because the ALJ excluded from the record materials relating to the Chinese litigation (*see* A185)—those decisions are subject to judicial notice. *Ermini*

60

*v. Vittori*, 758 F.3d 153, 156 n.2 (2d Cir. 2014). In any event, the ALJ's decision not to admit the materials turned on his view that comity was irrelevant to the investigation (A185); because that conclusion was erroneous, the decision not to accept material establishing the Chinese proceedings was erroneous for the same reason.

Because a Chinese court adjudicated the same claims between the same parties in China, comity should be accorded to the Chinese court's determination. The ITC's failure to do so requires reversal.

## III.   The ITC Erred In Imposing A Ten Year Exclusion Order.

The Commission's selection of a ten-year limited exclusion order (A183-84) rests on a plain legal error, is arbitrary and capricious, and should therefore be set aside. The ITC's determination rests on a clear misinterpretation of a Chinese contract governed by Chinese law—indeed, a conclusion diametrically opposed to the Chinese court's interpretation of the same contract.

SI Group's theory of the case, which the Commission adopted, is that Jie Xu disclosed confidential secrets to Sino Legend, in violation of the non-disclosure obligations in his employment contract. In fashioning a remedy, the ITC considered the length of time it would take Sino Legend to independently develop the claimed processes, which it estimated to be

61

ten years. A183-84. But the ITC neglected a critical fact: Xu's nondisclosure agreement lasted only three years, meaning that Sino Legend could lawfully gain knowledge of the processes after three years—not ten.

When an employee's non-disclosure agreement has a limited term, the employee may disclose secret information to a competitor after the term expires. In *ECT International, Inc. v. Zwerlein*, 597 N.W.2d 497, 480 (Wis. Ct. App. 1999), for example, a Wisconsin appellate court held that, "in imposing a one-year period, after termination of employment, during which an employee could not divulge trade secrets, [the employer] manifested an intent that after the expiration of that period a former employee is under no restrictions." *See also Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, 2008 WL 166950, at *17 (C.D. Cal. 2008); *Baystate Techs., Inc. v. Bentley Sys., Inc.*, 946 F. Supp. 1079, 1093 (D. Mass. 1996).

It is undisputed that the confidentiality provision in Jack Xu's employment contract specified a three-year term limit. [[██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████]] A1298; *see also* A599. Notably, [[████████████████████████████████████]] A1306. After

those three years expired, Xu could lawfully provide Sino Legend with any knowledge he held.

The Commission rejected this argument, however, based on its view that Xu's confidentiality obligation is *permanent*. A912. The ALJ reasoned that [[███████████████████████████████████████████████ ███████████████████████████████]] A321. And, in turn, [[██ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████]] A1330. The Commission held [[███████████████████████████████████████████████ ████████]] *Cf.* A321.

That conclusion is wrong for several reasons. *First*, the Chinese court, applying Chinese law, found that Xu's obligation lasted only three years. A4650. The court explained:



*Id.* Because the contract is governed by Chinese law (A1298), the Chinese court's interpretation controls.

*Second*, in addition to ignoring the Chinese judgment, the decision below ignores Chinese law, which provides that when a company's general policies conflict with a term in the employment contract, the *contract* controls. That is, "where the internal bylaws formulated by an employer conflict with the contents stipulated in the … employment contract," the employment contract must be given effect. A6963-64 (Article 16 of the Interpretation of the Supreme People's Court on Several Issues about the Application of Laws for the Trial of Labor Dispute Cases (II)).

*Third*, the ALJ's legal determination is also wrong under U.S. law. The well established rule that the specific controls the general applies in the context of employment contracts and policy manuals. Thus, a "specific agreement" in an employment contract "preempts the arguably inconsistent policy manual." *Grimes v. Allied Stores Corp.*, 768 P.2d 528, 529 (Wash. Ct. App. 1989). The parties' specific, tailored, hand-written three-year confidentiality agreement in the employment contract necessarily trumps the generic statement in a company-wide handbook.

Because the ALJ erred in concluding that Xu was subject to a permanent non-disclosure agreement, the remedy adopted below is wholly

unsupportable. At most, Sino Legend should be subject to a three-year exclusion order from the date the order issued.[7]

## CONCLUSION

The Commission's limited exclusion order should be vacated, and this matter should be remanded for dismissal of the complaint against appellants. If the limited exclusion order is not vacated, the Court should direct that its duration should be shortened to three years.

Respectfully submitted,


/s/ Andrew J. Pincus
Andrew J. Pincus
Gary Hnath
Paul W. Hughes
James F. Tierney
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000

*Counsel for Sino Legend Chemical Company Limited*

Dated: November 10, 2014

---

[7]  The ITC concluded that the duration of the exclusion order should run from the date of its entry rather than the time of the violation. A184 n.11.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned counsel certifies that this brief:

(i)    complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 13,698 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 2007 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: November 10, 2014                    /s/ Andrew J. Pincus
                                            Andrew J. Pincus

**ADDENDUM**

*PUBLIC VERSION*

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

In the Matter of

CERTAIN RUBBER RESINS AND
PROCESSES FOR MANUFACTURING
SAME

Inv. No. 337-TA-849

COMMISSION OPINION

TABLE OF CONTENTS

I. BACKGROUND ................................................................................................ 4

A.  Procedural History ...................................................................................... 4

B.  Overview of the Technology ...................................................................... 6

C.  Accused Products ........................................................................................ 8

II. STANDARD FOR DETERMINATION ON REVIEW ................................. 9

III. DISCUSSION ................................................................................................. 9

A.  The Law of Trade Secrets .......................................................................... 9

B.  Which Alkylation Steps are Protectable as Trade Secrets? ..................... 10
    1.  [                              ] .............................................. 10
    2.  [                              ] .............................................. 14
    3.  Use of [                    ] ................................................... 15
    4.  Use of [                ] ....................................................... 16
    5.  [                                ] .......................................... 17
    6.  [                              ] ............................................. 18
    7.  [                              ] ............................................. 18

C.  Which Condensation Steps are Protectable as Trade Secrets? ............... 20
    1.  Use of [                ] ....................................................... 20
    2.  [                        ] ..................................................... 24
    3.  [                  ] ............................................................. 25

4. The Use  [                        ]........................................... 27
5. [                        ] ............................................. 28
6. [                    ] .................................................. 30
7. [                            ] ...................................... 32
8. [                        ] ............................................. 35
9. [                ] ...................................................... 36
10. [                    ] .................................................. 37

D. **Overall Process Flow Trade Secret** ............................................. **40**

E. **Respondents' Access to the Trade Secrets Through Mr. Xu and Mr. Lai** ....... **41**

F. **Respondents' Use of Trade Secrets** ................................................. **42**

G. **Technical Proofs of Misappropriation of Each Alkylation Reaction Alleged
Trade Secret** ...................................................................... **43**
  1. [                        ] (and the Issue of the LFP Products) ........ 43
  2. [                    ] .................................................. 46
  3. Use of [                    ] ......................................... 47
  4. Use of [                ] ............................................. 47
  5. [                            ] ...................................... 48
  6. [                        ] ............................................. 49
  7. [                    ] .................................................. 49

H. **Technical Proofs of Misappropriation of Each Condensation Reaction Alleged
Trade Secret** ...................................................................... **51**
  1. Use of [                ] ............................................. 51
  2. Use of [                ] ............................................. 51
  3. [                        ] ............................................. 51
  4. Use of [                ] .............................................. 52
  5. [                    ] .................................................. 53
  6. [                            ] ...................................... 53
  7. [                        ] ............................................. 53
  8. Use of [                            ] .............................. 54
  9. Use of [                    ] ......................................... 54
  10. [                    ] .................................................. 54

I. **Technical Proof of Misappropriation of the Overall Process Flow Alleged
Trade Secret** ...................................................................... **55**

J. **Affirmative Defenses** ................................................................. **56**
  1. Independent Development ............................................... 56
  2. Unclean Hands .......................................................... 56

K. **Allocation of the Burden of Proof** ................................................. **56**

2

*PUBLIC VERSION*

L.  Domestic Industry and Injury ................................................................. **59**
　　1.　Existence of a Domestic Industry ..................................................... 60
　　2.　Injury................................................................................................. 60
　　　a.　Actual Substantial Injury ............................................................. 60
　　　b.　Threat of Substantial Injury ......................................................... 64
　　3.　SL-7015............................................................................................. 67

M.　**Which Parties Have Violated Section 337 Through Importation, the Sale for Importation, or the Sale After Importation?** ................................................. **69**

N.　**Remedy, the Public Interest, and Bonding** ........................................ **75**

IV. **CONCLUSION** ......................................................................................... **88**

On June 17, 2013, the presiding administrative law judge ("ALJ") (Judge Rogers) issued his final initial determination ("ID") in this investigation, finding a violation of Section 337. Specifically, the ALJ found misappropriation of trade secrets and injury to a domestic industry as a result thereof.

Having considered the ID, the submissions of the parties, and the relevant portions of the record, the Commission has determined to affirm-in-part and reverse-in-part the final ID. The Commission has determined that there has been misappropriation of trade secrets, that there is actual injury and the threat of injury to a domestic industry, and that certain of the Respondents have violated Section 337 in the importation, sale for importation, or sale after importation of rubber resins. The Commission has determined to adopt the ALJ's findings that are consistent with the Commission's opinion as set forth below.

3

*PUBLIC VERSION*

# I. BACKGROUND

**A.    Procedural History**

The Commission instituted this investigation on June 26, 2012, based on a complaint filed on behalf of SI Group, Inc. of Schenectady, New York ("SI Group" or "SI") on May 21, 2012, as supplemented on June 12, 2012. 77 *Fed. Reg.* 38083 (June 26, 2012). The complaint alleged violations of Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337 ("Section 337"), in the sale for importation, importation, or sale after importation into the United States of certain rubber resins by reason of misappropriation of trade secrets, the threat or effect of which is to destroy or substantially injure an industry in the United States. The Commission's notice of investigation named as respondents Red Avenue Chemical Corp. of America of Rochester, New York; Thomas R. Crumlish, Jr. of Rochester, New York; Precision Measurement International LLC of Westland, Michigan ("PMI"); Sino Legend (Zhangjiagang) Chemical Co., Ltd. of Zhangjiagang City, China ("Sino Legend ZJG" or "Sino Legend"); Sino Legend Holding Group, Inc. c/o Mr. Richard A. Peters of Kowloon, Hong Kong; Sino Legend Holding Group Ltd. of Hong Kong; Hong Kong Sino Legend Group, Ltd. of North Point, Hong Kong; Red Avenue Chemical Co. Ltd. of Shanghai, China; Ning Zhang of North Vancouver, Canada; Quanhai Yang of Beijing, China; and Shanghai Lunsai International Trading Company of Shanghai City, China. A Commission investigative attorney participated in this investigation.

On January 14, 2013, the Commission issued notice of its determination not to review an ID to amend the complaint and notice of investigation to add Red Avenue Group Limited of Kowloon, Hong Kong; Sino Legend Holding Group Inc. of Majuro,

4

*PUBLIC VERSION*

Marshall Islands; Gold Dynasty Limited c/o ATC Trustees (Cayman) Limited of Grand

Cayman, Cayman Islands; and Elite Holding Group Inc. c/o Morgan & Morgan Trust

Corporation (Belize) Limited of Belize City, Belize as respondents. 78 *Fed. Reg.* 3817

(January 17, 2013).

On June 17, 2013, the presiding administrative law judge issued his final ID,

finding a violation of Section 337. On July 1, 2013, Complainant and the Respondents

filed petitions for review. On July 9, 2013, Complainant, the Respondents, and the

Commission investigative attorney filed responses thereto.

On July 16, 2013, Respondents filed a notice of new authority, bringing a Chinese

decision in a parallel case to the Commission's attention. On July 24, 2013, the

Complainant submitted an objection to the notice of new authority, stating that the

Chinese decision is not "new" because it issued the same day as the ID and could have

been included in Respondents' petition for review, and that Respondents have not

challenged the ALJ's order excluding the Chinese legal proceedings from evidence.[1]

On July 17, 2013, Complainant filed a statement on the public interest, stating the

issuance of a general exclusion order would not adversely affect the public health, safety,

or welfare, consumers, or competitive conditions in the United States. On August 14,

2013, the New York State Chemical Alliance ("NYSCA") submitted a statement on the

---

[1] Respondents argued in their petition that "abstention and international comity warrant dismissal of Complainant's trade secret claims" because a Chinese court has held that Sino Legend did not misappropriate Complainant's alleged trade secrets under Chinese law. Respondents' Petition at 97-98. However, abstention and international comity do not relieve the Commission of its statutory responsibility to determine whether there is a violation of Section 337. 19 U.S.C. § 1337(c); *see also Tianrui Group Co. Ltd. v. International Trade Comm'n*, 661 F.3d 1322, 1327, 1332-33 (Fed. Cir. 2011) (holding that the question of whether there is a violation of Section 337 by reason of misappropriation of trade secrets is governed by (U.S.) federal common law, even where that misappropriation occurs abroad) ("We therefore detect no conflict between the Commission's actions and Chinese law that would counsel denying relief based on extraterritorial acts of trade secret misappropriation relating to the importation of goods affecting a domestic industry.").

5

public interest, stating that "it is not in the public interest to allow respondents to benefit financially from the sale of these products in the United States, particularly where there are other domestic manufacturers (beyond SI Group) of the products concerned." On August 14, 2013, the American Chemistry Council submitted a statement on the public interest, with a text similar to that of the NYSCA letter. On August 21, 2013, U.S. Senator Charles E. Schumer and U.S. Representative Paul D. Tonko filed a joint submission on the public interest noting that "Protecting this domestic industry against unfair competition is in the public interest."

On September 9, 2013, the Commission issued notice of its determination to review the final ID in its entirety, and requested briefing on the issues on review and on remedy, the public interest, and bonding. On September 23, 2013, each of the parties filed submissions in response to the Commission's notice, and on September 30, 2013, each of the parties filed submissions in reply thereto.

**B.    Overview of the Technology**

PTOP (p-tert-octyl phenol) tackifiers (also called "novalak resins") are used to manufacture tires. ID at 5. The tackifier bonds one layer of a tire to another. *Id.* at 6. "Tack" is defined as the force required to pull apart two pre-vulcanized rubber mixtures that have been pressed together under certain defined conditions. U.S. Patent No. 8,030,418, col. 1, lines 46-48.

The process for synthesizing the resins involves two steps: an alkylation reaction followed by a condensation reaction. The alkylation reaction belongs to a class of reactions known as a Friedel-Crafts reaction, *i.e.*, the modification of an aromatic ring by the addition of an alkyl chain (in the presence of an acid catalyst). In the primary

6

*PUBLIC VERSION*

alkylation reaction, Complainant reacts[

]

[                                    ]

ID at 65.  The product of this alkylation reaction is PTOP:



**PTOP**

*See generally* Complaint ¶73; ID at 65; RX-510 at SINOZJG_0022250 (discussing

Friedel-Crafts reactions); RX-508 at 849RESP 0004657.

In the condensation reaction, the PTOP (*i.e.*, the product of the alkylation

reaction) is further reacted with formaldehyde to form a resin (by the cross linking of

aromatic rings into a polymer):



| Alkylphenol | Formaldehyde | | Novolak Resin |

7

*PUBLIC VERSION*

where the alkylphenol is PTOP and where the acid is[      ] *See* Complaint ¶¶72-73;
ID at 244. The use of a substituted phenol (to which class PTOP belongs) in a
condensation reaction has been previously studied. *Cf.* RX-291 at 1:10-15; 2:13 (U.S.
Patent No. 3,005,797, issued in 1961) (using an octyl phenol).

Complainant has alleged as trade secrets the use of[

] Complainant has several patents on various aspects of
the technology, but states that certain features of its process are not contained in its
patents or published patent applications. The parties further dispute whether and to what
extent aspects of the process can be reverse-engineered from the final product. In all,
Complainant has asserted the existence of 7 alkylation trade secrets, 10 condensation
trade secrets, and that the overall combination of the 17 individual trade secrets is itself a
protectable trade secret.

## C.   Accused Products

The accused products are Respondents' resins designated as SL-1801, SL-1801
LFP, SL-1802, SL-1802 LFP, and SL-7015. ID at 6. The ALJ found arguments relating
to SL-1805 to be waived. *Id.* at 6-7. The SL-1805 product was not mentioned in
Complainant's or Respondents' petitions for review or their responses, or in their
submissions in response to the Commission Notice of Review; thus, the Commission
affirms waiver as to SL-1805. We address whether SL-7015 is still part of the

8

*PUBLIC VERSION*

investigation in the section on injury, *infra,* as argued by Complainant in its contingent

petition for review.

## II. STANDARD FOR DETERMINATION ON REVIEW

Once the Commission has determined to review the decision of the ALJ, the

agency has all of the powers which it would have in making the initial decision except as

it may limit the issues on notice or by rule. 5 U.S.C. § 557(b); *Certain Acid-Washed*

*Garments and Accessories,* Inv. No. 337-TA-324, Comm'n Op. at 4-5 (Aug. 6, 1992).

Commission Rule 210.45(c) implements 5 U.S.C. § 557(b). In other words, once the

Commission decides to review the decision of the ALJ, the Commission may conduct a

review of the findings of fact and conclusions of law presented by the record under a *de*

*novo* standard.

## III. DISCUSSION

### A.    The Law of Trade Secrets

Misappropriation of trade secrets is a method of unfair competition defined by the

common law. *TianRui Group Co. Ltd. v. ITC,* 661 F.3d 1322, 1327 (Fed. Cir. 2011).

Paragraph (a)(1)(A) of Section 337 governs the importation of articles derived from

common law forms of unfair competition:

> Unfair methods of competition and unfair acts in the importation of
> articles (other than articles provided for in subparagraphs (B), (C), (D),
> and (E), into the United States, or in the sale of such articles by the owner,
> importer, or consignee, the threat or effect of which is—
> (i)  to destroy or substantially injure an industry in the United States;
> (ii)  to prevent the establishment of such an industry; or
> (iii) to restrain or monopolize trade and commerce in the United States.

9

19 U.S.C. § 1337(a)(1)(A). Therefore, there is a requirement not only that the complainant demonstrate the existence of a domestic industry, but also that there be actual substantial injury or the threat of substantial injury to a domestic industry.

In *TianRui*, the Federal Circuit held that "a single federal standard, rather than the law of a particular state, should determine what constitutes a misappropriation of trade secrets sufficient to establish an 'unfair method of competition' under section 337." 661 F.3d at 1327. Sources of applicable law include the Uniform Trade Secrets Act ("UTSA") and federal common law.

The elements of misappropriation of trade secrets are as follows: (1) the existence of a process that is protectable as a trade secret (*e.g.*, that is (a) of economic value, (b) not generally known or readily ascertainable, and (c) that the complainant has taken reasonable precautions to maintain its secrecy); (2) that the complainant is the owner of the trade secret; (3) that the complainant disclosed the trade secret to respondent while in a confidential relationship or that the respondent wrongfully took the trade secret by unfair means; and (4) that the respondent has used or disclosed the trade secret causing injury to the complainant. *Certain Sausage Casings*, Inv. No. 337-TA-148/169, Initial Determination (July 31, 1984) (nonreviewed in pertinent part); UTSA, § 1(4).

**B.    Which Alkylation Steps are Protectable as Trade Secrets?**

**1.    [                                ]**

The ALJ found that [                              ] is a trade secret and used by the Complainant. ID at 113-114. (citing CX-1570C, QQ.74, 83). The ALJ found that Complainant had taken steps to protect the secrecy of the [

] and had made a *prima facie* case of showing that the [    ] is not

10

*PUBLIC VERSION*

generally known or ascertainable. *Id.* at 114-116 (citing CX-1570C, Q. 7). The ALJ also relied on the finding that there was a lack of competitors and that other resins were inferior in quality. The ALJ found that the Respondents failed to rebut the complainant's *prima facie* showing that the[      ]is not generally known or readily ascertainable. *Id.* at 117-118 (citing, *inter alia*, Tr. at 844:25-845:1; CX-1570C, Q.16). The ALJ rejected Respondents' argument that the[           ]in the alkylation reaction could be determined through reverse engineering based on the[           ]in the finished resin. *Id.* at 118-19 (citing CX-1570, Q.96). Finally, the ALJ found that the [           ]had economic value. *Id.* at 119-122.

Respondents argue that the ALJ erred in finding the existence of a trade secret in the [           ]because the Complainant is not entitled to claim a property right to a single value where the art discloses a range of values and the alleged secret falls within that range. Resps. Pet. at 14-15. Respondents rely on *Ultimax Cement Manuf. Corp. v. CTS Cement Manuf. Corp.*, 587, F.3d 1339, 1354-56 (Fed. Cir. 2009), and characterize the case in a parenthetical as an affirmance by the Federal Circuit of a district court's dismissal on summary judgment of a trade secret claim where the specific ratio of ingredients fell within the range of ratios disclosed in a patent. *Id.* at 15. Respondents state that Complainant's[

] *Id.* at 15-16 (citing RX-510[      ] and U.S. Patent No. 2,739,172).

Complainant argues that, to the contrary, the Federal Circuit has held that a plaintiff was entitled to trade secret protection for a specific value in a range in a case governed by the Uniform Trade Secrets Act (UTSA) based on testimony that the particular value was "very novel" and "very, very unusual." *Id.* at 31 (citing *BBA*

11

*PUBLIC VERSION*

*Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1340 (Fed. Cir. 2002). Both the Complainant and the IA argue that the ALJ found that [

         ]allows Complainant to make a superior product, and should be affirmed. *Id.* at 33 (citing ID at 120); IA Resp. at 9, 16.

   The Commission affirms the ALJ's finding and adopts the ALJ's reasoning, set forth in the ID at 113-122. We agree with the ALJ that Complainant's asserted [

                  ]is protectable as a trade secret. While certain publications (Kirk-Othmer (RX-510) and RX-512) disclose [                    ] Dr. Swager conceded that they do not disclose [                    ] Tr. at 845:2-848:3 (discussing RDX-5C (graphically representing RX-510, RX-514, RX-293, and RX-512)).

   Respondents cite the Federal Circuit's decision in *Ultimax Cement Manuf. Corp. v. CTS Cement Manuf. Corp.*, 587 F.3d 1339, 1354-56 (Fed. Cir. 2009), for the proposition that no one can claim a trade secret in a specific value where that value is part of a published range. In *Ultimax*, the Court explained that the district court stated on summary judgment that "the claimed trade secret of the use of a combination of lithium carbonate and citric acid in calcium sulphoaluminate cement had been publicly disclosed in a Japanese patent, [and] even if Plaintiffs were permitted to define the secret as a more specific ratio of the two compounds, the publication of the more general combination in the Japanese patent encompassed the specific ratio." Respondents understand this to mean that [          ] could not be protected as a trade secret because it was "encompassed" by a published range.

   Complainant argues that other cases support trade secret protection for [

   ]where a range is known, citing the Federal Circuit's decision in *BBA Nonwovens*

12

*PUBLIC VERSION*

*Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1340 (Fed. Cir. 2002). However, *BBA Nonwovens* does not address the question of whether protection of a specific value is precluded by a published range. Rather, in that case, the Court merely cited an expert who stated that the elements in a combination were "very novel," "really quite unusual," and "very, very unusual." *Id.*

The *BBA Nonwovens* decision indicates that if there is something special about the specific value [      ] then it may be protectable as a trade secret even where a range is known. The evidence shows that there is something special about [

] ID at 113-14; 119. Indeed, the ALJ found that Dr. Banach explained that [

] was first used in 1990 and was the "result of substantial expenditure on research and development by SI Group." ID at 119 (quoting CX-1565C, Q.94). The ALJ did not make factual findings about whether Complainant still uses [           ], but the evidence shows that [           ] was at the very least used successfully for 15 years, and with [           ] Therefore, one can infer that Complainant believed that there is something beneficial about [           ]

Respondents have not proven that they could have reverse-engineered [      ] Dr. Swager conceded that his calculations were based on certain assumptions, and Dr. Hamed testified that "you would have to already know the process used to make the final resin product in order to make a correlation" between a sample of the finished product and [           ] CX-1570C at Q.96. As discussed in the section on misappropriation, Respondents used this exact [           ] in their 2006 experiments.

The Commission concludes that the ALJ was correct in finding that [

] was entitled to trade secret protection.

13

A113

*PUBLIC VERSION*

2. [                    ]

The ALJ found that using [                         ]in the alkylation reaction
is a trade secret and used by the Complainant. ID at 131-35. The ALJ found that
Complainant has taken reasonable steps to protect the secrecy of the process. *Id* at 132.
The ALJ reaffirmed his findings in other sections regarding the lack of competition and
inferior resins of competitors as putative support for the *prima facie* case that the process
is not generally known or ascertainable. *Id.* Finally, the ALJ found that the use of [

]is a valuable trade secret. *Id.* at 133-35.

Respondents argue that the ALJ erroneously found that[

]is a trade secret. ID at 131-

35. Respondents state that it is obvious that any chemical process must have [


] Resps. Pet. at 21 (citing RX-421C (Swager Witness
Statement), Q.108-17; RDX-7C). The Commission affirms the ALJ's finding and adopts
the ALJ's reasoning, set forth in the ID at 131-135. Respondents cite the testimony of
Dr. Swager who opined that [        ]was superior to other possible [

] However, Dr. Hamed testified that Dr. Swager did not
consider [

] CX-1570C at Q.101. The Commission finds that the ALJ was correct in
holding that [                              ]is entitled to trade secret protection.

14

*PUBLIC VERSION*

3. Use of [                    ]

The ALJ found that the use of [                    ] in the preparation of [

] is not a trade secret. The ALJ found that Complainant made a *prima*

*facie* case that the process was not generally known or readily available based on the

same evidence of lack of competition as for other steps in the process, but found that the

Respondents successfully rebutted the *prima facie* case. ID at 141. The ALJ relied on a

1990 article which reported that [

] and an internal Complainant document

acknowledging [                    ] *Id.* at 141-42 (RX-508 at

849RESP_0004654); 144 (citing RX-146 at SIGITC0000053452).

Complainant argues that the ALJ erred in finding the use of [          ] is not

a trade secret. The Complainant argues that the literature commonly recommends

[



] Comp. Pet. at 4, 6-7 (citing CX-1570C at Q.21). The Complainant also

argues that there is no teaching to [                    ] However,

this argument confuses the order of the steps. The [      ] is used to [          ] and

the company would decide whether to [          ] Whether [

] would not change [

] The ALJ properly relied on the 1990 article in finding that it was generally known

that [                    ]. ID

at 141-42 (citing RX-508 at 849RESP_0004654). The Commission concludes that the

15

A115

ALJ was correct in finding that that the use of [                    ] is not protectable as a trade secret.

Therefore, the Commission affirms the ALJ's finding and adopts the ALJ's reasoning, set forth in the ID at 141-145.

### 4. Use of [            ]

The ALJ found that Complainant's process of [

] is a trade secret and used by the Complainant. ID at 159-63. The ALJ found that Complainant made a *prima facie* showing that the process was not generally known or readily ascertainable based on the same evidence of lack of competition set forth for other steps. *Id.* at 160. The ALJ concluded that the [

] includes a goal not accounted for by Dr. Swager, Respondents' expert, *i.e.,* [

] *Id.* at 161-62. Finally, the ALJ found that the

[            ] step had economic value. *Id.* at 162-63.

Respondents argue that Complainant's alleged [        ] trade secret is based on common sense and basic chemistry. Resps. Pet. at 27. Respondents argue that it is absurd to provide protection for [

] *Id.* at 28 (citing RX-421C at Q.159).

Respondents argue that Complainant has not shown that [        ] is not generally known. *Id.*

The Commission affirms the ALJ's finding and adopts the ALJ's reasoning, set forth in the ID at 159-163. The ALJ's findings support that [            ] was more than just the [            ] because it included [            ]

16

*PUBLIC VERSION*

[

] *i.e.*, more than just [                                    ] Tr. at

819. This means that there is a complex [

]which is protectable as a trade secret.

Complainant does not engage in the conventional [

]but rather the[          ]is a complex [

] CX-1565C, Q. 83; Tr. at 232:24-233:6; 820:3-

5. [                                                    ]CX-

1570C, Q.24-28. Complainant's[        ]process is[

] CX-1570C,

Q. 24. Mr. McAllister stated that "a large amount of work that was done to[

] So it

wasn't a straightforward[                        ]" Tr. 236:2-7.

The Commission concludes that the ALJ was correct in finding that the[

]is protectable as a trade secret.

5. [                                        ]

The ALJ found that the[                                    ]is

not a trade secret because it is dictated by[        ]and is disclosed in the literature.

ID at 168-71. The ALJ found that Complainant made a *prima facie* case that the

[                        ]was not generally known or readily ascertainable based

on the same evidence of lack of competition set forth for other steps, but the ALJ found

that the Respondents rebutted this *prima facie* showing. *Id.* at 168-69. The Commission

affirms the ALJ's finding that the[                                    ]is not

17

A117

protectable as a trade secret and adopts the ALJ's reasoning, set forth in the ID at 168-171. Moreover, the Complainant did not petition for review of the ALJ's finding and did not raise the issue in its briefing on review. Therefore, this issue is waived.

6. [                                    ]

The ALJ found that the[                    ]for the alkylation reaction was not a trade secret. The ALJ found that Complainant had made a *prima facie* case that[                    ]was not generally known or readily ascertainable based on the same evidence of lack of competition set forth for other steps, but found that Respondents rebutted this showing with a number of printed references. *Id.* at 177-78. The ALJ further found that the Complainant failed to show how this process has economic value but found that the Complainant has taken reasonable steps to protect this limitation.

The Commission affirms the ALJ's finding that the[                    ]of the alkylation reaction was not protectable as a trade secret and adopts the ALJ's reasoning, set forth in the ID at 177-181. Moreover, the Complainant did not petition for review of the ALJ's finding, and did not raise the issue in its briefing on review. Therefore, the issue is waived.

7. [                                    ]

The ALJ found that the combination of the following four features are a trade secret:[

]

*PUBLIC VERSION*

[      ] ID at 194-98. The ALJ found that Complainant made a *prima facie* showing that

the limitation was not generally known or readily ascertainable for the same lack of

evidence of competition as for the other steps. *Id.*

Respondents argue that the ALJ incorrectly concluded that aspects of

Complainant's[                              ]were protectable as trade secrets. Resps. Pet. at

33. Respondents argue that the ALJ erred in finding that Complainant made a *prima*

*facie* showing that[                         ]were not generally known based on the lack of

competition absent a nexus between the lack of competition and the alleged trade secret.

*Id.* (citing ID at 195; *Buffets*, 73 F.3d at 968-69 (9th Cir. 1996)). Respondents assert that

[                         ]was conventional, and that Complainant did not claim that any

special[                                             ] *Id.* at 35 (citing RX-422

at Q290-91).

The Commission affirms the ALJ's finding and adopts the ALJ's reasoning, set

forth in the ID at 194-198. The evidence supports the ALJ's findings that the use of[

                              ]are part of a protectable trade

secret based on Complainant's experience that[                                             ]

Respondents argue in their petition that[                         ]is standard, but

Dr. Hamed testified that '[

                  ]' CX-1570, Q.33. Respondents are correct, however, that the[

                  ]is sold as a standard[                  ] and that it is standard for there to

be[                                     ] RX-422C at 34, 290-91.

Nevertheless, the assertion of a trade secret is with respect to the combination of

elements, including[                         ] As noted by the Complainant and

19

*PUBLIC VERSION*

the IA, the ALJ found the combination of elements, including[

                                      ]to be a trade secret because the

configuration offered[                    ] ID at 197 (citing CX-1596C, Q.41; CX-

608C). The Commission concludes that the ALJ was correct in finding that the[

                        ]is protectable as a trade secret.

C.    **Which Condensation Steps are Protectable as Trade Secrets?**

    1.  Use of[                    ]

The ALJ found that the use of[

                        ]is a trade secret and used by the Complainant. ID at 212-17.

The ALJ found that Complainant made a *prima facie* showing that the use of[

            ]was not generally known or readily ascertainable based on the same evidence

of lack of competition as for other steps. *Id.* at 213. The ALJ found that Respondents did

not rebut this *prima facie* showing. The ALJ found that Complainant has taken

reasonable steps to protect the secrecy of its process and that the use of [          ]has

economic value. *Id.* at 217.

    Respondents argue that the ALJ's determination is contrary to Complainant's

admissions that the use of[                    ]is ascertainable through testing.

Resps. Pet. at 43. Respondents argue that it was undisputed that resins made using[

            ]will contain[                    ]and Dr. Banach,

Complainant's employee, testified that one can test for residuals in Complainant's

product (SP-1068) which will tell them whether they are using[          ] *Id.*

at 43-45 (citing RX-1C (Banach Depo. Tr.) at 249:6-251:6; Tr. at 184:4-23 (confirming

deposition testimony)). Respondents acknowledge the ALJ's conclusion that testing

20

would not differentiate between [                         ]and[                    ] *id.*

at 46, or that testing would not differentiate the two without reference samples, *Id.* at 47,

and argue that this is a litigation-inspired distinction and further aver that the ALJ is

making a distinction between [                         ] *Id.* at 45-46. Finally,

Respondents argue that the ALJ was wrong to conclude that the use of [        ]was

not well known in the industry. *Id.* at 48 (citing RX-510 at SINOZJG_0022260).

Respondents also argue that the '217 patent is still relevant and has not been

waived. Resps. Sub. at 10. Respondents assert that although the ALJ distinguished the

'217 patent because it was directed to phenol-aldehyde type resins that can be used for a

variety of end uses, the underlying chemical reaction between [

]to make resins had been known for a long time. *Id.* Respondents further

argue that testing would allow one to reverse engineer the use [               ] *Id.* at

12.

Complainant argues that the ALJ was correct in determining that the use of[

]is not ascertainable through testing. Complainant points out that the

[                                                                    ] *Id.* at 56

(citing CX-1570C at Q.37; CX-1565C at Q.13; Tr. at 183:5-184:3). Complainant argues

that it would not be possible to reverse engineer the finished product unless one already

knew that[                    ] *Id.* at 57 (citing CX-1570C at Q97). Complainant

further argues that one would not be able to distinguish between the use of[

]and[                    ]without knowing [               ] *See Id.* at 57-

58 (discussing Tr. 181:12-21; 182:11-16; 436:18-464:18). Similar to the Complainant,

the IA states that the ALJ properly rejected the possibility of reverse-engineering, finding

21

*PUBLIC VERSION*

that reverse engineering cannot differentiate between[                    ]and[

           ] IA Resp. at 22 (citing ID at 214-17).

   The ALJ found that the use of[                                        ]

in the condensation reaction was a trade secret. The question presented by the petitions is

whether the use [              ]was generally known or readily ascertainable. The

ALJ observed that the Encyclopedia of Chemical Technology, RX-510 ("Kirk-Othmer"),

teaches that [


          ](citing RX-510 at SINOZJG_0022260). We agree that Kirk-Othmer does not

teach [                       ]

   The '217 patent mentioned the use of[

                              ] We agree with Complainant and the IA

that Respondents waived reliance on the '217 patent because Respondents failed to

include the '217 patent in their petition for review. 19 C.F.R. § 210.43.

   There remains the question of whether[                    ]was

"readily ascertainable" by reason of reverse engineering. Complainant has argued that

that reverse engineering could reveal[                ]but would not reveal that

[                              ] *See* ID at 214. On examination of

the review briefing and on inspection of Respondents' emails with non-party Sumitomo,

we disagree with the ALJ because it appears that the analytical chemists inferred the

possible use of[          ]from the reverse engineering, *i.e.,*[          ][2] We are

---

[2] Red Avenue hired Sumitomo to attempt to analyze Complainant's product. Sumitomo analyzed the infrared spectrum of the product. On August 25, 2006, Sumitomo concluded that [

                                                                      ]

22

A122

*PUBLIC VERSION*

not persuaded by Complainant's argument that Respondents did not appreciate that they were examining[                              ] Indeed, Sumitomo appreciated that it was "a[              ]" and then went on to describe[                    ]it observed based on the chemical fingerprint.[3]

Moreover, even if we agreed with Complainant, Complainant has not proven the independent economic value of[                              ] Complainant has adduced testimony that[                    ]yields tackier tackifier but Complainant has not proven that[                    ]is superior to[                    ]given that Sumitomo [                              ] *See* CX-1584C at 849RESP_0010291.

The ALJ also concluded that the reverse engineering was unsuccessful because there could be an alternative source of[                    ] ID at 214. We disagree with the ALJ that this rendered the reverse engineering unsuccessful in the sense that the use of["          ]was still "readily ascertainable." This infrared examination of the fingerprint of SP-1068 could be followed by experimentation to verify the process, and

---

[                              ]RX-375C at SINOZJG_0023133. The ALJ found that this was an unsuccessful attempt at reverse-engineering SP-1068 because Sumitomo inferred[                              ] and because the alternative explanations undercut the guess that[          ] ID at 214. As discussed herein, we conclude that this evidence demonstrates that the use of [                    ]was readily ascertainable. CX-1584C (using PTO as an abbreviation for p-tert octyl phenol).

[3] In some sense this issue may narrow down to whether there is a difference between "a [          ]" and "[          ]" *i.e.*, whether the article "a" that accompanies "[          ]" in the Sumitomo email changes the meaning of "[          ]" to something that is[          ] Complainant relies on testimony that the presence of[          ]does not allow one to tell the difference between [          ]and completely[          ] Comp. Resp. to Pet. at 57 (citing Tr. at 192:4-22). However, the Sumitomo email uses the word [          ]and Complainant, who bears the ultimate burden of persuasion, has not proven that "[          ]" in "a[          ]" means something [          ] In other words, the testimony of what one may learn from reverse engineering seems to conflict with the actual inference made by Sumitomo.

23

**A123**

such verification would not detract from the fact that the use of "[        ]was

readily ascertainable from the infrared examination by analytical chemists.

We conclude that the Red-Avenue-Sumitomo reverse-engineering demonstrates

that the use of[        ]was readily ascertainable but that other process steps, such as

the use of[                              ]were not, as explained

elsewhere.

For these reasons, the Commission has determined to reverse the ALJ's finding

that Complainant has proven the existence of a trade secret in the use of[

]

2. [                              ]

The ALJ found that the use of[

]is not a trade secret. ID at 229-30. The ALJ found that

Complainant used[        ]in its Shanghai plant from 2004-07. *Id.* at 230. The ALJ

found that Complainant made a *prima facie* showing that[        ]was not generally

known or readily ascertainable based on the same evidence of lack of competition set

forth with respect to the other steps, but found that Respondents successfully rebutted the

showing. *Id.* Namely, the ALJ found that Complainant's patents disclose the use of

[        ] *Id.* at 231 (citing U.S. Patent Nos. 8,030,418 ("the '418 patent") and

7,425,602). Nevertheless, the ALJ found that the use of[        ]had economic value and

that Complainant took reasonable steps to protect this process. ID at 234-35.

Complainant argues that the ALJ correctly found that U.S. Patent No. 7,772,345

(the "'345 patent") does not disclose the use of[        ]but erred in finding that the '418

and '602 patents do. Comp. Pet. at 8-9. As to the '418 patent, Complainant argues that

24

*PUBLIC VERSION*

Respondents' misappropriated the trade secret before the November 6, 2008, publication of the application that led to the '418 patent. *Id.* at 9. Complainant argues that Respondents misappropriated and used the[        ]trade secret in Nov. 2006, before the publication of the application which resulted in the '418 patent. Comp. Sub. at 31 (citing CX-1570C at Q.137; ID 515-16). Complainant argues that even if the information is now public, the UTSA permits the issuance of an injunction to negate the head start that a misappropriator gained. *Id.* at 10 (citing, *inter alia*, UTSA Sec. 1 cmt. (1985)).

The Commission affirms the ALJ's finding set forth in the ID at 229-235 that the use of [                        ]was well known. In fact, Complainant's own patent, U.S. Patent No. 7,425,602, discloses the use of[        ] RX-498 (the '602 patent) at[        ]Tr. at 149; Tr. at 141-42; *see also* Tr. at 392. The Commission concludes that the use of the[                    ]was not protectable as a trade secret.

### 3.  [                ]

The ALJ found that the use of [

                ] is a trade secret and used by the Complainant. ID at 244-50. The ALJ found that the [            ]in U.S. Patent No. 8,030,418 ("the '418 patent") is[    ] whereas in Complainant's process it is[        ] and as a result the '418 patent does not disclose[        .] *Id.* at 246 (citing RX-3 at [        ] Respondents' Post–Hearing Brief at 56-57). The ALJ further found that the '418 process is directed to the use of[            ] and does not address the use of[        ] The ALJ found that Complainant has taken reasonable steps to protect the secrecy of its process. *Id.* at 245. The ALJ found that

25

*PUBLIC VERSION*

Complainant made a *prima facie* showing of [                    ] based on the same

evidence of lack of competition set forth for the other steps. *Id.* at 245.

The ALJ found economic value to [          ] and that the improvement to

Complainant's process was the "result of substantial expenditure on research and

development [and] leveraged years of practical experience at the company running the

alkylation and condensation reactions." ID at 248-49 (citing CX-1565C, Q.97).

Respondents argue that the ALJ erred because the [                    ] which is

equivalent to [                              ] is generally known

because "[                    ] appears in Complainant's U.S. Patent No. 8,030,418,

*i.e.,* [      ]" Resps. Pet. at 50-51 (citing RX-421C at Q316-32; Tr. at 138:16-139:14).

Respondents assert that Complainant has not proven that the [          ] is an

improvement over the [              ] especially where Complaints admit that the [

                    ] *Id.* Respondents further

argue that the ALJ erred in finding the '418 patent inapplicable because it was directed to

[                    ] rather than [                    ] *Id.* at 52.  Respondents

counter that the '418 patent does not specify [              ] and Complainant [

                    ] *Id.* Respondents further argue

that in making a public disclosure in a patent, Complainant has not followed the

requirement of UTSA Sec. 1(4)(ii) to take reasonable steps to maintain secrecy. *Id.* at 53.

The Commission affirms the ALJ's finding, set forth in the ID at 244-250.

Complainant's [    ] is [                    ] CX-1565C, Q.22.

Respondents have not shown that this was generally known or readily ascertainable. As

to Respondents' reliance on the '418 patent, the ALJ found that the '418 patent disclosed

26

**A126**

*PUBLIC VERSION*

[                                          ] ID at 246 (discussing RX-3 (the '418 patent)

at [        ] Tr. at 194:18-195:11 (Banach); RX-421C at Q.318 (Swager); Respondents'

Post-Hearing Br. at 56-57).  Although the disclosed [                              ] the

ALJ found that the [        ] were different because Complainant uses [              ]  We

agree.  Although in our view, the use of [                  ] is not protectable as a trade

secret, the [                                    ] is different [          ] and

Complainant has shown that it has [                                              ]

[            ] would have different composition than the [                ] in the patent.  *See*

Tr. 196:14-23.  The [                                    ] therefore has independent economic

value.  We conclude that [                            ] is protectable as a trade secret.

### 4.  The Use of [                                    ]

The ALJ found that the use of [

] is not a trade secret but is used by the Complainant.  ID at 257-60.  The

ALJ found that Complainant made a *prima facie* showing that the use of [        ] was not

generally known or readily ascertainable based on the same evidence of lack of

competition set forth with respect to the other steps but the ALJ found that the

Respondents successfully rebutted the *prima facie* showing.  The ALJ found that U.S.

Patent No. 7,425,602 ("the '602 patent") teaches the use of [                              ]

*Id.* at 259 (citing Tr. at 150:17-25; 368:23-396:6).  Nevertheless, the ALJ found that the

use of [        ] has economic value, *Id.* at 260, and that the Complainant took reasonable

steps to protect its processes.  *Id.* at 261.

Complainant argues that [        ] combined with [                          ]

avoids the need to [                                        ] Comp. Pet. at 15 (citing

27

A127

CX-1570C at Q.43). Complainant suggests that the ALJ erred in dismissing differences between the '602 patent and Complainant's process, *i.e.*, that Complainant's process uses

[          ]and[                                        ] *Id.* at 16.

The Commission affirms the ALJ's finding and adopts the ALJ's reasoning, as set forth in the ID at 257-261. The ALJ was correct in finding that the '602 patent teaches

[                                        ] ID at 259 (citing Tr. at 150:17-25; 368:23-396:6); RX-498 (the '602 patent) at 4:58-60. We conclude that the use of[      ]is not protectable as a trade secret. Further, Complainant has failed to prove that the use of[

]has significance to the condensation process.

5. [                                        ]

Although the ALJ found that the use of [          ]was not a trade secret, the ALJ found that the use of[                                        ]was entitled to protection as a trade secret and was used by the Complainant. ID at 268-72. The ALJ found that Complainant had made a *prima facie* showing that [

]was not generally known because of the same evidence of lack of competition set forth with respect to the other steps, and found that Respondents did not rebut this showing. *Id.* at 268. The ALJ found that the [                    ]had economic value and that Complainant had taken reasonable steps to protect the process. *Id.* at 270-72.

Respondents argue that the ALJ erred in finding[

]to be a trade secret because Complainant has admitted that [

]is equivalent to [                    ] which Complainant disclosed in the '379 patent application. Resps. Pet. at 54-57 (citing RX-355 at [      ]CX-1570C at Q.47; RX-302 [          ]). Both the Complainant and the IA argue that the ALJ

28

properly concluded that the '602 patent does not disclose [

                    ]because the '602 patent is directed to [              ] IA

Resp. at 26 (citing ID at 270). The IA states that Dr. Swager's testimony in support of

Respondents' argument was conclusory whereas Dr. Banach gave unrebutted testimony

regarding the difference in chemistry between[                             ]*Id.* at 26-27

(citing ID at 270).

As discussed below, the Commission reverses the ALJ's determination that the

use of[                                   ]was entitled to protection as a

trade secret. Complainant uses[

        ]ID at 268, which Complainant has admitted is equivalent to [

                ] RX-555C at 51 n.12 (Complainant's Seventh Supplemental Response

to Respondents' First Set of Interrogatories). The '602 patent discloses [

                ] *See* RX-498 (the '602 patent) at 5:5-14. Complainant states that

it uses[                  ] which it states is different than [           ]although Dr.

Banach conceded that[                        ]ID at 263; CX-1570C at Q.47; RX-421C,

Q.354; Tr. at 148:1-5. The ALJ found that the '602 patent discloses a similar[

                ]but does not so do with[              ] ID at 270

(citing Tr. 853:13-23). However, Complainant has admitted that[

                    ] *See* Comp. Resp. to Pet. at 65

("Therefore, as stated in SI's interrogatory responses, it is equivalent to state [

                                    ] RX-

555C at 51, n.12."). Indeed, the[                              ] *See* ID

at 260 (discussing CX-1565C, Q.28). Thus, contrary to the ALJ's finding, it is irrelevant,

29

for purposes of the asserted trade secret, whether [                    ] because the

[                                    ] Further, to the extent that there is

difference between [                    ] and [

                    ] Complainant has not proven that this difference has an

independent economic value. For these reasons, the Commission has determined to

reverse the ALJ's finding that [                    ] is protectable as a trade secret.

   6. [                    ]

   The ALJ found that the use of [

                    ] was entitled to protection as a trade secret. ID at 281-87. The

ALJ found that the Complainant used a [                    ] at its

Shanghai plant between 2004 and 2007, and has otherwise used [

                    ] *Id.* at 281. The ALJ found that

Complainant has taken reasonable steps to protect the secrecy of its process. *Id.* at 282.

The ALJ found that the Complainant made a *prima facie* showing based on the same

evidence of lack of competition set forth for other steps and found that the Respondents

had not rebutted that showing. *Id.* at 282-83.

   The ALJ observed that U.S. Patent Application No. 2007/0060718 A1 discloses a

similar [                    ] but found that [

   ] *Id.* at 283. The ALJ noted that [

                    ] The ALJ therefore concluded that [

                    ] was not generally known or readily

ascertainable. The ALJ found that [                    ] has economic value. *Id.* at

286.

30

**A130**

Respondents argue that Complainant's '718 published patent application
disclosed[                        ] Resps. Pet. at 58-59.  Respondents acknowledge the
ALJ's reasoning that the '718 patent application did not disclose[                        ] but
argue that the '718 application is not limited to[                        ] because it
did not disclose[                        ] *Id.* at 59.   In response to the Commission's
question as to whether Respondents benefited from a lead time before the publication of
the '718 application, Respondents argue that[                        ] was already
known and typical, as evidenced by the '718 application and that Complainant's
[        ] was[                        ] and distributed to customers. Resps.
Reply Sub. at 20-21 and n.18 (citing Tr. at 443:16-21; JX-7C; RX-496).

Complainant and the IA argue that the disclosure of the '718 application is not
applicable to Complainant's[                        ] because it does not disclose[
                        ] *Id.*; IA Resp. at 28 (citing ID at 283-84); IA Reply
Sub. at 11. Complainant argues that Complainant uses[                        ] and
that Dr. Swager conceded that[

                        ] *Id.* at 69 (citing ID at 284).  Complainant argues that its[                        ]
trade secret is not readily ascertainable through reverse engineering. *Id.*  Complainant
argues that the ALJ properly refused to credit the testimony of Dr. Swager that reverse
engineering of[                        ] was possible, and that any such reverse
engineering was merely theoretical rather than actual. *Id.* at 69-70 (discussing ID at 286;
Tr. at 862:24-863:5).

The Commission reverses the ALJ, ID at 281-287, and finds that there is not a
trade secret in[                        ] because it was generally known or readily

31

*PUBLIC VERSION*

ascertainable. The background of the '718 patent application indicates that it was already known in the art, *i.e.*, before the '718 application, that [

                                            ] RX-496 (the '718 application) at [ ]

("[

                        ]"). Dr. Banach, Complainant's employee, confirmed that

[           ]was typical and in use: "the patent states that typical commercial ones are [

        ]" Tr. 146:22-147:11; *see also* RX-531 (Pat. Appl. No.: 09/734,734, Published

Jun. 21, 2001) [


]; RX-291 (U.S. Patent No. 3,005,797, issued 1958) at SINOZJG 0023310 [


                                    ]. Further, to the extent that Complainant's

[                     ]may be slightly different, Complainant has not proven

independent economic value in such a difference.

7. [                                                    ]

    The ALJ found that the [                                                ]

used in Complainant's Shanghai facility is a trade secret, *i.e.*,[

                    ] ID at 289-92. The ALJ found that Complainant made

a *prima facie* showing that the[      ]was not generally known or readily ascertainable

based upon the same evidence of lack of competition set forth for other steps and found

that Respondents had not rebutted this showing. ID at 290. The ALJ found that the '345

patent did not disclose[      ]and rejected Respondents' argument that[

]is required by [                                        ]because he

32

A132

found Dr. Swager's testimony to be unsupported. *Id.* at 290-91. The ALJ found that the [                               ] has economic value. *Id.* at 291-92.

Respondents assert that the difference between the alleged trade secret and the '345 patent was "razor thin" and the Complainant offered no meaningful evidence demonstrating that the [                                        ] had any independent value. Resps. Sub. at 13-14. Respondents state that the ALJ found that the value of the alleged trade secret was to [

                    ] *Id.* (citing ID at 292). Respondents argue that this problem and solution was disclosed in the '345 patent (RX-497 at [      ], and that the [                        ] does not relate to Complainant's point of distinction from the '345 patent, *i.e.*, that [

    ] *Id.* at 15.

Complainant asserts that Respondents have no evidence to dispute the ALJ's finding that the '345 patent discloses a different [              ] than Complainant's trade secret uses. Comp. Resp. at 71. Complainant asserts that Dr. Hamed's argument refutes Dr. Swager's claim that the [                        ] is a common sense choice. *Id.* at 73 (citing CX-1570 at Q.108). Complainant asserts that the disclosure of the '345 patent is not limited to [

      ] because it also teaches that [

                    ] *Id.* at 12-13 (citing RX-497, [      ]. The IA argues that the ALJ's conclusion that the trade secret was not generally known or readily ascertainable is not based on clear error, and that the ALJ properly distinguished the '345 patent. IA Sub. at 11 (citing ID at 289-92). The IA

33

asserts that the ALJ adequately distinguished the '345 patent from the asserted trade secret and that the ALJ correctly determined that the trade secret has independent economic value based on uncontested testimony from Dr. Banach. 1A Reply Sub. at 5 (citing ID at 291-92).

The Commission has determined to reverse the ALJ's holding that the[

] is a trade secret. The Complainant's own '345 patent discloses a similar[

] ID at 290-91 (citing RX-497 at [    ].

Respondents argue that it would be common sense to [

] citing Dr. Swager's testimony. *See* RX-421C at Q.387 ("It is natural for any chemist to [

]") The ALJ found Dr. Swager's testimony to be unsupported and conclusory. ID at 291. We disagree. In our view, Dr. Swager provided a reasoned basis for his opinion.

Further, we agree with Respondents that the ALJ's basis for the value of the alleged trade secret was to[

] that this problem and solution was disclosed in the '345 patent (RX-497 at [    ]), and that the[                    ] does not relate to Complainant's point of distinction from the '345 patent, *i.e.*, that Complainant[        ]

34

*PUBLIC VERSION*

[                                        ] Therefore, we agree with Respondents

that Complainant has not proven independent economic value for its asserted trade secret.

For these reasons, the Commission has determined to reverse the ALJ's finding

that [                                ] is protectable as a trade secret.

8. [                                        ]

The ALJ found that [

                                                    ] is not a trade

secret and is used by the Complainant. ID at 298-302. The ALJ found that Complainant

has taken reasonable steps to protect the secrecy of its process. *Id.* at 299. The ALJ

found that Complainant had made a *prima facie* showing that [          ] is not

generally known based on the same evidence of lack of competition set forth with respect

to the other steps but the ALJ found that the Respondents successfully rebutted this

showing. *Id.* at 299-300. The ALJ found that U.S. Patent Application No. 2001/0004664

("the '664 application") teaches [

                    ] *Id.* at 300. Nevertheless, the ALJ found that the [          ]

has economic value. *Id.* at 301.

Complainant argues that in the relevant literature, [

                                        ] *Id.* at 17 (citing CX-

1570C at Q.52). Complainant argues that [

                                        ] *Id.* at 18 (citing CX-1570C at

Q.52; CX-1565C at Q.30). Complainant argues that the ALJ erred in finding that the

'664 application discloses [                        ] because the '664 application

35

does not use[                                 ]and is conducted on a laboratory scale. *Id.*
at 18-19 (citing CX-1570C at Q.139).

We affirm the ALJ and adopt the ALJ's reasoning, set forth in the ID at 298-302.
The ALJ was correct that U.S. Patent Application No. 2001/0004664 ("the '664
application") teaches[

] ID at 300 (citing RX-531 (the '664 application) at ¶5). We note that the '664
application does not specify[                                               ]
Nevertheless, the '664 application renders[                         ]readily
ascertainable for[                              ] The Commission concludes
that[                              ]is not protectable as a trade secret.

9. [              ]

The ALJ found that [

]is not a trade secret. ID at 310–
14. The ALJ found that Complainant had made a *prima facie* showing that [

]was not generally known based on the same lack of competition set forth for other
steps but the ALJ found that Respondents successfully rebutted this showing. *Id.* at 311–
12. The ALJ found that the '718 application teaches[

] *Id.* at 312. Nevertheless, the ALJ found that[

]has economic value. *Id.* at 313-14.

Complainant argues that[

] Comp. Pet. at 20 (citing CX-1570C at Q.109). Complainant
argues that [

]

36

A136

[                            ] *Id.* (citing Tr. at 201:14-202:12). Complainant asserts

that the ALJ erred in relying on RX-496 (the '718 application) because it was published

after the misappropriation occurred and because it discloses different features than

Complainant's process. *Id.* at 21.

The Commission affirms the ALJ's finding, set forth in the ID at 310-314, that[

] The[

] ID

at 312 (citing Tr. at 443:16-21; JX-7C). The Commission concludes that the

[                            ]is not protectable as a trade secret.

**10. [                            ]**

The ALJ found that the combination of three features of[                            ]

is a trade secret, *i.e.*, (1)[

] (2) [

] and (3)[                            ]

ID at 327-31. The ALJ relied on testimony that '[                            ]would be

unique." *Id.* at 327-28 (citing CX-1570C, Qs. 56-57). The ALJ found that these features

have economic value and that Complainant has taken reasonable steps to protect the

secrecy of these features. *Id.* at 329. The ALJ found that Complainant made a *prima*

*facie* showing that the features were not generally known based on the same evidence of

lack of competition set forth with respect to the other steps and found that Respondents

had not rebutted this showing. *Id.* at 330.

Respondents argue that (1)[                            ]confirms that

Complainant's use of[                            ]was conventional; (2) the ALJ erred

37

as a matter of law in extending trade secret protection to a combination of known features

where Complainant provided no support for a finding that the combination's value

exceeded the sum of the values of each individual feature; and (3) Complainant has never

claimed that [                    ] as a whole is a trade secret and Complainant should

not be allowed to rely on a subset of features if the whole is not a trade secret. Resps.

Sub. at 15-16. Respondents argue that each of the features falls in the middle of the

conventional range, *i.e.,* for [

                           ] and that a specific value in a disclosed range is

publicly known. Resps. Sub. at 11; Resps. Reply Sub. at 16-17 (citing RX-532 at

849RESP0000560-61; RX-422C at Q.380-81; RX-270 at 214; RX-505 at 85; *Ultimax

Cement Manuf. Corp. v. CTS Cement Manuf. Corp.*, 587 F.3d 1339, 1354-56 (Fed. Cir.

2009)). Respondents state that the component features were chosen by [          ]

            ·, and that [        ] disclosed [            ] to Complainant. *Id.*

at 16. Respondents argue that there is a heightened standard for combination trade

secrets, and that a combination of features must exceed the value of the individual

features. Resps. Sub. at 11-12; Resps. Reply Sub. at 17-18 (citing *Strategic Directions

Group v. Bristol-Meyers Squibb*, 293 F.3d 1062 (8th Cir. 2002)).

     Complainant asserts that [

   ], did not disclose [                              ] and did

not alone or in combination with any other reference disclose the combination of [

                                    ] *i.e.,* (1) [

          ] (2) [                                    ]

*PUBLIC VERSION*

[                                           ] and (3) [                                    ]

Comp. Sub. at 13-14.

Complainant argues that *Ultimax* did not address the situation where a trade secret is a specific value within a previously disclosed range, citing *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1340 (Fed. Cir. 2002), and did not address the situation where a trade secret is combined with other features, which as a whole forms a unique trade secret. Comp. Reply Sub. at 8. Complainant, citing *Synthex Ophthalmics, Inc. v. Novicky*, 745 F.2d 1423, 1434 (Fed. Cir. 1984), disagrees with Respondents' assertion that there is a heightened standard for the assertion of combination trade secrets. *Id.* Complainant asserts that Respondents are focused on immaterial differences between their [                        ] and the asserted invention. *Id.* at 9 (citing ID at 562).

The IA makes similar arguments to the Complainant, and states that [

                        ] did not disclose [                                    ] used by Complainant (or the other features) when it disclosed [

                        ] IA Sub. at 12-13; IA Reply Sub. at 5. The IA argues that the ALJ properly relied on the corroborating testimony of Dr. Hamed and Mr. McAllister, in which they opined that the combination of features allows the Complainant to [

                        ] *Id.* at 6 (citing ID at 327-331).

The Respondents have demonstrated that [                                    ] because [            ] was using [                ] RX-532 at 849RESP0000560-61; RX-422C, Q.380-81, [                        ] and the use of [            ] were publicly known, RX-422C at QQ.354-58, 384-85, and the use of [                    ] is taught

39

A139

*PUBLIC VERSION*

in textbooks because of the use of [          ] RX-270 at 212.  Complainants have

not demonstrated that there was anything unique about [

[          ] and Complainant has not demonstrated anything unique about the

combination of publicly known elements.  *Compare BBA Nonwovens Simpsonville, Inc.*

*v. Superior Nonwovens, LLC*, 303 F.3d 1332, 1340 (Fed. Cir. 2002) (combination was

"very unique").  Indeed, Complainant has not shown independent economic value for [

[          ] or that the combination of elements has

independent economic value.  For these reasons, the Commission has determined to

reverse the ALJ's finding that these features of the [          ] are protectable

as a trade secret.

**D.    Overall Process Flow Trade Secret**

The ALJ found that the overall process flow, defined as the seven alkylation

reaction features [                          ] combined

with the ten condensation reaction features [                    ] is a trade secret.

ID at 342-45.  The ALJ found that Complainant practiced each of the individual

elements, and has not disclosed the elements.  *Id.* at 342.  The ALJ found that

Complainant made a *prima facie* showing that the overall process flow was not generally

known based on the same evidence of lack of competition set forth with respect to the

other sections and found that the Respondents have not rebutted this *prima facie* showing.

The ALJ found that the combination of seventeen elements is valuable.  *Id.* at 344.

Respondents argue that the ID was "wrong" to conclude that Complainant's so-

called "overall process flow" was entitled to trade secret status.  Resps. Pet. at 73-75.

Respondents argue that the ALJ erred in finding the combination of 17 components to be

40

**A140**

secret where the ALJ found that 7 of the 17 alleged trade secrets were not legitimate. *Id.*

at 75 (relying on *Fishing Concepts*, 1985 U.S. Dist. LEXIS 19763 at \*13-14; *Arco Indus.*,

633 F.2d at 441-42).

The Commission affirms the ALJ's finding and adopts the ALJ's reasoning, set

forth in the ID at 342-345. The ALJ did not err in finding that, just as certain elements

are unique [



] the combination of elements is also unique.

The Commission concludes that the overall process is protectable as a trade secret.

### E.  Respondents' Access to the Trade Secrets Through Mr. Xu and Mr. Lai

The ALJ found that Complainant has shown by a preponderance of the evidence

that Mr. Jack Xu and Mr. C.Y. Lai, two high-level employees at Complainant's Shanghai

subsidiary had unquestioned access to Complainant's trade secrets in the normal course

of their employment. ID at 390. The ALJ found that Mr. Xu and Mr. Lai signed

confidentiality and noncompetition agreements with Complainant's Shanghai subsidiary

but left to work for Respondents where Respondents wrongfully took Complainant's

SP1068 trade secrets by unfair means. *Id.* at 390-91; 392 (Lai agreement, CX-256C);

393-94 (Xu agreements, CX-317C at 5 and CX-318C-320C).

The ALJ found that Respondents have failed to explain how they proceeded from

their pre-November 2006 parameters to the post-November 2006 parameters that

strikingly resemble Complainant's parameters. *Id.* at 406. The ALJ thus found that

strong circumstantial evidence compels the conclusion that Respondent Sino Legend ZJG

wrongfully took Complainant's trade secrets by unfair means through Mr. Xu and Mr.

41

Lai. *Id.* The ALJ found that copying is especially evident in the particular match in the

[                              ]in Mr. Fan's notebook, which is exact to the thousandth

decimal point. *Id.* (citing Tr. 458:2-24).

The Respondents argue that the ALJ's finding of access by Mr. Xu or Mr. Lai to

pre-2000 formulas is unsupported and clear error. Resps. Pet. at 10-13. Respondents

state that they do not dispute that Mr. Xu and Mr. Lai saw Complainant's Formula 1 for

making SP-1068 and the United States precedent for Formula 1 (post-2000) but argue

that there was no evidence that anyone who worked at Sino Legend ever laid eyes on any

pre-2000 process information relied on by Complainant. Resps. Pet. at 10-11.

The Commission affirms and adopts the ALJ's findings, set forth in the ID at 390-

406. The ALJ was correct in finding that Mr. Lai and Mr. Xu had access to

Complainant's trade secrets by virtue of their positions at the Shanghai plant. The email

correspondence indicates that Mr. Lai was aware of the use of [      ]at other facilities

even though this was not used in Shanghai. The Commission concludes that Mr. Lai and

Mr. Xu had access to Complainant's trade secrets.

**F.    Respondents' Use of Trade Secrets**

The Commission affirms and adopts the ALJ's findings, set forth in the ID at 424-

428. The ALJ found that Respondents' processes used Complainant's alleged trade

secrets. *Id.* at 424. Based on Dr. Chao's witness statement, the ALJ found that the Key

in CDX-001C reflects that Dr. Chao made a comprehensive comparison for each of: (1)

the lab scale experiments from Mr. Fan's notebook in 11/2006; (2) Sino Legend's pilot

study in 12/2006; (3) Sino Legend's first commercial scale production of SL-1801 in

12/2007; (4) Sino Legend's [      ]SL-1801 importation batches in 2010-12; (5) Sino

42

*PUBLIC VERSION*

Legend's [             ]SL-1801 and SL-1802 importation batches in 2012; and (6)

formula 1 with Respondents' products, whether or not included in the tables. *Id.* at 425.

The ALJ found that the LFP products were modifications of the original 1801 formula

with "low free PTOP." *Id.* at 426 (citing Tr. at 461:13-16 and 462:10-17).

   The ALJ found that even without the explicit evidence of documentary copying,

the later versions of Sino Legend's products were at least derived from misappropriated

proprietary information from Complainant. *Id.* at 426.

   The ALJ rejected Respondents' argument that the trade secret is a patchwork of

formulas from different times, places, and products. *Id.* at 427. The ALJ found that

Complainant asserted that its own rubber resins at issue include SP-1068, HRJ-2765, SP–

1045, and R-7578, and that it practices variations of the SP-1068 process at its Rotterdam

Junction and Shanghai plants. *Id.*

   We address the arguments as to whether there is misappropriation of the

individual trade secrets (for the alkylation reaction, for the condensation reaction, and for

the overall process) in the following sections.

## G.    Technical Proofs of Misappropriation of Each Alkylation Reaction Alleged Trade Secret

   **1. [                          ](and the Issue of the LFP Products)**

   The ALJ found that Respondents' process for manufacturing[              ]

tackifier resins uses and substantially uses (or is at least derived from) Complainant's

trade secret. The ALJ found that a November 8, 2006, experiment from Mr. Fan's lab

notebook shows [                          ] *Id.* at 449

(citing CX-32C at SINOZJG_005184, 88; CDX-2C at No. 10; CDX-3C at No. 10; CX-

43

*PUBLIC VERSION*

1566C, Q.24). The ALJ found that Sino Legend used [                    ]for its

December 2006 pilot study. *Id.* (citing CX-1566, Q.24). The ALJ rejected Respondents'

argument that the[    ]would be different when taking into account[          ]for the

reasons discussed with respect to the trade secret [*e.g.,*[

], and found that[          ]would in any event be substantially similar. *Id.* at

450-51. The ALJ rejected Respondents' argument that the LFP (low free PTOP)

products use a different [    ]because Dr. Chao testified that they are derived from the

same basic process as the SL-1801 and SL-1802 products. *Id.* at 451 (citing Tr. at

461:13-16; 462:10-17).

Respondents assert that there is no evidence that the [          ]for the LFP

products is derived from Complainant's [          ] Resps. Reply Sub. at 5.

Respondents argue that merely because the SL-1801 and 1802 products came first does

not mean that the LFP[          ]was based thereon. *Id.* at 6. Respondents further

contend that there is no evidence that the LFP [          ]was based on an historical

formula of Complainant, and that the [          ]is different from

Complainant's. *Id.* at 7.

Respondents argue that Sino Legend's LFP products should be outside the scope

of any exclusion order because they argue that changing one component can negate

misappropriation. *Id.* at 10 (citing *In re: John Wilson*, 1999 U.S. App. LEXIS 27340 at

*5-6 (4th Cir. 1999). Respondents further argue that the remaining alleged trade secrets,

such as [          ]cannot justify an exclusion order. Resps. Reply

Sub. at 9.

44

*PUBLIC VERSION*

Complainant asserts that the [                    ] used to make the LFP

products are based on Complainant's historical formulae which had [

                    ] Comp. Sub. at 2-3 (citing CX-1565C at Q.61-62). Complainant

asserts that modification does not remove the copied process from the realm of

misappropriation because the process is derived from the misappropriated information.

*Id.* at 4-6 (citing *Mangren Research and Development Corp. v. National Chem. Co., Inc.*,

87 F.3d 937, 943-45 (7th Cir. 1996); *Norbrook Labs. Ltd. v. G.C. Hanford Mfg. Co.*, 297

F.Supp.2d 463 (N.D.N.Y. 2003); *Pioneer Hi-Bred Int'l v. Holden Foundation Seeds, Inc.*,

35 F.3d 1226, 1239 (8th Cir. 1994); *Agilent Techs., Inc. v. Kirkland*, C.A. No. 3512-VCS,

2010 LW 610725, *22 (Del. Ch. Feb. 18, 2010); *Sokol Crystal Prods, Inc. v. DSC

Commc'ns. Corp.*, No. 91-C-974-S, 1993 WL 597382, *3 (W.D. Wis. Mar. 30, 1993)).

Similarly, in the IA's view, the importation of Respondents' LFP products violates

Section 337 because the process for the LFP products is derived from SI's process and

modifications that are based on misappropriated trade secrets do not negate a finding of

misappropriation. IA Sub. at 6; IA Reply Sub. at 2.

As set forth in Section III.B.1. *supra*, Complainant has a protectable trade secret

in the use of [                    ] As to whether that [    ] is present in

Respondents' processes, the Commission adopts the ALJ's findings, set forth in the ID at

449-452, although the Commission reaches a different conclusion as to the presence of

misappropriation with respect to the LFP products. The ALJ was correct in finding that

Mr. Fan's lab notebook shows an experiment using [                    ] and a

pilot study using [            ] ID at 449 (citing CX-32C at SINOZJG_005184, 88;

45

CDX-2C at No. 10; CDX-3C at No. 10; CX-1566C, Q.24). This is classic misappropriation of trade secrets, with copying down to the thousandth decimal place.

Respondents' LFP products use [          ] ID at 429. The ALJ found that the LFP products were derived from the experiments [          ] and were also derived from Complainant's use of [          ] in Rotterdam Junction. *Id.* Complainant relies on *Mangren Research and Development Corp. v. National Chem. Co., Inc.*, 87 F.3d 937, 943-45 (7th Cir. 1996) (*cited in Certain Cast Steel Railway Wheels*, Inv. No. 337-TA-655, USITC Pub. 4265 (March 19, 2010)), for the proposition that a modification of [

] does not lessen the misappropriation of [          ] However, Complainants narrowly defined the trade secret as [          ] in view of the ranges of values which were known in the art. It is inconsistent for Complainants to attempt to capture in application what they gave up in definition. Complainant cannot now argue that the LFP products were derived from a trade secret relating to [          ] where Complainant has disclaimed [          ] used by the LFP products in obtaining trade secret protection for [          ] For these reasons, the Commission has determined to reverse the ALJ's finding of misappropriation of [          ] with respect to the LFP products. Nevertheless, because Respondents' processes have misappropriated other trade secrets, as set forth *infra*, the LFP products are still subject to exclusion by reason of misappropriation of other trade secrets.

2. [                    ]

The ALJ found that Respondents' process for manufacturing [          ] tackifier resins uses Complainant's trade secret. *Id.* at 463-65. The ALJ relied on Dr. Chao's testimony that Sino Legend ZJG's December 2006 pilot study shows a [   ]

46

*PUBLIC VERSION*

[                              ] *Id.* (citing CX-60C). The ALJ found that the trade secret does not require a specific [          ] and because the ALJ found that the evidence shows that Sino Legend does in fact use a [                    ]

Respondents argue that Sino Legend has never practiced [

] in combination with [                              ] in any commercial production, and that the ALJ only found use in a 2006 pilot study. Resps. Pet. at 25. Respondents argue that Sino Legend uses a [                    ] *Id.*

As set forth in Section III.B.2. *supra*, the Commission affirms the ALJ's finding that there is a protectable trade secret in the use of [                    ] As to misappropriation, the Commission affirms the ALJ's finding and adopts the ALJ's reasoning, set forth in the ID at 463-465. We further agree with the IA that no specific

[                    ] is required by the trade secret, only the use of [

] The Commission concludes that Respondents' processes misappropriated the [                    ]

### 3. Use of [                    ]

As set forth in Section III.B.3. *supra*, the Commission affirms the ALJ's finding that the use of [                    ] is not a valid trade secret. Therefore, although Respondents use [                    ] ID at 467-468, there is no misappropriation of a protectable trade secret with respect to the use of [                    ] The Commission thus affirms the ALJ's findings of no misappropriation with respect thereto.

### 4. Use of [                    ]

The ALJ found that Respondents' process for manufacturing [                    ] tackifier resins uses Complainant's trade secret. *Id.* at 272. The ALJ relied on Dr.

47

A147

*PUBLIC VERSION*

Chao's testimony to this effect and on Respondents' First Supplemental Response to

Complainant's Requests for Admission that "the process for manufacturing SL-1801

[

]" *Id.* (quoting CX-492C at 51).

Respondents argue that Complainant failed to present sufficient evidence that

Sino Legend's [                    ] is the same as Complainant's [                    ] Resps.

Pet. at 32. Respondents argue that although Dr. Chao described Respondents' process, he

never provided a comparison with Complainant's process and that the ALJ incorrectly

placed the burden on Respondents to identify a difference. *Id.* at 32. Respondents further

argue that Respondents' LFP products [                                        ] that

Complainant has never used. *Id.*

As set forth in Section III.B.4. *supra*, the Commission affirms the ALJ's finding

that the use of [              ] is a trade secret. The Commission further affirms and

adopts the ALJ's findings, set forth in the ID at 472-480, as to misappropriation. The

ALJ was correct in finding that the Respondents' processes [              ] based on Dr.

Chao's testimony. ID at 472-80; CX-1566C, Q.31. The Commission therefore concludes

that Respondents' processes have misappropriated [                        ]

    5. [                                                    ]

As set forth in Section III.B.5. *supra*, the Commission affirms the ALJ's finding

that the [                                        ] is not a trade secret. Therefore,

although Respondents' processes use the same [          ] as Complainant, ID at 482-484,

there is no misappropriation of a protectable trade secret with respect to the [          ]

48

## *PUBLIC VERSION*

[                              ] The Commission thus affirms the ALJ's finding of no

misappropriation with respect thereto.

6. [                                            ]

As set forth in Section III.B.6. *supra*, the Commission affirms the ALJ's finding

that the [                                        ] is not a valid trade secret.

Therefore, although Respondents use Complainant's method of [

                          ] ID at 487-489, there is no misappropriation of a protectable

trade secret with respect to the [                              ] The

Commission thus affirms the ALJ's finding of no misappropriation with respect thereto.

7. The [                          ]

The ALJ found that Respondents' process for manufacturing [                              ]

tackifier resins substantially uses or is at least derived from Complainant's trade secret

[                                        ] *Id.* at

502-503. The ALJ found that credible evidence shows that certain aspects of Sino

Legend ZJG's [                ] were changed to conform to the [                ] in

Complainant's plant, *i.e.*, based on a difference between 2005 and 2007. *Id.* (comparing

CX-1345C and Tr. 436:3-437:11).

Respondents argue that the ALJ incorrectly found that Sino Legend

misappropriated complainant's [                    ] because Respondents state that

there are "dozens of differences" between Complainant's and Respondents' [      ]

Resps. Pet. at 37. Respondents assert that Dr. Chao acknowledged that he did not

compare all aspects of the [        ] but rather focused on certain aspects. *Id.*

49

*PUBLIC VERSION*

As set forth in Section III.B.7. *supra*, the Commission affirms the ALJ's finding that the [                    ] is a protectable trade secret. The Commission further affirms and adopts the ALJ's findings that Respondents' processes have misappropriated Complainant's trade secrets with respect to the [                    ] set forth in the ID at 502-505.

The ALJ was correct in finding that credible evidence shows that certain aspects of Sino Legend ZJG's [             ] were changed to conform to the [      ] in Complainant's plant. ID at 503. The ALJ relied on Dr. Chao's Witness Statement (CX-1566C). Dr. Chao analyzed Sino Legend's 2005 [      ](CX-1345C) and Sino Legend's 2007 [         ](CX-57C). Dr. Chao makes a comparison of different metrics inasmuch as the 2005 [                    ] and the 2007 [                    ]). Nevertheless, Dr. Chao gave the opinion that the 2007 [                    ] appears to copy Complainant's [      ] as it has the same [        ] and Sino Legend used the same [            ] CX-1566C at Q.37. Sino Legend also uses a [                    ] *Id.* Dr. Chao stated that [                    ] of Sino Legend's [                    ] *Id.* (relying on CX-0853C, CX-0532C, and CX-0606C). It is immaterial whether there are other differences between the [                    ] not asserted as part of the trade secret. The Commission therefore concludes that the ALJ was correct in finding misappropriation of the [                    ]

50

*PUBLIC VERSION*

H.    **Technical Proofs of Misappropriation of Each Condensation Reaction Alleged Trade Secret**

1.  Use[                          ]

As set forth in Section III.C.1. *supra*, the Commission has reversed the ALJ's finding that the use of[                    ]was protectable as a trade secret because of the reverse engineering described above which revealed the use of[              ] Therefore, although Respondents' processes use [                ] ID at 514-516, there is no misappropriation of a protectable trade secret with respect to the use of[            ] The Commission has thus determined to reverse the ALJ's finding of misappropriation with respect thereto.

2.  Use of[                         ]

As set forth in Section III.C.2. *supra*,, the Commission affirms the ALJ's finding that the use of[                              ]is not a trade secret. Therefore, although Respondents use [                          ]which is equivalent to [        ]ID at 515, there is no misappropriation of a protectable trade secret with respect to the use of[        ] The Commission thus affirms the ALJ's finding of no misappropriation with respect thereto.

3.  [                                        ]

The ALJ found that Mr. Fan's notebook indicates experiments from November 10-17, 2006, in which he used [

                    ] ID at 519 (CX-1566C, Q.44; CX-32C at 2-9).

The ALJ thus found that Respondents used Complainant's[        ]in the early lab experiments for the production of SL-1801 and in the first commercial scale condensation

51

A151

reaction batch of 1802. *Id.* at 519 (citing CX-1566C, Q.44; CX-223C at 2-3; CX-232C at 1-2).

Respondents argue that its[      ]varies from [      ]and furthermore the use of[    ]is exactly consistent with the [        ]disclosed in Complainant's '418 patent. Resp. Pet. at 53-54.

As set forth in Section III.C.3, *supra*, the Commission affirms the ALJ's finding that there is a trade secret in the[                    ]based on a difference from the '418 patent, which taught[            ]*i.e.*, that Complainant has optimized [                    ] Further, the Commission affirms and adopts the ALJ's findings, set forth in the ID at 518-520, that Respondents' processes used Complainant's[        ]in the early lab experiments for the production of SL-1801 and in the first commercial scale condensation reaction batch of 1802. ID at 519 (citing CX-1566C, Q.44; CX-223C at 2-3; CX-232C at 1-2). It is uncontested that the[                    ]is equivalent to[            ]ID at 244. We agree with the ALJ that there was copying of the [      ]in the lab notebooks. ID at 244, 402-03. The Commission therefore affirms the ALJ's finding that Respondents' processes misappropriated the [            ]

4. [                    ]

As set forth in Section III.C.4. *supra*, the Commission affirms the ALJ's finding that Complainant's use of[              ]is not a valid trade secret. Therefore, although Respondents' processes use [            ]ID at 522, there is no misappropriation of a protectable trade secret with respect to the use of

52

*PUBLIC VERSION*

[                                    ] The Commission thus affirms the ALJ's finding of no misappropriation with respect thereto.

5. [                          ]

As set forth in Section III.C.5. *supra*, the [                    ] is not protectable as a trade secret. Therefore, although Respondents' processes use a similar [                    ] as Complainant, ID at 525-526, there is no misappropriation of a protectable trade secret with respect to the [                ] The Commission has thus determined to reverse the ALJ's finding of misappropriation with respect thereto.

6. [                                    ]

As set forth in Section III.C.6. *supra*, the [                    ] is not protectable as a trade secret. Further, there is no misappropriation because Sino Legend is using a different [                    ] which Complainant asserted is a trade secret. CX-1566C at Q. 50; Tr. 424. The Commission therefore finds that there is no misappropriation of a protectable trade secret with respect to the [

] The Commission has thus determined to reverse the ALJ's finding of misappropriation with respect thereto.

7. [                                    ]

As set forth in Section III.C.7. *supra*, the [                    ] is not protectable as a trade secret. Therefore, although Respondents' processes use the same

[                                    ] as Complainant, ID at 543-45, there is no misappropriation of a protectable trade secret with respect to the [

] The Commission has thus determined to reverse the ALJ's finding of misappropriation with respect thereto.

53

**A153**

8.  Use of [                                                      ]

As set forth in Section III.C.8. *supra*, the Commission affirms the ALJ's finding

that [                                                      ] is not a trade secret.

Therefore, although Respondents' processes use a [                          ] ID at

547-549, there is no misappropriation of a protectable trade secret with respect to the

[                                                      .] The Commission thus affirms the ALJ's

finding of no misappropriation with respect thereto.

9.  Use of [                                                      ]

As set forth in Section III.C.9. *supra*, the Commission affirms the ALJ's finding

that the use of [                                      ] is not a valid trade secret.

Therefore, although Respondents use [                          ] ID at 550–

551, there is no misappropriation of a protectable trade secret with respect to the use of

[                                      ] The Commission thus affirms the ALJ's

finding of no misappropriation with respect thereto.

10. [                                      ]

As set forth in Section III.C.10. *supra*, the [                          ] is not

protectable as a trade secret.  Therefore, although Respondents' processes use a similar

[                          ] to Complainant's, ID at 550-551, there is no misappropriation of a

protectable trade secret with respect to the [                          ] The Commission

has thus determined to reverse the ALJ's finding of misappropriation with respect

thereto.

54

A154

*PUBLIC VERSION*

I.    **Technical Proof of Misappropriation of the Overall Process Flow** Alleged
      **Trade Secret**

The ALJ found that Respondents' process for manufacturing the accused

tackifiers use, substantially use, and are substantially derived from Complainant's trade

secret, *i.e.*, the combination of the 17 aspects of Complainant's process.  ID at 574. The

ALJ stated that he relied on the entries in Mr. Fan's notebook, documents relating to the

initial pilot study, documents relating to commercial scale production, and the

manufacture of SL-1801 and SL-1802. *Id.* at 575.

Respondents argue that they cannot be found to use the alleged "overall process

flow" because they are not using all of the 17 alleged individual trade secrets. Resps. Pet.

at 76.  Respondents provide the example that the LFP products do not use [

                                ] *Id.*

Here, even if certain of the 17 individual trade secrets are not protectable

individually as trade secrets, or if Respondents have modified certain steps, it is our view

that the overall combination of elements is protectable since it incorporates several valid

trade secrets and has been misappropriated as discussed above. The Commission

therefore affirms and adopts the ALJ's finding, set forth in the ID at 574-575, that

Respondents' processes have misappropriated a protectable trade secret in the overall

process (except with respect to the LFP products which do not practice the[

    ].

55

*PUBLIC VERSION*

### J.    Affirmative Defenses

#### 1.  Independent Development

We address this defense in the sections above with respect to each individual trade secret.

#### 2.  Unclean Hands

Respondents argued to the ALJ that Complainant itself improperly obtained and used Sino Legend's confidential process to modify SP1068 in China. ID at 604. The ALJ found this affirmative defense of unclean hands to be "ludicrous." ID at 607. The ALJ found that Respondents have come to this investigation with unclean hands in which "1068" was whited out, refused to provide Mr. Pu's deposition, and a page was torn from Mr. Pu's notebook. *Id.* at 608. The ALJ found that credible evidence shows that Respondents have taken steps to hide the relationships between the parties and the origin of products. *Id.* at 609. The ALJ further found that Respondents failed to provide any support for their very general allegation of unclean hands. *Id.*

No petitions for review were filed and the Respondents did not contest the ALJ's factual finding in their briefing on review. The Commission therefore affirms and adopts the ALJ's fact finding that Respondents have not shown unclean hands on the part of the Complainant.

### K.    Allocation of the Burden of Proof

The ALJ found that "Complainant has made a *prima facie* showing that its process for making tackifier resins is not generally known." ID at 117. This is part of the ALJ's analysis for each of the trade secrets, for which he individually determined whether Respondents rebutted the *prima facie* showing for each asserted trade secret.

56

*PUBLIC VERSION*

In reaching his conclusion that Complainant has made a *prima facie* showing that the process is not generally known, the ALJ found that Dr. Hamed testified that "no company (other than Sino Legend) has been able to make a similar product effectively and economically capable of competing with SI Group's SP-1068 in the United States. This fact provides further support for my opinions that SI Group's trade secrets provide a clear economic advantage to SI Group and are novel and not generally known." CX-1570C, Q.7. The ALJ found that Dr. Putnam and Dr. Hart testified that the only competing product, made by Durez, was of inferior quality. ID at 117.

Respondents argue that there is no legally sufficient nexus between the cited evidence of Complainant's supposed market share and alleged inferior quality of its competitor's product, on the one hand, and whether each of the alleged trade secrets is generally known or readily ascertainable, on the other. Resps. Sub. at t 27, 29 (citing ID at 116-117, 132, 160, 195, 245, 269, 282-83, 290, 330, 343). Respondents assert that the mere existence of market share and allegations of a competitor's inferior quality are not enough to establish a *prima facie* showing that a trade secret is not generally known or readily ascertainable. *Id.* at 27. Respondents argue that there must be a "demonstrated relationship" (or nexus) between the lack of success of the plaintiff's competitors and the secrecy of its alleged trade secret recipes. *Id.* (citing *Buffets v. Klinke*, 73 F.3d 965, 969 (9th Cir. 1996)). Thus, the Respondents state that Complainant did not establish a *prima facie* case sufficient to justify shifting the burden onto Respondents to disprove all of the alleged trade secrets. *Id.* at 28.

As noted above, the ALJ found that Complainant made a *prima facie* case of the existence of a trade secret for each of the trade secrets. *E.g.*, ID at 117. The Commission

57

affirms the ALJ's finding and adopts his reasoning with the following clarification. Wright & Miller explain that the phrase "proving a prima facie case" is another way of saying that the party has satisfied the burden of production. Wright & Miller, Federal Practice and Procedure § 5122 ("When the party satisfies the burden of production, she is sometimes said to have proved a "prima facie case.") Wright & Miller explain that in this situation, the party that has satisfied its burden of production retains the burden of persuasion, and indeed, proving a "*prima facie*" case does not mean that the party has satisfied the burden of persuasion - - it just means that the party has put in enough evidence to survive a motion for a directed verdict (or summary judgment motion). *Id.* Nevertheless, the opposing parties may very well wish to produce evidence for the contrary position. We thus affirm the ALJ with the clarification that, where the ALJ indicated that Complainant made a *prima facie* case, this means that Complainant satisfied the burden of production and retained the burden of persuasion.

The ALJ held that Complainant made a *prima facie* case that each of the alleged trade secrets was not generally known or readily ascertainable based on testimony that Complainant occupies [  ]% of market share and on testimony that Sumitomo makes an inferior product. Tr. at 528:4-18, 547:22-548:8; CX-1567C at QQ. 147–48; CX-1586C at QQ. 64-66; JX-5C at 5; *see also* CX-1570C, Q.7 (Hamed). The testimony relied on by the ALJ is indirect evidence that Respondents did not know what process Complainant used. Nevertheless, we agree with Respondents that the testimony relied on by Complainant is by itself insufficient to prove that a given asserted trade secret is not generally known by organic chemists or readily ascertainable, because the testimony is conclusory and there is an insufficient nexus between market share and the conclusion

58

that each alleged trade secret was not generally known or readily ascertainable.[4] *See*

*Buffets v. Klinke*, 73 F.3d 965, 969 (9th Cir. 1996) ("the court made no finding as to

whether the manuals were generally known or readily ascertainable").

However, there is further evidence, relied on by Complainant, that Respondents

did not know what process Complainant used. Specifically, Red Avenue Chemical Co.,

Ltd. hired analytical chemists at Sumitomo to compare the molecular weight distribution

of SP-1068 with that of a "typical" resin. RX-375C at SINOZJG_0023132. The fact that

Respondents hired Sumitomo to engage in reverse-engineering of Complainant's product

is evidence that Respondents (and Sumitomo) did not know what process Complainant

used and that such information was not public available. The Commission agrees that

this is sufficient to satisfy Complainant's burden of production (with the exception of the

use of [          ][5] Such evidence demonstrates a relationship between the success of

Complainant's products and the conclusion that Complainant's trade secrets were not

generally known or readily ascertainable. *See Buffets v. Klinke*, 73 F.3d 965, 969 (9th Cir.

1996). The Commission concludes that Complainant still bore the burden of proof and

the burden of persuasion of the existence of each trade secret.

**L.    Domestic Industry and Injury**

In order to find a Section 337 violation based on trade secret misappropriation, a

complainant must show actual substantial injury, or threat of substantial injury, to a

---

[5] On August 25, 2006, Sumitomo concluded that "[

          ][5] *Id.* at SINOZJG_0023133. The ALJ found that this was an unsuccessful attempt
at reverse-engineering SP-1068 because Sumitomo inferred the possible use of [          ] but no one
guessed that [                              ] and because the alternative explanations undercut
the guess that a [          ] ID at 214. We conclude that this evidence demonstrates that the use of
[          ] was readily ascertainable.

59

domestic industry from the misappropriation. 19 U.S.C. § 1337(a)(1)(A) ("unfair methods of competition . . . the threat or effect of which is -- to destroy or substantially injure an industry in the United States").

As explained below, the Commission affirms the ALJ's findings as to the existence of a domestic industry and affirms on modified grounds the ALJ's findings of actual and threat of injury. The ALJ's findings that are consistent with this opinion are adopted.

### 1.  Existence of a Domestic Industry

The ALJ found that the relevant domestic industry, based on the scope of the investigation, is rubber resins and that the industry should not be limited to tackifier resins. ID at 620. The ALJ determined that the evidence establishes that a domestic industry exists in the U.S. *Id.* at 620-624. The ALJ specifically found that Complainant maintained[  ]% of the tackifier resin market from 2007 to 2011, manufactured tackifier resin at a facility in Rotterdam Junction, NY, invested millions in research and development at its center in Niskayuna, NY and that Complainant's investments were substantial. *Id.* No party petitioned for review of these findings. The Commission affirms the ALJ's findings as to the existence of a domestic industry. ID at 611-624.

### 2.  Injury

#### a.  Actual Substantial Injury

In determining whether unfair acts have substantially injured the domestic industry, the Commission considers a broad range of indicia, including: the volume of imports and their degree of penetration, complainant's lost sales, underselling by respondents, reductions in complainants' declining production, profitability and sales,

60

**A160**

and harm to complainant's good will or reputation. *Certain Cast Steel Railway Wheels*, ITC Inv. No. 337-TA-655, Unreviewed Initial Determination at 80 (quoting *Certain Electric Power Tools, Battery Cartridges and Battery Chargers*, Inv. No. 337-TA-284, Unreviewed Initial Determination at 246, USITC Pub. No. 2389 (1991) ("*Electric Power Tools*"). When the complainant alleges actual injury, there must be a causal nexus between the unfair acts of the respondents and the injury. *Bally/Midway Mfg. Co. v. Int'l Trade Comm'n*, 714 F.2d 1117, 1125 (Fed. Cir. 1983).

The ALJ concluded that Respondents have substantially injured the rubber resin industry in the U.S. ID at 648. In reaching his conclusion, the ALJ found that Respondents' importation of SL-1801 and SL-1802 to [    ] was sufficient to manufacture 50,000 tires and that this was a substantial volume. *Id.* at 651. In 2010 and 2012, Complainant supplied [  ]% of [    ] U.S. tackifier demand, except for these importations by Respondents. *Id.* In addition, the ALJ determined that Complainant supplies more than [  ]% of the U.S. tackifier demand. *Id.* The ALJ held that the sales by Respondents to [    ] are actual sales and therefore, there is actual injury to the Complainant. *Id.*

Additionally, the ALJ found that it was more significant that the sales by the Respondents led to the qualification of their products for sale to [    ] which is Complainant's customer. *Id.* at 651-52. The ALJ determined that the qualification of Respondents to sell to [    ] represents penetration of the market that is disproportionate to the actual sales. *Id.* at 652. The ALJ found that the evidence shows that Respondents' qualification to sell to [    ] and their lower prices, allowed [    ] to apply pressure to Complainants during contract negotiations. *Id.* at 653.

61

*PUBLIC VERSION*

This pressure led to a lower contract price for Complainant. *Id.* Therefore, the ALJ found that similar to *TianRui*, Complainant experienced actual injury because Respondents undersold their products and Complainant's profits have declined as a result. *Id.* at 654. Complainant also accepted unfavorable payment terms as a result of the negotiations. *Id.* Accordingly, the ALJ found that the price drop and payment terms are directly attributable to Respondents' entry and effect on the U.S. tackifier market and the sale of misappropriated articles resulted in actual injury. *Id.* at 655.

On review, Respondents argue that Complainant's alleged lost sales are to an unrelated third party and that Respondents did not make any sales to [       ] that created "negotiation pressure" that resulted in injury.[6] Resps. Pet. at 84. Respondents assert that it was legal error for the ALJ to find an injury to Complainant's domestic industry based on alleged offers for sale, without any lost sales to the Respondents. *Id.* at 85.

Complainant asserts the Commission does not have to find lost sales to find injury. Comp. Resp. at 80. Complainant contends that the Respondents' shipments and qualification of resin made possible the substantial price, revenue and profit reductions that SI suffered in its contract negotiations with [       ] *Id.* at 81. The importations made by Respondents and the subsequent negotiations caused a loss of $[    ] million in tackifier resin profits from [       ] resulting in actual injury. *Id.* at 81-84.

The IA argues that the ALJ properly considered whether or not Respondents' importations had the threat or the effect of injuring Complainant's domestic industry. IA Resp. at 34. The IA argues that the sale of SL-1801 and SL-1802 is sufficient to

---

[6] The parties' arguments are not limited to actual injury and may also be applicable to threat of injury.

62

*PUBLIC VERSION*

manufacture 50,000 tires and that this is more than a qualification; there was evidence of actual injury when Complainant suffered $[    ]million in margin loss based on negotiation pressure from Respondents and a [                    ]term was also added to the contract; and there is a causal nexus between Respondents' unfair acts and the injury to Complainant's domestic industry. *Id.* at 34-35.

The Commission finds that the evidence supports a finding of actual substantial injury based on the strong evidence of Respondents underselling and Complainant's reduced profitability. The Commission adopts the ALJ's findings that are consistent with this determination. ID at 651-655. The Commission does not adopt the ALJ's findings that lost sales resulted from Respondents' importations. ID at 651.

Specifically, record evidence shows that Respondents imported tackifer resin into the United States. *E.g.,* CX-103C, CX-104C, CX-105C, CX-106C and CX-107C. The ALJ found that as a result of Respondents' importations, Respondents were qualified by [        ]Complainant's customer, as a supplier. ID at 651-52; *see also* Tr. at 547:24–548:4; CX-1568C at Q. 56. This qualification allowed Respondents to participate in contract negotiations with [        ] Respondents thereupon offered [        ]a reduced price per pound for tackifier resin which the ALJ found allowed [        ]to apply pricing pressure on Complainant during negotiations of an amended contract resulting in Complainant entering into a contract at a lower level of profitability. ID at 653; Tr. at 536:6-22; 537:8-24; CX-1588C. The contract price that [        ]obtained from Complainant thus went from $[        ]per pound to [        ]per pound, *see* Tr. at 537:8-24, 540:17-541:20, with a lost margin of $[    ]million. Tr. at 536:6-22. Therefore, although Respondents argue that there are no lost sales, the Commission finds that

63

### PUBLIC VERSION

Complainant has sustained a showing of actual injury based on underselling and reduced profitability and a causal nexus between the injury and the unfair acts of Respondents. Accordingly, the Commission affirms the ALJ's conclusion on these grounds.

#### b. Threat of Substantial Injury

19 U.S.C. § 1337(a)(1)(A) states that "[u]nfair methods of competition and unfair acts in the importation of articles...or in the sale of such articles by the owner, importer, or consignee, the threat or effect of which is—(i) to destroy or substantially injure an industry in the United States" are unlawful.

In determining whether a threat to substantially injure exists, the Commission considers, *inter alia*, the following indicia:

> (1) substantial foreign manufacturing capacity;
> (2) ability of imported product to undersell the domestic product;
> (3) explicit intention to enter into the U.S. market;
> (4) the inability of the domestic industry to compete with the foreign products because of vastly lower foreign costs of production and lower prices; and
> (5) the significant negative impact this would have on the domestic industry.

*Certain Methods for Extruding Plastic Tubing*, Inv. No. 337-TA-110, 0082 WL 941574, Commission Opinion at *9 (Sept. 1982); *Certain Digital Multimeters, and Products with Multimeter Functionality*, Inv. No. 337-TA-588, 2010 WL 5642165, Comm'n Op. at *33 (Dec. 2010). The threatened injury must also be "substantive and clearly foreseen," with a causal connection between the action of the respondents and the threatened injury. *Id.*

The ALJ found that Respondents' unfair acts presented a threat to injure or destroy Complainant's domestic industry. *Id.* The ALJ found that Respondents have

64

### A164

*PUBLIC VERSION*

additional manufacturing capability, Respondents are able to undersell Complainant, and Respondents intend to enter the U.S. market. *Id.* at 656-657. The ALJ also found that Complainant's production costs are higher than those of the Respondents, which allows Respondents to undersell Complainant. *Id.* at 658.

The ALJ found that Complainant has not provided any evidence of comparable production costs and only provided general statements. *Id.* However, the ALJ held that Complainant cannot compete with Respondents' lower prices that are due to lower production costs. *Id.* Therefore, the ALJ found that "Respondents' unfair acts have the effect of substantial injury and a tendency to substantially injure SI's domestic industry." *Id.* at 659; *see also id.* at 660.

The Commission adopts the ALJ's analysis and findings for indicia (1) and (3)-(5). ID 655-656, 657-660. Respondents did not challenge these findings. Resp. Pet. at 84-91. With respect to factor (2), the ability of the imported product to undersell the domestic product, we agree with ALJ that this factor is met. Respondents' materials were qualified for sale to [      ] and they were able to influence the renegotiation of Complainant's contract with [      ] by offering a lower price ($[      ] per pound) for the tackifier resin. *See* CX-1588C at 5; Tr. at 540:17-541:20; CX-1567C at Q. 167-168; CX-1568C at Q. 54-61. The contract price that [      ] renegotiated with Complainant went from $[      ] per pound to $[      ] per pound. Tr. at 537:8-24, 540:17-541:20. This will result in a projected $[   ] million injury over the contract term, 2013-2017. CX-343C; Tr. 537:8-24. In addition, Complainant agreed to a [      ] term. CX-1588 at 3; Tr. 541:-542:23. Moreover, we adopt the following of the ALJ's findings:

65

Dr. Putnam's unrebutted testimony is that in addition to [          ],
[                    ] has agreed to try Respondents' SL-1801 tackifier
resins. (CX-1567C, Qs. 156-158; and JX-25C) Also, the U.S. division of
[                    ] has requested internal approval to purchase SL-1801
from Respondents. (Citing CX-1567C, Qs. 156-158; and JX-025C).

Complainant argues reasonably that, as happened with [          ], it will
suffer even more substantial injury if the foregoing customers apply
pricing pressure and elect to renew agreements with Complainant only at
lower prices. (*See* CX-1567C, Qs. 150, 180-181)

ID at 657. Based on this evidence, we affirm the ALJ's conclusions:

I find, too, that the threat to injury or destroy the domestic industry is
substantive and clearly foreseen as a result of Respondents' unfair acts.
The evidence cited, *supra*, establishes that the recently signed amendment
to contract between Complainant and [          ], represents a loss to
Complainant of more than [     ] million dollars per year in annual revenue
for a total of at least $[     ] million corresponding to a margin loss of $[     ]
million for [     ] tackifier sales to [          ], which results from Sino
Legend's negotiation pressure.

Sino Legend ZJG's tackifier resin products, SL-1801 and SL-1802, have
been certified as meeting [          ]'s specifications and have been
approved for sale to [                    ]. (CX-1567C, Qs.149-182;
and Tr. at 532:3-11) Respondents have made clear that they intend to use
their SL-1801 and SL-1802 products to compete in the United States
tackifier market for other customers such as [     ] and [          ].
(*Id.*, Qs. 150, 156-160; JX-025C) Respondents' tackifier resins will
compete directly and be interchangeable with Complainant's tackifier
resins. *Id.*

The evidence shows that Respondents have substantial capacity to
manufacture their SL-1801 and SL-1802 tackifiers, the ability to import
their SL-1801 and SL01802 tackifiers to undersell SI Group's tackifiers,
and an explicit intention to enter into the U.S. market to sell their SL-1801
and SL-1802 tackifiers. (CX-1567C, Qs. 149-182)

ID at 659-60. Accordingly, the Commission finds that there is a threat to substantially

injure or destroy Complainant's domestic industry.

66

*PUBLIC VERSION*

### 3. SL-7015

The ALJ found that there was "neither argument nor evidence provided by Complainant that Respondents' importation of the SL-7015 (curing resin) product results in any injury or threat of injury to the domestic industry arising out of 'unfair acts' by Respondents. . . . Based upon a record devoid of evidence regarding misappropriation of trade secrets related to curing resins, and more specifically the product identified as SL-7015, I find that there has been no violation of 19 U.S.C. § 1337(a)(1)(A) in the importation of the SL-7015 product." ID at 647.

Complainant argues that it has consistently alleged SL-7015 of misappropriating its curing resin trade secret and that it provided allegations and evidence of domestic industry in its Complaint and during discovery. Comp. Sub. at 21. Complainant also argues that its discovery requests required Respondents to provide discovery on SL-7015, which Respondents did not do. *Id.* at 22-23. Complainant further contends that it is entitled to relief because Respondents made a decision to assert that they had not imported SL-7015 and refused to engage in discovery. *Id.* at 23. Complainant asserts, and the ALJ found, that Respondents failure to provide discovery prevented SI from addressing SL-7015 substantively in contention interrogatories. *Id.* Complainant explains that by allowing Respondents to violate the ALJ's discovery order, Respondents will be able to circumvent the Commission's jurisdiction. *Id.* at 24.

Respondents explain that Complainant did not meet its burden in establishing a section 337 violation for SL-7015. Resps. Sub. at 24. Respondents assert that Complainant did not identify any trade secrets for SP-1045 and provide no comparison between SP-7015 and SP-1045 in briefing or in expert disclosures/testimony. *Id.* at 25.

67

**A167**

*PUBLIC VERSION*

Respondents further assert that in response to interrogatories, Complainant did not identify any trade secrets for SP-1045. *Id.* at 25-26. This failure, according to Respondents, deprived the ALJ and Respondents from evaluating Complainant's allegations.

The IA asserts that the ID's finding to not grant relief for SL-7015 is not error. IA Sub. at 22. The IA argues that even though Respondents did not produce discovery on SL-7015, Complainant's failure to identify any trade secrets for SP-1045 deprived the IA, Respondents and the ALJ of the opportunity to investigate or evaluate the allegations with particularity. IA Reply Sub. at 8. The IA argues that without identifying any trade secrets, Complainant cannot establish a section 337 violation. *Id.*

The Commission affirms the ALJ's finding that there is no violation for SL-7015 on modified grounds. ID at 647-648.

The ALJ based his findings that there was no threat of injury or any injury resulting from any unfair acts on the testimony of Quanhai Yang. Mr. Yang testified that Respondents have not manufactured SL-7015 and the ALJ found Mr. Yang's testimony was unrebutted. However, the ALJ found that Mr. Yang's testimony was not credible and that he was an impeached witness in other sections of the ID. ID at 401, 704 n. 106. Therefore, the Commission does not adopt the ALJ's findings that rely on the testimony of Mr. Yang.

In the complaint, Complainant alleged that Respondents had violated its trade secret for SP-1045. The complaint identified SL-7015 as the corresponding accused product. In Complainant's prehearing brief, SP-7015 is only addressed in the remedy section. Complainant's Pre-Hearing. Brief at 397-401. Complainant did not disclose a

68

specific process of SP-1045 that they allege Respondents misappropriated. Nor did

Complainant provide evidence of injury for SP-1045 in its prehearing brief.

Further, in Complainant's post hearing brief, SP-1045 and SL-7015 are primarily

discussed in domestic industry and remedy sections.[7] Again, Complainant did not

disclose a specific process of SP-1045 that they accuse Respondents of misappropriating.

In addition, in its Contingent Petition for Review, Complainant still did not present

evidence of what process was misappropriated.

The Commission finds that there is no violation of section 337 for SL-7015.

Specifically, the Commission finds that there is no evidence or argument that

Respondents misappropriated any specific trade secret of SP-1045. In both the pre-

hearing and post-hearing briefing, Complainants failed to assert a trade secret that was

misappropriated in making SL-7015. Accordingly, Complainants failed to meet their

burden of proving that violation of 337 occurred for SL-7015.

**M.    Which Parties Have Violated Section 337 Through Importation, the Sale for Importation, or the Sale After Importation?**

The ALJ found Mr. Yang, Ms. Ning Zhang, Sino Legend ZJG, Sino Legend BVI,

Sino Legend Hong Kong, Sino Legend Marshall Islands, Sino Legend Holding Group,

Gold Dynasty, Elite, Red Avenue BVI, Red Avenue Hong Kong, and PMI to have

misappropriated trade secrets.[8] ID at 714. The ALJ found that (1) Sino Legend ZJG is a

manufacturing company; (2) Mr. Yang is the chairman of Sino Legend ZJG; (3) Ms.

---

[7] Complainant presented the allegation that there has been an injury for SP-1045 in its post-hearing brief with respect to lost sales.

[8] The ALJ did not find Red Avenue America, Shanghai Lunsai, or Thomas Crumlish to be in violation. ID at 714. Thomas Crumlish, whom the ALJ found not to be in violation, is the Chairman or Chief Executive Officer of Red Avenue America. ID at 350. The ALJ stated that Respondents represent that Shanghai Lunsai does not manufacture any tackifiers at issue in this investigation and has not shipped to or received within the United States any tackifiers at issue in this investigation. *Id.*

Zhang owns and controls Sino Legend ZJG; (4) PMI is the consignee of a shipment of tackifier; (5) Sino Legend Marshall Island shipped tackifiers to the United States; and (6) the other entities found by the ALJ to be in violation are owned or controlled by Mr. Yang and Ms. Zhang. *See* ID at 347-51. The ALJ found that certain of the companies are holding companies which own or control other companies as set forth in the ID at 349-350 (reproducing CX-258C at 3).

Respondents argue that the ALJ improperly applied piercing the corporate veil principles to find individuals Yang and Zhang in violation of Section 337. Resps. Pet. at 95. Respondents argue that the ALJ did not discuss piercing the corporate veil other than by summarizing Respondents' arguments, and the Commission has routinely rejected invitations to pierce the corporate veil. Resps. Pet. at 95 (citing *Plastic Food Storage Containers*, 1983 WL 206916 at *4; *Institution of Section 337 Investigation on Certain Office Desk Accessories*, 1983 206953 n.8 (July 1983)).

Respondents further submit that the record contains no evidence that Sino BVI, Red Avenue BVI, or Red Avenue HK participated in manufacturing or in the importation or sale of such articles, as required by Section 337(a)(1)(A). *Id.* Respondents state that Elite, Gold Dynasty, and Hong Kong SL possess ownership interests in other respondents but the ALJ has provided no basis for piercing the corporate veil, and that these respondents have not participated in manufacturing, importation, or sale. *Id.* at 24.

Respondents argue that consenting to jurisdiction is not a concession of liability and does not trigger a finding of violation. Resps. Reply Sub. at 12. Respondents assert that the Complainant and the IA do not attempt to meet the tests for piercing the corporate veil, *i.e.*, do not cite any evidence that the individuals used the corporations as

70

an alter ego or acted in an ultra vires manner. *Id.* at 13. Respondents contend that "acting in concert" does not trump the corporate form doctrine or allow individual liability and that the Restatement of Torts does not so provide. *Id.* (citing *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 552-53 (Fed. Cir. 1990)).

Respondents further argue that Complainant points to no evidence that Sino Legend BVI, Red Avenue BVI, Red Avenue HK, Elite, Gold Dynasty, Hong Kong SL, or Shanghai Lunsai manufactured, distributed, or imported the accused tackifiers. *Id.* at 14.

Complainant responds that although personal jurisdiction is not required, Yang and Zhang submitted to the Commission's personal jurisdiction.[9] Comp. Resp. at 86-87. Complainant further responds that piercing the corporate veil is not required because each has engaged in activities with a sufficient nexus to the importation of the products at issue to be subject to an exclusion order. Complainant rejects as irrelevant Respondents' argument that Yang and Zhang acted in their official capacities. *Id.* at 88-89 (citing *Floppy Disk Drives*, Inv. No. 337-TA-203, Order No. 11 (Oct. 23, 1984), 1984 WL 273857, at *2). Complainant argues that Respondents' corporate shell games further justify exercise of the Commission's personal jurisdiction over Zhang and Yang. *Id.* at 91-92.

On review, Complainant argues that piercing the corporate veil is not required because the Commission has jurisdiction. Comp. Sub. at 20-21 (citing the consent orders in *Floppy Disk Drives*, Order No. 22 (Dec. 28, 1984), 1984 WL 273962). Further, Complainant argues that the Commission does not require piercing the corporate veil in

---

[9] The IA did not comment on this issue at the petition stage, and his briefing on review is similar to that of Complainant. IA Sub. at 14-21; IA Reply Sub. at 6-7.

*PUBLIC VERSION*

order to find liability of individual respondents if the respondents have acted in concert. Comp. Reply Sub. at 9-10. Complainant recounts Mr. Yang's statement that no agreements are needed for cooperation between RedAvenue and Sino Legend because they are both owned by the same person, Mr. Zhang. Comp. Sub. at 16 (citing CX-1352.1C at 119:4-17).

As to the individual acts, Complainant argues that Mr. Yang was personally involved in recruiting and hiring Xu and trying to hide Xu's involvement with Sino Legend, and that Yang served as the conduit through which Complainant's trade secrets passed. Comp. Sub. at 16-17 (citing CX-938C; CX-153C; CX-1563C at Q.42; CX-1372C; CX-170C; CX-1563C at Q.44; CX-938C; CX-153C; CX-154; ID at 398-404). Complainant argues that Mr. Crumlish owns and manages Red Avenue America, personally managed Sino Legend US's marketing campaign, and served as the U.S. contact for Sino Legend's importation of SL-7015. *Id.* at 17 (citing Tr. at 696:18-20). Complainant argues that Sino Legend ZJG is the undisputed manufacturer of the Sino Legend products at issue. *Id.* at 17. Complainant states that an order against Sino Legend ZJG's parent entities is necessary to provide relief, *i.e.*, Hong Kong Sino Legend; Sino Legend MI, Gold Dynasty, Elite, and Sino Legend BVI. *Id.* Complainant states that PMI is an SL distributor in the United States, which imports and sells SL-1801 in the United States after importation. *Id.* (citing CX-102C; CX-43C; CX-44C). Complainant asserts that Sino Legend HGL is responsible for shipping SL-1801 to PMI. *Id.* (citing CX-44C; CX-46C). Complainant argues that Red Avenue Chemical America is involved in the marketing of SL-1801 to U.S. customers through Mr. Crumlish's activities and was

72

the importer and distributor for SL-7015. *Id.* (citing CX-1354C at 273:22–274:6, 274:12–19, 274:25–275:9m 275:15-21; Tr. at 696:14-17, 696:21-697:2; CX-1601C).

Complainant asserts that Lunsai was involved in the misappropriation of trade secrets by Xu and Yang. *Id.* at 16 (citing ID at 398). Complainant argues that Red Avenue HK employs Mr. Xu, handles Sino Legend ZJG's U.S. sales and shares many employees with Sino Legend companies. *Id.* at 17-18 (citing CX-1357.1C at 12:3-7; 23:17-24:5; CDX-6C). Finally, Complainant asserts that Red Avenue BVI provided funding for Tong Yue, which conducted Respondents' pilot studies for "1068 Resin" which became SL-1801. *Id.* at 16-18 (citing CX-1352.1C at 72:10-18, 117:20-118:2, 119:4-10). Complainant argues that each respondent has engaged in activities with a sufficient nexus between their unfair acts and the importation to confer jurisdiction. *Id.* at 18-19 (citing Certain Floppy Disk Drives and Components Thereof, Inv. No. 337-TA-203, Order No. 11 (Oct. 23, 1984), 1984 WL 273857, at *2).

We agree with Complainant that the following companies have acted in concert. *See* ID at 576, 707. Respondents admit that four corporate respondents have played roles in manufacturing, distribution, and importation as follows: Sino Legend ZJG (manufacturing); SLHG Ltd. (importation); Sino Legend Marshall Islands (importation); and PMI (importation and sale after importation). Resps. Sub. at 21. There is testimony that Sino Legend ZJG and Red Avenue Hong Kong work together "seamlessly" without any agreement. CX-1352.1C at 119:16-17. PMI is a Sino Legend distributor in the United States, which imports and sells SL-1801 in the United States after importation. CX-102C; CX-43C; CX-44C. Sino Legend HGL is responsible for shipping SL-1801 to PMI. CX-44C; CX-46C. Shanghai Lunsai was involved in the misappropriation of trade

73

*PUBLIC VERSION*

secrets by Xu. CX-154C; CX-938C. Red Avenue HK employs Mr. Xu, handles Sino Legend ZJG's U.S. sales and shares many employees with Sino Legend companies. CX–1357.1C at 23:17-24:5; CDX-6C. Red Avenue BVI provided funding for Tong Yue, which conducted Respondents' pilot studies for "1068 Resin" which became SL-1801. CX-1352.1C at 72:10-18, 117:20-118:2, 119:4-10.

Neither the ALJ nor any of the parties have attempted to conduct a "piercing the veil" analysis, which would enable the Commission to hold an individual liable for acts done in the course of his employment or to hold a shareholder liable for acts done by a corporation. *Wordtech Systems, Inc v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1313 (Fed. Cir. 2010). In fact, Complainant has not even tried to argue that Mr. Yang or Ms. Zhang used one of the companies as an "alter ego." Further, although Mr. Yang participated in the hiring of Mr. Xu, and companies affiliated with them were involved in misappropriation, Complainant has not met its burden of proving personal responsibility by Mr. Yang or Ms. Zhang for the transfer or copying of Complainant's trade secrets. *Cf. Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579 (Fed. Cir. 1986) (liability may exist where there is personal responsibility). We disagree with Respondents that the entry of consent orders in *Floppy Disk Drives* demonstrates that jurisdiction is sufficient for entry of an order because a finding of violation is not necessary for entry of a consent order.

Similarly, although the ALJ made findings that there were parent holding companies, Hong Kong Sino Legend, Sino Legend MI, Gold Dynasty, Elite, were part of a convoluted structure of companies, ID at 347-351, mere ownership is not enough to hold a parent corporation liable for the acts of its subsidiaries absent further showing.

74

A174

*Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338, 1349 (Fed. Cir. 2010). Because the Complainant and the ALJ have not attempted a "piercing the veil" analysis, we do not find these parent companies in violation absent other acts. Thus, Sino Legend Marshall Island is in violation, but these other companies affiliated with Sino Legend ZJG are not.

We further agree with the ALJ's finding that Complainant has not demonstrated liability by Mr. Crumlish or Red Avenue North America. *See* ID at 350-51; 576.

The following Respondents are therefore in violation and subject to any order as set forth in the remedy section below: Sino Legend ZJG; SLHG Ltd.; Sino Legend Marshall Islands; PMI; Red Avenue Hong Kong; Sino Legend HGL; Shanghai Lunsai; and Red Avenue BVI.

## N.     Remedy, the Public Interest, and Bonding

### Remedy

The ALJ recommended the issuance of a general exclusion order (GEO) extending for a period of ten years commencing on the target date with respect to SL-1801, SL-1801 LFP, SL-1802, and SL-1802 LFP. ID/RD at 700-706. In his analysis, the ALJ found that "Respondents created a convoluted set of corporate structures and relationships that involve a number of entities that manufacture, distribute and import the accused products." ID/RD at 701. The ALJ recommended that if the Commission determines to issue a limited exclusion order (LEO), that the order be directed to Mr. Yang, Ms. Ning Zhang, Sino Legend ZJG, Sino Legend BVI, Sino Legend Hong Kong,

75

*PUBLIC VERSION*

Sino Legend Marshall Islands, Sino Legend Holding Group, Gold Dynasty, Elite, Red
Avenue BVI, Red Avenue Hong Kong, PMI, and all affiliated companies. ID/RD at 707.

Complainant requests a GEO, or in the alternative an LEO, for a duration of 10-20
years. Comp. Sub. at 36. Complainant argues that the criteria of both Section
337(d)(2)(A) and (B) are met. *Id.* at 37. Complainant likens its predicament to that of
the Complainant in *Handbags* where there is no practical way to prevent circumvention
of an LEO because of the "shifting sands" of Respondents' corporate names and forms
and because it is difficult to identify the source of goods. *Id.* at 38 (citing *Certain
Handbags, Luggage, Accessories and Packaging*, Inv. No. 337-TA-754, 2012 WL
864789 (March 5, 2012)).

Complainant asserts that Respondents' steps to hide their activities from
Complainant supports a GEO. *Id.* at 38. Specifically Complainant argues that
Respondents hid the hiring of Jack Xu by hiring him through ZZPE and Shunsai Trading.
*Id.* at 39 (citing ID at 702). Complainant contends that Respondents took steps to avoid
suspicion about the relationship between its manufacturing and distribution arms, and that
emails demonstrate a purposeful effort by Sino Legend to distance itself from Tong Yue
and Red Avenue. *Id.* Complainant argues that Respondents engaged in deceit as to the
origin of their shipments by preparing labels falsely indicating an origin in the United
States. *Id.* at 40 (citing CX-644C; Tr. at 742:19-745:13). Complainant asserts that
Respondents engaged in discovery abuses to avoid a full investigation, that they
unilaterally withheld discovery for two months at the start of the case, that they avoided
disclosure throughout discovery that certain importations were made with[       ]that
they withheld the majority of their documents until after the close of fact discovery, and

76

then still withheld email from the critical time period, that they tampered with key documents, and that they withheld discovery regarding SL-7015. Comp. Sub. at 41-44.

Complainant argues that Respondents' discovery abuses support a GEO (and LEO) regarding SL-7015. Complainant argues that Respondents had a duty to supplement their discovery responses to reflect three importations of SL-7015. *Id.* at 44–45.

Complainant requests that a GEO contain a certification provision. *Id.* at 46.

Complainant requests in the alternative an LEO that includes the individual Respondents Yang and Zhang because they are concerned that the Respondents may be dissolved and reconstituted as new entities. *Id.*

Complainant argues that any exclusion order should remain in effect for 20 years, or alternatively should remain in effect for at least 10 years. *Id.* at 47. Complainant points to the testimony of Dr. Banach that it took at least 45 years to develop the process that was implemented by Complainant in 2004 and he estimated that it would take 10-20 years of process development to recreate the process from scratch. *Id.* at 49 (citing CX-1565 at Q.100).

Complainant argues that Respondents' sole challenge to a GEO misplaces reliance on *Spray Pumps*. Complainant asserts that while the Commission in the past has considered the *Spray Pumps* factors, the Commission now focuses principally on the statutory criteria. Comp. Reply Sub. at 17 (citing *Protective Cases*, Inv. No. 337-TA-780, 2012 WL 5874344, *12 (Nov. 19, 2012) (quoting *Hydraulic Excavators*, Inv. No. 337-TA-582, USITC Pub. 4115, Comm'n Op. at 16-18 (December 2009)).

*PUBLIC VERSION*

Complainant contends that Respondents are proposing to make any exclusion order ineffectively narrow. Comp. Reply Sub. at 19. Complainant argues that Respondents' discovery abuse warrants an injunction, especially in a process of production case where it would be impossible to understand the process at issue. *Id.* Complainant argues that nothing suggests that its [       ] technology is obsolete. *Id.* at 20 (citing Tr. at 152:16-153:17; 220:25-222:3).

Complainant responds to Respondents' argument that Complainant's [       ] technology is outdated, and argues that Complainant uses [                              ] solely because of [                ] and that it still uses [       ] in China. Comp. Reply Sub. at 20 (citing Tr. at 220:25-222:3; 152:16-153:17). Complainant submits that the Commission should not preclude an exclusion order merely because Complainant does not currently practice all embodiments. *Id.* Complainant submits that neither the UTSA nor the Restatement require current use for trade secret protection. *Id.* (citing *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 727 and n.6 (7th Cir. 2003)).

Complainant asserts that Mr. Xu's non-disclosure obligations are still in effect (and being breached) today. Comp. Reply Sub. at 21 (citing CX-318C at 2). Complainant states that Mr. Xu's non-disclosure agreement with SI Group committed Xu to permanently refrain from disclosing Complainant's confidential information. Complainant clarifies that Mr. Xu's agreement with SI Group affiliate SISL was limited to 3 years, but that does not take into account his agreement with SI Group which was permanent. *Id.* Complainant further states that the SISL Employee Handbook states a policy which restricts disclosure during or after employment. *Id.* (citing CX-317C at 3; CX-321C at 2; Tr. 294:7-11).

78

*PUBLIC VERSION*

Complainant counters Respondents' reliance on the testimony of Dr. Swager that the trade secrets could be independently developed in six months, stating that Dr. Swager had little industry experience and that his opinion lacked evidentiary support. *Id.* at 22.

Complainant asserts that the time of exclusion runs from the date of any exclusion order. *Id.* at 24 (citing *Sausage Casings*, Comm'n Op. at 22; *Cast Steel Railway Wheels*, Excl. Order at 2).

The Respondents argue that a general exclusion order is contrary to Commission precedent. Resps. Sub. at 34. Respondents argue that the RD runs afoul of *Spray Pumps* by recommending a GEO despite finding that there was no widespread pattern of unauthorized use, ID at 704-05, and by failing to address whether a GEO would "unintentionally stifle the flow of legitimate trade" by Complainant's competitors unrelated to Respondents including Durez (now owned by Sumitomo Bakelite), Kolon, and other international tackifier producers. *Id.* at 34-35 (citing *Spray Pumps*, 216 USPQ at 473). Respondents further argue that a GEO is not necessary to prevent circumvention because the accused products are shipped in large quantities with bills of lading, such that their identities and sources are easily recognized. *Id.* at 35 (citing CX-106C; CX-110C; CX327C; CX-1578).

Respondents assert that any remedy must be tailored to the specific products and processes subject to underlying misappropriation findings. *Id.* at 35. Respondents argue that a GEO directed to "resins manufactured using the Rubber Resin Trade Secrets" without defining "Rubber Resin Trade Secrets" would open the door to later-defined secrets, and should be limited to "SP-1068 Trade Secrets" defined as "trade secrets found to exist in this investigation." Resps. Reply Sub. at 22-23. Respondents state that

79

Complainant seeks an exclusion order directed to SL-7015 when it admits that it never identified any allegedly misappropriated secrets. *Id.* at 23. Respondents request a certification provision permitting them to certify that future imports are beyond the scope of the order. Resps. Sub. at 35.

Respondents argue that the length of any exclusion order should not exceed the time it would take to develop any trade secrets found to have been misappropriated. *Id.* at 36. Respondents contend that Complainant's 2007 process for making SP-1068 is into stale and obsolete, and Complainant itself has made subsequent changes. *Id.* at 36-37. Respondents suggest that Mr. Xu was under no obligation to maintain the confidentiality of any information he learned from Complainant after April 2010 because the contract provided a three year limitation during which Xu was bound by confidentiality. *Id.* at 37-38 (citing *Minn. Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 609 (7th Cir. 2001); Tr. at 229:12-24; CX-1372C). Respondents state that the nominal length of any remedy should reflect the fact that a party developing a tackifier process in 2006 would have the benefit of all of Complainant's public disclosures and the ability to chemically test samples of SP-1068. Respondents argue that Dr. Swager testified that it would take six months to one year to develop the trade secrets. *Id.* at 39 (citing Tr. at 865:14-866:9 (Swager). Respondents argue that the ALJ relied on conclusory testimony in arriving at his recommendation of a 10 year exclusion period. *Id.* at 40 (citing CX-1566C at Q.78). Finally, Respondents argue that the remedy should run from the date of the misappropriation, not the date of any issued order. *Id.* at 41 (citing *Viscofan, S.A. v. ITC*, 787 F.2d 544, 551 (Fed. Cir. 1986)).

80

*PUBLIC VERSION*

The IA is of the view that the appropriate remedy will include a GEO "directed to rubber resins using any of the SP-1068 Rubber Resin Trade Secrets that are manufactured by, for, or on behalf of Respondents or any of their affiliated companies, parents, subsidiaries, licensees, contractors, or other related business entities, or their successors or assigns." IA Sub. at 28; IA Reply Sub. at 14. The IA agrees with the ALJ that there is a likelihood of circumvention because of the shifting sands of corporate names and structures. IA Reply Sub. at 15. The IA submits that a GEO would be beneficial because it would include manufacture by Respondents through non-party Tongyue, non-party Shanxi Chemical Research Institute, or any other newly formed corporate entity. *Id.* The IA agrees with the ALJ that the record fails to support commercially significant domestic inventories that would warrant the issuance of a cease and desist order. IA Sub. at 28-29.

A general exclusion order may issue if "(A) [it] is necessary to prevent circumvention of an exclusion order limited to products of named persons; or (B) there is a pattern of violation of this section and it is difficult to identify the source of infringing products." 19 U.S.C. § 1337(d)(2)(A) and (B).

The ALJ found likelihood of circumvention based on the convoluted corporate structures of the Respondents. ID/RD at 701-02. We disagree. If a limited exclusion order includes those acting on behalf of the named Respondents, this would be sufficient in our view to prevent circumvention of an order. Complainants rely on *Certain Handbags, Luggage, Accessories and Packaging*, Inv. No. 337-TA-754, 2012 WL 864789 (March 5, 2012), in arguing that a GEO is warranted to prevent circumvention of an exclusion order because of the "shifting names" of the corporations. However, the evidence shows that a new manufacturer cannot easily circumvent a limited exclusion

81

*PUBLIC VERSION*

order because tackifier-manufacturers must qualify their products with a sale to a

domestic manufacturer such as [        ] to demonstrate that their product meets

specifications. *See, e.g.*, CX-1567 at QQ. 30, 36, 148.

    As to the existence of a pattern of violation, the ALJ found that Complainant had

not identified any violative acts by nonrespondents and did not recommend the issuance

of an exclusion order under Section 337(d)(2)(B). ID/RD at 704-05. We agree.

    As to whether it would be difficult to identify the source of "infringing" products,

the ALJ did not make specific findings. Complainant states that Respondents have

placed some labels on products to indicate a false origin in the United States. However,

we do not believe that the tackifiers at issue are a fungible product because tackifier-

manufacturers must have qualify their products with a sale to a domestic manufacturer

such as [        ] to demonstrate that their product meets specifications. *See, e.g.*, CX-

1567 at QQ. 30, 36, 148. Therefore, the identity of the manufacturer is known.

    The Commission has therefore determined that the proper remedy is the issuance

of a limited exclusion order, which would extend to those selling on behalf of the named

respondents. [10]

    There is one final issue as to remedy - - the duration of any order. The duration of

an order in a trade secret misappropriation case is set as the time it would have taken to

independently develop the trade secrets. *See Certain Cast Steel Wheels*, Inv. No. 337-

TA-655, Comm'n Op. at 8-9. There is a dispute between the parties as to whether the

trade secrets would have taken 6 months or 10-20 years to develop, based on testimony.

---

[10] Complainant has not expressly requested the issuance of a cease and desist order and the ALJ did not
recommend a cease and desist order. The IA adds that there is insufficient evidence of domestic inventory
and submits that the ALJ was correct not to recommend a cease and desist order. Based on the lack of
request and the lack of evidence, the Commission has determined not to issue of a cease and desist order.

*PUBLIC VERSION*

The Commission has determined to set a period of 10 years from the date of issuance of the exclusion order. Complainant has adduced expert testimony that the totality of asserted trade secrets would take at least 10 years to independently develop given the time it took Complainant to develop the process, even if not all of the asserted trade secrets are protectable. CX-1565C at QQ.99-100. The Commission does not find credible the testimony adduced by Respondents that Complainant's process could be independently developed in 6 months. In fact, Respondents were not successful in reverse-engineering most of Complainant's process and resorted to hiring Complainant's employees in order to copy Complainant's processes. Respondents argue that one of the trade secrets (*i.e.*, [                    ] is "obvious" in view of the economical and environmental benefits of [                    ] This is speculative, especially because the [                                        ] which is part of Complainant's trade secret. ID at 161 (citing Tr. at 818:5-820:5). Sumitomo inferred from reverse-engineering the use of [          ] but there is no evidence that anyone deduced the use of [                    ] for example.

The Commission therefore concludes that the most reasonable duration of the exclusion order is a 10 year remedy. [11]

### Public Interest

Respondents argue that the ALJ's decision and remedy are in conflict with principles of abstention and international comity because a Chinese court proceeding

---

[11] Respondents further argue that the time of exclusion should run from the time of the violation rather than the issuance of the order. Respondents, however, should not be allowed to profit from any delays in the legal process.

83

## PUBLIC VERSION

culminated in a judgment adverse to Complainant. Resps. Sub. at 43.[12]  Respondents

further argue that consumers will have higher prices in the event of an exclusion order

because Complainant by its own admission has [     ]% of the market share. *Id.* at 44.

Finally, Respondents argue that there is a public interest in enforcing the contracts written

by the parties, specifically the three year limitation on disclosure in Mr. Xu's contract,

which Respondents argue has now expired. *Id.* at 44.

Complainant's opening submission on review incorporates by reference its

statement on the public interest. Comp. Sub. at 50.  Complainant's Statement on the

Public Interest explains that the imported tires are sold in direct competition with

tackifiers made domestically.  Comp. Pub. Interest Sub. at 1-2.  Complainant states that a

GEO would not adversely impact health, safety or welfare, that Complainant's process

has environmental benefits because it [                    ] citing CX-1570 at Q.39,

and that public interest favors the protection of IP rights. *Id.* at 2.  Complainant states

---

[12]     On July 16, 2013, Respondents submitted a paper styled "Respondents' Notice of New Authority" in which they gave notice of a June 17, 2013 Civil Judgment of the Shanghai No. 2 Intermediate People's Court of the People's Republic of China, 2011 HEZMW(Z) CZ No. 50 ("Chinese Judgment"). Respondents state that the legal action leading to the Chinese Judgment is based upon the same allegations of trade secret misappropriation present in the present investigation, and resulted in a finding of no misappropriation.

On July 24, 2013, Complainant submitted a response in objection, arguing that this was not new authority because it issued on the same day as the ID, it is a Chinese decision, and it does not change Chinese law.  Comp. Response to Notice of Authority at 1-2.  Complainants state that Respondents have not challenged the order given by the ALJ at the pre-hearing conference excluding evidence relating to the Chinese legal proceeding. *Id.* at 3. Complainant argues that the Chinese proceeding was not fair. *Id.* at 4. Complainants submit that comity is an affirmative defense for which Respondents bear the burden. *Id.* at 5. Complainant argues that the United States through its Trade Representative has recently expressed concern about trade secret theft by Chinese companies and that it has been difficult for some U.S. companies to obtain relief [in China]. *Id.* at 6.

On July 25, 2013, the IA submitted a response to the notice of authority, arguing that the appealable Chinese Judgment is of limited or no relevance to the Commission's determination on whether to the Commission's determination or with respect to the ID's conclusion that Respondents have violated Section 337.  IA Response to Notice of Authority at 3.  The IA states that in *Sausage Casings*, foreign judgments were admitted into the record and given little weight, but that here the ALJ ruled that the Chinese litigation would not be admitted into the record. *Id.* at 4.

84

*PUBLIC VERSION*

that Durez is a viable alternative to the other products, and the Complainant can also

replace the volume sold by Respondents. *Id.* at 3 (citing Tr. at 528:4-18; 529:19-530:5;

JX-28C; CX-1568C at 1; Tr. at 555:7-25; CX-306C; CX-843C). Complainant argues that

a GEO would have effect on U.S. consumers or competition because an abundant supply

of tackifiers will continue to be available in the U.S. market. *Id.* at 5.

Complainant argues that Respondents' defense that international comity and

abstention would preclude an exclusion order is unsupported by ITC case law. Comp.

Reply Sub. at 24. Complainant asserts that a remedy would favor the public interest

because it would foster legitimate competition. *Id.* at 25. Complainant argues that

honoring contracts does not detract from the public interest of issuing a remedy because

Respondents have no standing to enforce Mr. Xu's contracts, and induced him to breach

his contractual obligations. *Id.*[13]

The IA states that the rubber tackifier resins are not the types of products that

raise concerns relating to public health and welfare or U.S. consumers. IA Sub. at 29.

The IA suggests that the presence of the Durez products in the market which directly

compete with Complainant's products minimizes the impact on competitive conditions.

*Id.* at 30. As to Respondents' argument that the Commission should abstain because of

legal proceedings in China, the IA states that the ID found that there is nothing in the

record to suggest that any legal proceedings in China are or would be relevant to a

violation of Section 337. IA Reply Sub. at 18. As to Respondents' argument that

consumer prices would increase, the IA states that this is an argument that would apply to

---

[13] There were three additional public interest submissions on behalf of Complainants, arguing for enforcement of IP rights and stating that Complainant employs workers in New York: by: (1) U.S. Sen. Charles E. Schumer and U.S. Rep. Paul D. Tonko, (2) American Chemistry Council, and (3) New York State Chemical Alliance.

*PUBLIC VERSION*

any case involving the enforcement of valid IP rights, and that the public interest favors the protection of U.S. intellectual property. *Id.*

The Commission has determined that there are no public interest factors which would preclude the issuance of a remedy. None of the parties have identified any public health or welfare considerations. To the extent that environmental issues have been raised, the evidence indicates that Complainant's process uses less formaldehyde than comparable processes. CX-1570 at Q.39.

Issuance of a limited exclusion order would not have an effect on U.S. consumers or competition because an abundant supply of tackifiers will continue to be available in the U.S. market. *Id.* at 5. The Commission agrees with Complainant and the IA that consumer demand can be met by Complainant and by non-party Sumitomo Durez. Durez is a viable alternative to the other products, and the Complainant can also replace the volume sold by Respondents. *Id.* at 3 (citing Tr. at 528:4-18; 529:19-530:5; JX-28C; CX-1568C at 1; Tr. at 555:7-25; CX-306C; CX-843C).

In addition, issuance of an exclusion order would not have a detrimental impact on domestic production of tackifiers.

Further, the Chinese litigation does not preclude issuance of a remedy in this investigation which is an investigation. The Chinese judgment has no bearing on the public interest factors, which the Commission is required by statute to consider in connection with the issuance of a remedy for a violation of Section 337 that has been established based on the administrative record of this proceeding.

**Bonding**

86

*PUBLIC VERSION*

The ALJ recommended a bond of $0.22 per pound of imported tackifier resin (or 19% of the stated value). ID/RD at 713.

Complainant argues that the ALJ properly recommended a bond in the amount of 19% for the reasons set forth in the ID. Comp. Sub. at 50 (citing ID at 711-13).

Respondents argue that a bond is not necessary, but if one is imposed, it should be set at Complainant's admitted reasonable royalty rate of [    ]% *Id.* at 42. Respondents argue that a reliable price comparison is not possible because Respondents' only U.S. sales were for qualifying purposes, and argues that the [    ]% royalty rate from Complainant's agreement with SISL is applicable. *Id.* (citing CX-341C). Respondents suggest that Complainant's recent contract with [        ] effectively ensures that there will be no injury during the period of Presidential review. *Id.* (citing CX-1588C at 1-2, 5).

The IA supports the ALJ's recommendation of a bond in the amount of 19% because evidence supports a finding of a price differential between SL-1801 and Complainant's as being $0.22 per pound or 19%. IA Sub. at 31 (citing ID at 711-13).

The Commission agrees with the ALJ that a bond based on the price differential between Respondents' product and Complainant's competing product is appropriate. Respondents' price is based on record evidence of a sale to [        ] The purpose of the sale has not been shown to disqualify the transaction from consideration for bond. The Commission therefore determines that the appropriate bond is the price difference of 19% of entered value.

87

*PUBLIC VERSION*

## IV. CONCLUSION

The Commission has determined to affirm-in-part and reverse-in-part the final ID of the ALJ, and to find a violation of Section 337 by reason of misappropriation of trade secrets in the importation, sale for importation, or sale within the United States after importation of rubber resins by certain respondents. The Commission has found that Sino Legend ZJG; SLHG Ltd.; Sino Legend Marshall Islands; PMI; Red Avenue Hong Kong; Sino Legend HGL; Shanghai Lunsai; and Red Avenue BVI are in violation of Section 337. The Commission has determined to issue a limited exclusion order.

By order of the Commission.

Lisa R. Barton
Acting Secretary to the Commission

Issued:    **FEB 2 6 2014**

88

CERTAIN RUBBER RESINS AND PROCESSES FOR         337-TA-849
MANUFACTURING SAME

## CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **COMMISSION OPINION [PUBLIC VERSION]** has been served by hand upon the Commission Investigative Attorney, **John Shin, Esq.**, and the following parties as indicated, on **February 26, 2014.**

Lisa R. Barton, Acting Secretary
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436

**ON BEHALF OF COMPLAINANT SI GROUP, INC.:**

| | |
|---|---|
| Lawrence T. Kass, Esq. | ( ) Via Hand Delivery |
| **MILBANK, TWEED, HADLEY & MCCLOY, LLP** | (X) Via Express Delivery |
| One Chase Manhattan Plaza | ( ) Via First Class Mail |
| New York, NY 10005 | ( ) Other: _____ |

**ON BEHALF OF RESPONDENTS REDAVENUE
CHEMICAL CORP. OF AMERICA, THOMAS R.
CRUMLISH, JR., PRECISION MEASUREMENT
INTERNATIONAL LLC, SINO LEGEND
(ZHANGJIAGANG) CHEMICAL CO., LTD., SINO
LEGEND HOLDING GROUP, INC., SINO LEGEND
HOLDING GROUP LIMITED, HONGKONG SINO
LEGEND GROUP, LTD., RED AVENUE CHEMICAL
CO. LTD, NING ZHANG, QUANHAI YANG, AND
SHANGHAI LUNSAI INTERNATIONAL TRADING
COMPANY:**

| | |
|---|---|
| Michael R. Franzinger, Esq. | ( ) Via Hand Delivery |
| **SIDLEY AUSTIN LLP** | (X) Via Express Delivery |
| 1501 K Street, NW | ( ) Via First Class Mail |
| Washington, DC 20005 | ( ) Other: _____ |

# CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2014, I served the foregoing Non-Confidential Opening Brief of Appellants on each party separately represented via the Court's electronic Pacer/ECF system.

Dated: November 10, 2014                    /s/ Andrew J. Pincus
                                            Andrew J. Pincus