2014-1478

CORRECTED NONCONFIDENTIAL

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

SINO LEGEND (ZHANGJIAGANG) CHEMICAL CO., LTD., SINO LEGEND
HOLDING GROUP, INC., SINO LEGEND HOLDING GROUP LTD., PRECISION
MEASUREMENT INTERNATIONAL LLC, RED AVENUE CHEMICAL CO., LTD.,
SHANGHAI LUNSAI INTERNATIONAL TRADING COMPANY, RED AVENUE GROUP
LIMITED, AND SINO LEGEND HOLDING GROUP INC. OF MARSHALL ISLANDS,

Appellants,

v.

INTERNATIONAL TRADE COMMISSION,

Appellee,

and

SI GROUP, INC.,

Intervenor.

---

On appeal from the United States International Trade Commission
in Investigation No. 337-TA-849

---

### CORRECTED NONCONFIDENTIAL BRIEF OF
### APPELLEE INTERNATIONAL TRADE COMMISSION

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3365

CLARK S. CHENEY
Acting Assistant General Counsel
Telephone (202) 205-2661

AMANDA P. FISHEROW
Attorney for Appellee
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW, Suite 707
Washington, DC  20436
Telephone (202) 205-2737

Dated:  April 6, 2015

The material redacted from pages 3-7, 9-10, 15-18, 20, 22, 55, 56, and 60-64 of the Commission's non-confidential brief was designated as confidential business information during the investigation under appeal and was granted confidential treatment by the Commission. *See* 19 U.S.C. § 1337(n); *see also* 19 C.F.R. § 210.5.

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF RELATED CASES ..........................................................1

STATEMENT OF JURISDICTION .............................................................2

STATEMENT OF ISSUES .........................................................................2

STATEMENT OF THE CASE ....................................................................3

I.      SI's Trade Secrets .................................................................3

II.     Sino Legend's Misappropriation of SI's Trade Secrets .......................4

III.    Institution of the Commission Investigation .........................................8

IV.     The ALJ's Initial Determination .............................................9

        A.      Relevant Misappropriation Factual Findings............................ 9

        B.      Extraterritoriality.............................................. 10

        C.      Comity and Abstention ............................................ 11

        D.      Duration of the Exclusion Order ............................................ 12

V.      Proceedings Before the Commission ................................................. 13

VI.     The Commission's Final Determination ........................................... 18

SUMMARY OF ARGUMENT ................................................................ 19

ARGUMENT ........................................................................................ 22

I.      Standard of Review ......................................................... 22

II.     The Commission May Consider Foreign Conduct When Adjudicating Claims Under Section 337(a)(1)(a) ............................ 24

        A.      The Commission Did Not Apply Section 337(a)(1)(A) to Govern Extraterritorial Conduct ............................................ 25

i

## TABLE OF CONTENTS (CONT'D)

B.    The Commission's Interpretation of Section 337(a)(1)(A) Is Consistent with Congressional Intent ................... 27

C.    *TianRui* Does Not Conflict with *Kiobel* .................................. 32

      1.    *Kiobel* Interprets an Unrelated Statute in a Completely Different Factual Context........................... 33

      2.    *TianRui* Applies the Same Interpretive Canons as *Kiobel* ........................................................................ 38

D.    *TianRui* Does Not Conflict with *Amtorg* ................................ 41

E.    *TianRui* Does Not Conflict with *Villanueva* ........................... 43

F.    The Commission's Application of Section 337(a)(1)(A) Presents No Foreign Policy Conflicts ..................................... 45

      1.    The Presidential Review Provision in Section 337(j) Negates Any Foreign Policy Concerns .............. 45

      2.    The Commission Did Not Impinge on the Sovereignty of China ...................................................... 47

G.    Sino Legend's Argument Against Deference to the Commission's Interpretation Is Irrelevant .............................. 48

H.    Sino Legend Did Not Adequately Preserve Its Statutory Interpretation Argument........................................................... 48

III.    The Commission was Not Required to Give Deference to the Chinese Court's Decisions ................................................... 50

A.    The Commission's Comity Decision May Only Be Reviewed for Abuse of Discretion.......................................... 50

B.    Sino Legend Did Not Meet Its Burden to Prove Comity Is Warranted .......................................................................... 52

      1.    Sino Legend Failed to Show that the Chinese Court Abided by Fundamental Standards of Procedural Fairness....................................................... 53

      2.    Sino Legend Failed to Show the Chinese Action Involved the Same Parties ........................................... 56

      3.    Sino Legend Failed to Show the Chinese Action Involved the Same Claims ........................................... 58

## TABLE OF CONTENTS (CONT'D)

4.    Sino Legend Failed to Show the Chinese Action Involved the Same Accused Products............................ 59

5.    Sino Legend Failed to Show the Chinese Action Addressed Injury to a United States Industry ................ 59

IV. The Commission Did Not Abuse Its Discretion in Setting the Duration of the Exclusion Order to 10 Years .................................... 60

    A.    The Commission's Remedy Is Supported by the Record ........ 60

    B.    Mr. Xu's Labor Contract Does Not Support Sino Legend's Argument.................................................................. 62

CONCLUSION ............................................................................................ 64

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acumed LLC v. Stryker Corp.*,
    525 F.3d 1319 (Fed. Cir. 2008) ............................................................ 51

*Akzo N.V. v. U.S. Int'l Trade Comm'n*,
    808 F.2d 1471 (Fed. Cir. 1986) ...................................................... 27, 37

*American Ass'n of Exporters & Importers-Textile & Apparel
    Grp. v. United States*,
    751 F.2d 1239 (Fed. Cir. 1985) ............................................................ 46

*In re Amtorg Trading Corp.*,
    75 F.2d 826 (C.C.P.A. 1935) .................................................... 41, 42, 43

*Bowman Transp. v. Arkansas-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974) ................................................................... 51, 52

*Buttfield v. Stranahan*,
    192 U.S. 470 (1904) ...................................................................... 47, 48

*Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ....................................................................... 23, 48

*Colony, Inc. v. Commissioner of Internal Revenue*,
    357 U.S. 28 (1958) .............................................................................. 27

*Conforto v. Merit Sys. Prot. Bd.*,
    713 F.3d 1111 (Fed. Cir. 2013) ...................................................... 33, 38

*Conn. Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) ............................................................................ 25

*Corning Glass Works v. Int'l Trade Comm'n*,
    799 F.2d 1559 (Fed. Cir. 1986) .......................................................... 23

*Cunard S.S. Co. v. Mellon*,
    262 U.S. 100 (1923) ................................................................... *passim*

iv

# TABLE OF AUTHORITIES (CONT'D)

*Deckers Corp. v. United States*,
   752 F.3d 949 (Fed. Cir. 2014) .................................................. 32

*Desert Palace, Inc. v. Costa*,
   539 U.S. 90 (2003)................................................................... 25

*Duracell, Inc. v. U.S. Int'l Trade Comm'n*,
   778 F.2d 1578 (Fed. Cir. 1985) ................................... 45, 47, 52

*Finnigan Corp. v. Int'l Trade Comm'n*,
   180 F.3d 1354 (Fed. Cir. 1999) ................................... 49, 54, 63

*Hilton v. Guyot*,
   159 U.S. 113 (1895)................................................................. 50

*Hyundai Elecs. Indus. Co. v. U.S. Int'l Trade Comm'n*,
   899 F.2d 1204 (Fed. Cir. 1990) .............................................. 24

*Int'l Nutrition Co. v. Horphag Research Ltd.*,
   257 F.3d 1324 (Fed. Cir. 2001) .............................20, 24-26, 35, 48, 50-53

*Jacob Siegel Co. v. Federal Trade Comm'n*,
   327 U.S. 608 (1946)................................................................. 64

*Kiobel v. Royal Dutch Petroleum Co.*,
   133 S.Ct. 1659 (2013)......................................................20-41

*Litecubes, LLC v. Northern Light Prods., Inc.*,
   523 F.3d 1353 (Fed. Cir. 2008) .............................................. 27

*Morrison v. National Australia Bank Ltd.*,
   561 U.S. 247 (2010)........................................................... 11, 18

*Norwegian Nitrogen Prods. Co. v. United States*,
   288 U.S. 294 (1933)................................................................. 31

*In re Orion Co.*,
   71 F.2d 458 (C.C.P.A. 1934)................................................... 43

v

## TABLE OF AUTHORITIES (CONT'D)

*Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*,
    109 F.3d 850 (2d Cir.1997) ............................................................... 50, 52

*Ruberoid Co. v. Federal Trade Comm'n*,
    343 U.S. 470 (1952)......................................................................... 24, 62

*Sealed Air Corp. v. U.S. Int'l Trade Comm'n*,
    645 F.2d 976 (C.C.P.A. 1981) ................................................................ 27

*Sharp Kabushiki Kaisha v. Thinksharp, Inc.*,
    448 F.3d 1368 (Fed. Cir. 2006) .............................................................. 51

*Sioux Nation of Indians v. United States*,
    601 F.2d 1157 (Ct. Cl. 1979).................................................................. 33

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006) .............................................................. 63

*Sosa v. Alvarez–Machain*,
    124 S.Ct. 2739 (2004)............................................................................ 36

*Spansion, Inc. v. Int'l Trade Comm'n*,
    629 F.3d 1331 (Fed. Cir. 2010) .............................................................. 24

*TianRui Grp. Co. Ltd. v. Int'l Trade Comm'n*,
    661 F.3d 1322 (Fed. Cir. 2011) ..................................................... 11, 23-44

*United States v. Home Concrete & Supply, LLC*,
    132 S.Ct. 1836 (2012)...................................................................... 27, 38

*United States v. Ramsey*,
    431 U.S. 606 (1977).............................................................................. 47

*United States v. Villanueva*,
    408 F.3d 193 (5th Cir. 2005) ........................................................... 43, 44

# TABLE OF AUTHORITIES (CONT'D)

*Viscofan, S.A. v. U.S. Int'l Trade Comm'n,*
  787 F.2d 544 (Fed. Cir. 1986) ...................................................... 24, 60, 64

*Zenith Elecs. Corp. v. United States,*
  988 F.2d 1573 (Fed. Cir. 1993) ........................................................ 28, 30

**Constitutional Provisions**

U.S. Const., Article I, § 8 ............................................................................ 37

**Statutes**

15 U.S.C. § 78aa(b)(2) ................................................................................ 40

16 U.S.C. § 1538(a)(1)(A) .......................................................................... 36

19 U.S.C. § 1307 ........................................................................................ 35

19 U.S.C. § 1337(a)(1)(A) .................................................................. *passim*

19 U.S.C. § 1337(a)(1)(A)(i) ................................................................ 41, 59

19 U.S.C. § 1337(j) .............................................................. 21, 45, 47, 52

19 U.S.C. § 1337a (1940) .......................................................................... 42

Tariff Act of 1922 .................................................................................. 29, 30

Tariff Act of 1930 .............................................................................. *passim*

**Legislative History**

62 Cong. Rec. 5874 (1922) ........................................................................ 30

H. Rep. No. 76–1781 (1940) ...................................................................... 42

S. Rep. No. 67–595 (1922) ........................................................................ 30

S. Rep. No. 76–1903 (1940) ...................................................................... 42

# TABLE OF AUTHORITIES (CONT'D)

S. Rep. No. 93-1298 (1974) ........................................................................ 45

*Tariff Act of 1929, Vol. 17: Special and Administrative
Provisions: Hearing on H.R. 2667 Before the S. Comm. on
Finance*, 71st Cong. 77–79 (1929) ......................................................... 31

U.S. Tariff Comm'n, *Dumping and Unfair Foreign
Competition in the United States and Canada's Anti-
dumping Law* (1919) ............................................................... 28, 30

U.S. Tariff Comm'n, *Sixth Annual Report* (1922) ...................................... 30

**Administrative Decision**

*Certain Welded Stainless Steel Pipe and Tube Industry*,
Inv. 337-TA-29 ........................................................................ 46

**Code of Federal Regulations**

19 C.F.R. § 210.43(b) ........................................................ 13, 54, 63

19 C.F.R. § 210.43(b)(2) .................................................... 13, 48, 49

19 C.F.R. § 210.43(d)(2) ........................................................... 54

**Federal Register Notices**

43 Fed. Reg. 17789 (April 26, 1978) ........................................... 46

70 Fed. Reg. 43251 (July 26, 2005) ............................................ 21

77 Fed. Reg. 38083 (June 26, 2012) ............................................. 8

78 Fed. Reg. 3917 (Jan. 17, 2013) ............................................. 9

78 Fed. Reg. 56734 (Sept. 13, 2013) ...................................... 16, 17

## STATEMENT OF RELATED CASES

Appellee U.S. International Trade Commission ("the Commission")

has no information concerning related cases.

## STATEMENT OF JURISDICTION

Pursuant to Federal Circuit Rule 28(b), the Commission states that it has no disagreement with appellant's jurisdictional statement.

## STATEMENT OF ISSUES

The Commission disagrees with Sino Legend's[1] statement of the issues.  Pursuant to Federal Circuit Rule 28(b), the Commission submits that the issues on appeal are more properly framed as follows:

(1)    Whether the Commission properly applied Federal Circuit and Supreme Court precedent to determine that 19 U.S.C. § 1337(a)(1)(A) applies to the importation of articles made using U.S. trade secrets that were misappropriated by Sino Legend in China.

(2)    Whether the Commission acted within its discretion when it determined that the judgment of a Chinese court did not control the outcome of the investigation.

(3)    Whether the Commission acted within its discretion in issuing a ten-year limited exclusion order based on record evidence showing it would take ten years to independently develop the trade secrets that Sino Legend misappropriated.

---

[1] We refer to appellants collectively as Sino Legend.  *See infra* Statement of the Case III.  The appellants have chosen to collectively refer to themselves as Sino Legend (Bl. Br. at 2 n.2), and presented their arguments collectively.

CONFIDENTIAL BUSINESS
INFORMATION DELETED

# STATEMENT OF THE CASE

Pursuant to Rule 28(a)(6), the Commission provides a statement of the case setting out the facts relevant to the issues of this appeal.

## I.    SI's Trade Secrets

Intervenor SI Group Inc. ("SI") manufactures rubber resins used in the manufacture of tires for vehicles.  The resins, also called PTOP tackifiers, are used to bond layers of tire materials together.  A211-12.  SI has invested [[          ]] of dollars in research and development related to its tackifiers in the United States.  A829-30.  This research has resulted in the development of certain proprietary processes for the production of SI's resins.  SI's secret processes have contributed to the success of SI's domestic industry.  SI has [[      ]] of the market share in the United States for tackifier products. A550.

SI's process for synthesizing resins involves two steps: an alkylation reaction followed by a condensation reaction.  A107.  In the primary alkylation reaction, SI reacts [[                                                ]]. A107-08.  In the condensation reaction, the PTOP (*i.e.*, the product of the alkylation reaction) is further reacted with formaldehyde to form a resin. A108.

CONFIDENTIAL BUSINESS INFORMATION DELETED

SI's trade secrets include the use of [[




]].

A109.

SI took significant measures to keep the asserted trade secrets protected.  Employees are required to sign confidentiality agreements, and all third parties, consultants, suppliers, and customers with access to SI trade secrets are also required to sign confidentiality agreements.  A320.  In addition, SI's Chinese subsidiary, SI Group (Shanghai) Co., Ltd. ("SI Shanghai") limits access to confidential information, protects the identity of raw material names by using codes, stores files in a secure room that has logged access, and has a written document control policy.  A320-21.

## II.    Sino Legend's Misappropriation of SI's Trade Secrets

Sino Legend misappropriated SI's trade secrets through two former employees of SI Shanghai:  Mr. C.Y. Lai and Mr. Jack Xu.   In 1999, SI hired C.Y. Lai to serve as the General Manager of SI Shanghai.  A597.  In 2004, Mr. Lai hired Jack Xu, and in June 2006, Mr. Xu was promoted to Plant Manager of SI Shanghai.  A598-99.  Both Mr. Lai and Mr. Xu



CONFIDENTIAL BUSINESS
INFORMATION DELETED

executed labor agreements with SI Shanghai.  A597, A599-600.  [[


]].  *Id.*

Mr. Xu also signed a non-disclosure agreement ("NDA") with SI.
A599.  This agreement required Mr. Xu [[

]].
A1635.  Specifically, Mr. Xu's NDA states:  [[




]]  *Id.* (emphasis original).

The labor contract Mr. Xu signed with SI Shanghai had two relevant
provisions regarding confidentiality.  Article 9 of the labor contract required
Mr. Xu to [[

]].[2]  A1298.

Article 6 of the labor contract includes [[

]].  A1296.  SI Shanghai's employee handbook

---

[2] Mr. Lai's labor contract [[

]].

CONFIDENTIAL BUSINESS
INFORMATION DELETED

provides [[

]]

A1330.

Mr. Lai and Mr. Xu both had access to SI's trade secrets.  For example, both Mr. Xu and Mr. Lai had access to SI's SP-1068 formula due to their high level positions.  A610.  In addition, certain trade secret plant formulas were sent to SI Shanghai through Mr. Lai when the SI Shanghai plant was starting up.  A598.  Evidence shows that Mr. Lai received copies of SI's formulas for [[              ]] and SP-1068.  *Id.*

Mr. Xu admitted that he had access to batch cards that included technical information on the production of SP-1068.  A600-02.  Mr. Xu signed a "borrow log" which reflected his access to technical information from SI Shanghai.  A600.  In addition, Mr. Xu had [[

]]. A600-02.  Mr. Lai and Mr. Xu also had access to a file room containing the formulas from SI's U.S. plant.  A602-03.

Mr. Lai's employment with SI Shanghai ended in 2005.  A598.  By September 2006, Mr. Lai was working with [[                    ]], Shanghai Red Avenue Chemical Co. Ltd.  *Id.*  Mr. Lai was working with

6

[[                                    ]] to develop resins like those he learned to make at SI.  *See* A608.

Meanwhile, Mr. Xu was still employed at SI Shanghai.  About the same time that Mr. Lai began working with Sino Legend, Mr. Xu started misappropriating SI's trade secrets for Sino Legend.  A604-05.  Mr. Xu was communicating with Sino Legend from his SI laptop by late 2006.  *Id.*  Mr. Xu left SI in 2007 and began working for entities affiliated with Sino Legend (Zhangjiagang) Chemical Co., Ltd. ("Sino Legend ZJG").  A604. When Mr. Xu resigned from SI, he lied about his future employment plans. A604.  He stated that he had found a job in an unrelated industry and that he did not intend to go to a competing company.  A604; A1757-59; A20288:1-22; A20290:6-10;  A20320:2-4; A20321:4-6.

After Mr. Lai and Mr. Xu began working for Sino Legend, SI Shanghai began hearing reports from its sales team that Sino Legend boasted to customers that it had hired SI Shanghai's former plant manager.  A1761. Customers also reported that Sino Legend claimed it would soon be selling the same products, produced using the same methods, as those sold by SI. *Id.*

Shortly after Sino Legend began working with Mr. Xu, Sino Legend developed a tackifier virtually identical to SI's.  *See e.g.,* A142-43; A612.

The record shows that Sino Legend's resins designated as SL-1801, SL-1801 LFP, SL-1802, and SL-1802 LFP were made using SI's trade secrets.  *See e.g.,* A156; A151; 156; A708-11.  Later, Sino Legend ZJG filed a Chinese patent application that disclosed SI trade secrets.  A1820-21; A1558-1632.

## III.    Institution of the Commission Investigation

The Commission instituted this investigation on June 26, 2012, based on a complaint filed on behalf of SI on May 21, 2012, as supplemented on June 12, 2012.  77 Fed. Reg. 38083 (June 26, 2012).  The complaint alleged violations of section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337  or "section 337"), in the sale for importation, importation, or sale after importation into the United States of certain rubber resins by reason of misappropriation of trade secrets, the threat or effect of which is to destroy or substantially injure an industry in the United States.  The Commission's notice of investigation named as respondents, *inter alia*, Precision Measurement International LLC; Sino Legend ZJG; Sino Legend Holding Group, Inc.; and Shanghai Lunsai International Trading Company.  Later the scope of the investigation was amended to include Red Avenue Group

CONFIDENTIAL BUSINESS
INFORMATION DELETED

Limited and Sino Legend Holding Group Inc. of Marshall Islands as
respondents.[3]  78 Fed. Reg. 3917 (Jan. 17, 2013).

SI asserted that rubber resins imported and sold by Sino Legend were
made using 18 of its trade secrets:  7 trade secrets relating to its alkylation
process, 10 trade secrets relating to its condensation process, and an 18th
trade secret comprising a combination of the other 17 asserted trade secrets.
A109.  The trade secrets include the use [[

]]. *Id.*

## IV.    The ALJ's Initial Determination

On June 17, 2013, the presiding administrative law judge issued his
final ID, finding a violation of section 337.  The ALJ found 11 of the 18
asserted trade secrets were protectable and misappropriated.  A920.

### A.    Relevant Misappropriation Factual Findings

The ALJ determined that not only did Mr. Xu and Mr. Lai have access
to SI's trade secrets but they were also bound to keep those trade secrets
confidential.  A597-603.

---

[3] The respondents discussed herein are limited to those that are appellants in
this appeal.  Other respondents were terminated from the investigation and
have not appealed.  As previously mentioned, we refer to the appellants
collectively as "Sino Legend."

The ALJ found that Mr. Xu and Mr. Lai left SI Shanghai to work for Sino Legend, where Sino Legend took SI's SP-1068 trade secrets by unfair means. A597; 603. Specifically, Mr. Xu was in communication with Sino Legend for at least five to six months prior to his departure from SI Shanghai. A604-07. Mr. Xu drafted and sent to Sino Legend [[

]] A605. [[



]] *Id.* The ALJ also found that Sino Legend ZJG acquired [[

]] from Mr. Xu in 2006 and [[

]] from Mr. Xu after he started working at Sino Legend ZJG. *Id.*

The ALJ found that based on Mr. Lai's and Mr. Xu's access to SI's trade secrets and the drastic change in Sino Legend's formulations after it had access to Mr. Xu, Sino Legend misappropriated SI's trade secrets. A632-33. The ALJ found that using SI's trade secrets provided Sino Legend with a substantial head start in launching its competing products. *Id*.

## B.     Extraterritoriality

Sino Legend argued to the ALJ that because the alleged misappropriation occurred outside of the United States, the Commission does not have subject matter jurisdiction. A222. The ALJ explained that in

*TianRui Group Co. Ltd. v. International Trade Commission*, 661 F.3d 1322 (Fed. Cir. 2011), the Federal Circuit directly addressed this issue and held that section 337 is applicable to the importation of articles made using trade secrets that were misappropriated outside of the United States.  A222.  The ALJ explained that this investigation is directed to similar unfair acts.  A222-23.  The ALJ noted that *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), which Sino Legend claimed to conflict with *TianRui*, was expressly considered by the *TianRui* Court.  A223.  Therefore, the ALJ found that Sino Legend did not present "compelling" reasons to ignore binding precedent.  *Id.*

### C.   Comity and Abstention

Sino Legend further argued that the Commission should stay or terminate the investigation in favor of co-pending Chinese litigation brought by SI and its Chinese subsidiary SI Shanghai against Sino Legend ZJG and Mr. Xu.  Sino Legend argued that the Chinese litigation addressed the same allegations of trade secret misappropriation as those at issue in the Commission investigation, making comity appropriate.  The ALJ found Sino Legend's briefing on comity to be deficient because it was merely "a conclusory argument."  A223-24.  The ALJ also explained that the Commission investigation was already at a late stage.  *Id*.  Therefore, the

ALJ found that "neither comity nor the principles of abstention weigh in favor of the Commission's declining to exercise jurisdiction." *Id.*

### D.    Duration of the Exclusion Order

Having found a violation of section 337, the ALJ made a recommendation to the Commission on the appropriate remedy. A911-12. The ALJ noted that the Commission practice in trade secrets investigations is to set the length of an exclusion order based on the time it would take to independently development the misappropriated secrets. *Id.* The ALJ considered competing evidence from SI's expert and Sino Legend's expert concerning the length of time that it would take to independently develop the trade secrets that Sino Legend misappropriated. The ALJ credited the testimony of Dr. Chao, SI's expert, that it would take at least 10 years to independently develop SI's processes. A911. The ALJ did not find credible testimony from Sino Legend's expert, Dr. Swager, that the process could be developed in six months. A911-12. The ALJ noted that Dr. Swager's testimony relied on his opinion that the asserted trade secrets were generally known. *Id.* The ALJ stated that because eleven of the asserted processes were in fact secret, they were not generally known. A912. The ALJ therefore rejected Dr. Swager's contrary opinion. *Id.* The ALJ

recommended that the Commission set the term of any exclusion order to be 10 years.  A911-12.

## V.    Proceedings Before the Commission

On July 1, 2013, Sino Legend filed a petition for review of the ALJ's ID.  On July 9, 2013, SI filed a response thereto.  Sino Legend argued, *inter alia*, (1) section 337 should not reach extraterritorial activity nor apply federal law to wholly foreign conduct; and (2) abstention and comity warrant dismissal of SI's trade secret claims.  A6859-60.

With respect to the scope of section 337, Sino Legend acknowledged that this Court in *TianRui* held that section 337(a)(1)(A) prohibits the importation of articles made using trade secrets that were misappropriated abroad.  Nevertheless, Sino Legend attempted to "respectfully contest jurisdiction" by arguing that *TianRui* was wrongly decided.  *See* A6859.

Sino Legend also made a cursory argument that even if section 337(a)(1)(A) can reach SI's misappropriation claims, the Commission should dismiss those claims in favor of the Chinese proceedings.  A6859-60. In violation of Commission Rule 210.43, Sino Legend attempted to incorporate by reference its arguments to the ALJ on this point.  A6860; 19 C.F.R. § 210.43(b)(2).

13

In response to Sino Legend's petition for review, SI argued that this
Court in *TianRui* expressly rejected the same arguments regarding the scope
of section 337 that Sino Legend was making to the Commission.  A7684-85.
SI contended that Sino Legend's briefing to the ALJ did not sufficiently
explain why *TianRui* could be disregarded and was not sufficiently
developed to preserve the argument for Commission review.  A7685.  SI
further argued that Sino Legend's cursory arguments on abstention and
comity must also fail.  *Id.*

After submitting its petition for review, Sino Legend filed three other
documents with the Commission that attempted to expand upon the legal
relevance of the Chinese decision.  *See* A4625-27; A4501-02; A7827-28.

In response to Sino Legend's various filings, SI argued that Sino
Legend had the burden to prove that the Chinese litigation it relied upon was
conducted according to principles of fundamental fairness.  *See* A7713-14;
A7940-41.  SI proffered several arguments that the Chinese proceedings
were unfair.  For example, SI argued that the Chinese court failed to
consider material facts, including the following:

- Mr. C.Y. Lai and Mr. Xu had full access to SI's trade secrets while
  employed at SI Shanghai.  A143; A596-A603.

- Before September 2006, Sino Legend could not make its process
  work.  A607.

14

CONFIDENTIAL BUSINESS
INFORMATION DELETED

- In September 2006, Mr. Lai was consulting for Sino Legend about developing its competing process.  A608.

- At least as early as December 2006, Mr. Xu was communicating with Sino Legend, on his SI laptop, about the pilot plan for Sino Legend's competing process.  A605-08; A612.

- Sino Legend's laboratory notebooks in November 2006 and pilot study in December 2006 contained parameters identical to or substantially the same as SI's.  A142-43; A145-48; A156; A607-12; A631-33; A655-56; A658; A669-71; A725; A781.

- The SI parameters allowed Sino Legend to finally produce a competing tackifier resin (SL-1801 and SL-1802).  A607.

- Sino Legend later modified certain parameters, including the [[                    ]], based on other versions of SI's process, to which Mr. Lai and Mr. Xu had proven access.  A605; A671; A148.
- Sino Legend engaged in misconduct in an attempt to hide the truth about its products.  A610-12; A814-15.

*See* A7713-14; A7940-41.

SI also claimed it was unable to develop a fair record before the

Chinese court because Sino Legend destroyed and altered evidence.

Specifically, the ALJ found that Sino Legend tore a page out of a lab

notebook that related to Sino Legend's independent development arguments.

A611-12; A814-15.  The ALJ also found that Sino Legend had whited out

information on numerous pages of the [[                              ]]

which was germane to showing Mr. Xu's collusion with Sino Legend.

A610-11; A814-15.

15

CONFIDENTIAL BUSINESS
INFORMATION DELETED

Additionally, SI cited reports from the U.S. Trade Representative ("USTR") describing the difficulty U.S. firms have in obtaining trade secret relief in China.  *See* A7714 (citing USTR 2013 Special 301 Report at 27, 31).  Sino Legend failed to rebut SI's allegation that the deficiencies identified in the USTR reports were also present in the relevant Chinese proceedings.  *See* A7827-28.

On September 9, 2013, the Commission issued a notice of its determination to review the final Initial Determination ("ID") in its entirety, and requested briefing on the issues under review and on remedy, the public interest, and bonding.  78 Fed. Reg. 56734-36 (Sept. 13, 2013).  On September 23, 2013, the parties filed submissions in response to the Commission's notice, and on September 30, 2013, the parties filed submissions in reply thereto.

In its response to the Commission's request for briefing on remedy, Sino Legend argued no exclusion order should issue.  A7820.  Sino Legend based this argument, in part, on a labor contract between Mr. Xu and SI's Chinese subsidiary SI Shanghai.  A7820-22.  Sino Legend noted that Mr. Xu's labor contract [[

]] *Id.*  [[

CONFIDENTIAL BUSINESS
INFORMATION DELETED

.]]  *Id.*  Sino Legend contended that if the Commission were to issue an exclusion order now it would amount to an unwarranted windfall in favor of SI.  *Id.*  Sino Legend alternatively contended that it would only take six months to a year to independently develop SI's trade secrets and any exclusion order should be limited to that period.  A7823.

SI argued and presented evidence that the Commission's remedy should have a duration of 10 to 20 years.  A7771-74.  SI described Dr. Banach's testimony, which outlined the development of SP-1068 over time and estimated that it would take at least 10 to 20 years of process development to arrive at the process that Sino Legend developed.  A7773-74.  Dr. Chao, SI's expert, similarly testified that it would take at least 10 years of research and development to develop such a process.  A7774.

In response to Sino Legend's assertion that Mr. Xu's confidentiality

[[                                        ]], SI explained that Mr. Xu was

[[

                                        ]]  A7900 (citing CX-318C (A1633-

43)).

CONFIDENTIAL BUSINESS
INFORMATION DELETED

## VI.     The Commission's Final Determination

On January 15, 2014, the Commission issued its final determination. The Commission found that there was "misappropriation of trade secrets, that there was actual injury and the threat of injury to a domestic industry," and that the Sino Legend respondents "violated section 337 in the importation, sale for importation, or sale after importation of rubber resins." A104. The Commission adopted the ALJ's findings that were consistent with its opinion, including the ALJ's determination that the Commission could consider Sino Legend's conduct in China when determining a violation of section 337(a)(1)(A). *Id.* The Commission's determination therefore rested on application of *Morrison* and *TianRui*. *See* A223; A104; A110-11.

The Commission affirmed many of the ALJ's findings including, *inter alia*, Mr. Xu and Mr. Lai's access to the asserted trade secrets (A143), the existence of a domestic industry and related factual findings (A161), and that SI took steps to protect the secrecy of its trade secrets, including the ALJ's finding that [[

        ]] (A113).

The Commission determined that abstention and comity did not relieve it of its statutory responsibility to determine whether there is a

violation of section 337.  A106.  The Commission also found that the Chinese litigation did not preclude a remedy in this investigation.  A187.

The Commission noted that the duration of an exclusion order in a trade secret misappropriation case normally is the time it would have taken the respondents to independently develop the trade secrets.  A183.  The Commission set the duration of the remedy to 10 years from the date of issuance of the exclusion order.  A184.  The Commission considered testimony from SI's expert that it would take at least 10 years to independently develop the trade secrets and testimony from Sino Legend's expert that SI's processes could be independently developed in six months.  *Id.*  The Commission did not find Sino Legend's evidence credible and set the duration of the exclusion order to 10 years.  *Id.*

## SUMMARY OF ARGUMENT

On appeal, Sino Legend does not dispute that its employees Mr. Xu and Mr. Lai took proprietary information from SI and gave it to Sino Legend.  Neither does Sino Legend dispute that it utilized SI's trade secrets in manufacturing its products, nor that those products were imported into the United States.  Instead, Sino Legend seeks to avoid the consequences of its misappropriation and importation with arguments that (1) this Court should overturn its previous decision in *TianRui* that section 337 prohibits the

CONFIDENTIAL BUSINESS INFORMATION DELETED

importation of articles made using misappropriated trade secrets when that misappropriation occurs abroad; (2) a Chinese court determination should be afforded deference based on the principles of abstention and comity; and (3) this Court should usurp the Commission's discretion, reweigh record evidence, and limit the Commission's [[                              ]].  As summarized below, none of these arguments has merit.

First, Sino Legend asks this Court to overturn its prior ruling in *TianRui* based on an allegedly inconsistent Supreme Court case, *Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659 (2013).  Sino Legend's argument lacks merit.  *Kiobel* concerns application of a federal statute to wholly extra-territorial conduct.  The Commission did not apply section 337(a)(1)(A) in this investigation to regulate extraterritorial conduct.  Section 337(a)(1)(A) regulates unfair acts "in the importation of articles." 19 U.S.C. § 1337(a)(1)(A).  Under Supreme Court precedent, "importation" is domestic conduct, not extraterritorial conduct, so the presumption against interpreting the statute to cover extraterritorial conduct does not apply. *Cunard*, 262 U.S. at 122.  In enacting section 337, Congress was aware of and intended section 337 to cover unfair acts in the importation of articles that may have occurred abroad.

*TianRui* is not inconsistent with the Supreme Court's *Kiobel* decision. *Kiobel* interprets the Alien Tort Statute of 1789, not section 337 of the Tariff Act of 1930. *Kiobel* is not controlling for at least that reason. Nevertheless, *TianRui* faithfully applies the same principles of statutory interpretation as those applied in *Kiobel*, including a central focus on the text of the statute and an examination of congressional intent.

Sino Legend's argument that the interpretation of section 337 in *TianRui* will cause international conflict is also without merit. In enacting section 337, Congress was aware that the Commission's trade decisions could have an effect on foreign policy. That is why section 337 allows the President to disapprove a Commission determination for policy reasons.[4] The Presidential review provision contradicts Sino Legend's interpretation of section 337. The Commission's determination and order here were subject to review by the executive branch, but were not disapproved.

Second, Sino Legend asserts that the Commission improperly determined that the principles of comity and abstention were not applicable to this investigation. There was no error. Sino Legend now tries to meet its

_____

[4] *See* 19 U.S.C. § 1337(j). The President has delegated this authority to the U.S. Trade Representative. *See* Presidential Memorandum of July 21, 2005. 70 Fed. Reg. 43251 (July 26, 2005).

CONFIDENTIAL BUSINESS
INFORMATION DELETED

burden to prove abstention and comity are warranted with arguments it never presented to the Commission. Moreover, even if Sino Legend had made these arguments before the Commission, comity and abstention are not warranted because Sino Legend has not established that the Chinese court abided by the principles of fundamental fairness and that the lawsuits are coextensive. The Commission's determination therefore is not an abuse of discretion.

Finally, Sino Legend asks the Court to limit the Commission's remedy to [[            ]] based on Mr. Xu's labor contract. But Sino Legend's opening brief to this Court does not address Mr. Xu's confidentiality obligation under the NDA he signed with SI. Under that document, Mr. Xu was obligated to [[

                                            ]]. The Commission did not abuse its discretion in setting the length of its remedy to 10 years based on record evidence demonstrating that it would take 10 years to independently develop the trade secrets Sino Legend misappropriated.

## ARGUMENT

### I.    Standard of Review

Sino Legend's brief lacks a complete presentation of the standard of review, which is required by Federal Rule of Appellate Procedure 28(a).

The Commission submits that the following legal standards apply to Sino Legend's appeal.

Sino Legend challenges the Commission's determination that section 337 governs the importation of articles made using trade secrets that were misappropriated abroad. To the extent that review of the Commission's determination requires interpretation of section 337—the statute the Commission is charged to administer—this Court defers to the Commission's reasonable interpretation of the statute. *See Corning Glass Works v. Int'l Trade Comm'n*, 799 F.2d 1559, 1565 (Fed. Cir. 1986); *TianRui*, 661 F.3d at 1332; *see also Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984).

The Court in *Chevron* outlined the two step process for agency statutory interpretation. The first question is whether "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842-43. "If the intent of Congress is clear, that is the end of the matter." *Id.* However, if Congress has not addressed the issue, the court must determine whether the agency's interpretation of the statute is "a permissible construction." *Id.*

To the extent the Court must consider any of the Commission's factual determinations, they are reviewed for substantial evidence.

*Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1343-44 (Fed. Cir. 2010).

Sino Legend challenges the Commission's determination to decline to apply the principles of abstention and comity. The Commission's determination regarding comity is reviewed for abuse of discretion. *Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1329 (Fed. Cir. 2001).

Sino Legend challenges the terms of the Commission's limited exclusion order. This Court has held that the Commission has broad discretion to fashion its remedies. *Hyundai Elecs. Indus. Co. v. U.S. Int'l Trade Comm'n*, 899 F.2d 1204, 1207-08 (Fed. Cir. 1990). Therefore, judicial review on the issue of remedy "necessarily is limited." *Viscofan, S.A. v. U.S. Int'l Trade Comm'n*, 787 F.2d 544, 548 (Fed. Cir. 1986). So long as the Commission's remedy bears a reasonable relation to the harm identified in the investigation, the remedy will be sustained. *See Ruberoid Co. v. Federal Trade Comm'n*, 343 U.S. 470, 473 (1952).

## II.   The Commission May Consider Foreign Conduct When Adjudicating Claims Under Section 337(a)(1)(A)

Because Sino Legend cannot dispute that Mr. Lai and Mr. Xu took SI's proprietary information and gave it to Sino Legend without authorization, it is left to argue that the law it has violated should change. In

particular, Sino Legend appeals to this Court to overturn its precedential

decision in *TianRui Group Co. Ltd. v. International Trade Commission*.  In

that case, the Court held that section 337 "only sets the conditions under

which products may be imported into the United States" and therefore "the

presumption against extraterritoriality does not govern" the interpretation of

section 337.  661 F.3d at 1330.  The Court therefore found that the

Commission can issue an exclusion order barring the importation of goods

made using trade secrets that were misappropriated abroad.  *Id*. at 1334-35.

As explained below, the Court's reasoning in *TianRui* is sound and does not

conflict with the authorities cited by Sino Legend.

### A.    The Commission Did Not Apply Section 337(a)(1)(A) to Govern Extraterritorial Conduct

Any interpretation of section 337(a)(1)(A) must begin with the text of

the statute.  *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) (citing

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).  Section

337(a)(1)(A) governs the "importation" of foreign goods "into the United

States."  19 U.S.C. §1337 (a)(1)(A).  By definition, importation is conduct

that takes place in the United States.

The meaning of "import" has long been held to mean bringing a good

into the territory of United States from a foreign nation.  *Cunard S.S. Co. v.*

*Mellon*, 262 U.S. 100, 122 (1923).  "It now is settled in the United States

25

and recognized elsewhere that the territory subject to its jurisdiction includes the land areas under its dominion and control, the ports, harbors, bays and other enclosed arms of the sea." *Id.* Thus, controlling the entry of articles into the United States is not regulating extraterritorial conduct.

When the Commission excludes goods manufactured abroad from importation into the United States based on predicate acts of wrongdoing, the Commission is controlling the importation of the goods, not the underlying predicate acts. *TianRui*, 661 F.3d at 1330 ("[T]he determination of misappropriation was merely a predicate to the charge that TianRui committed unfair acts in importing its wheels into the United States."). Contrary to Sino Legend's argument, section 337 does not "police business practices abroad"; rather, it controls entry of goods into the United States. *Compare* Bl. Br. at 18 *with TianRui*, 661 F.3d at 1330.

In this case, the Commission had no reason to investigate Sino Legend's trade secret misappropriation in China until Sino Legend began importing into the United States resins made using those misappropriated trade secrets. When SI complained to the Commission, the Commission applied U.S. law within U.S. borders. The Commission's exclusion order applies only to goods imported into the United States. There is nothing "extraterritorial" about the Commission's action.

26

Although section 337(a)(1)(A) governs the domestic conduct of

importation, this Court and its predecessor have repeatedly affirmed that the

Commission may consider foreign conduct that renders such importation

unfair.  *See, e.g.*, *Sealed Air Corp. v. U.S. Int'l Trade Comm'n*, 645 F.2d

976, 985 (C.C.P.A. 1981) (section 337 remedies "unfair acts instigated by

foreign concerns operating beyond the in personam jurisdiction of domestic

courts"); *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1481 (Fed.

Cir. 1986) (section 337 addresses "unfair practices beginning abroad and

culminating in importation"); *TianRui*, 661 F.3d at 1330.  As discussed in

the following sections, Sino Legend raises no sound reason to disturb settled

law.

### B.    The Commission's Interpretation of Section 337(a)(1)(A) Is Consistent with Congressional Intent

The presumption against extraterritoriality upon which Sino Legend

so heavily relies "is simply a question of statutory interpretation."

*Litecubes, LLC v. Northern Light Prods., Inc.*, 523 F.3d 1353, 1363 (Fed.

Cir. 2008).  Where the legislative history indicates Congress has decided a

question of interpretation "definitively," there is "no room for the agency to

reach a contrary result."  *See United States v. Home Concrete & Supply,*

*LLC*, 132 S.Ct. 1836, 1844 (2012), analyzing *Colony, Inc. v. Commissioner*

*of Internal Revenue*, 357 U.S. 28 (1958).  Here, the text and legislative

27

history of section 337 show that Congress clearly intended the interpretation of the law that this Court applied in *TianRui* and that the Commission applied in the investigation under review.

The legislative history behind the provision in modern section 337(a)(1)(A) stretches back to 1916, when Congress created the Tariff Commission (the predecessor to the modern International Trade Commission).  In a 1919 report to the House Ways and Means Committee, the Commission identified several deficiencies in U.S. trade laws, including the lack of any adequate "governmental machinery" for investigating allegations of dumping.[5]   U.S. Tariff Comm'n, *Dumping and Unfair Foreign Competition in the United States and Canada's Anti-dumping Law* (1919) ("1919 Report"), at 18.    The Commission noted that it was difficult to obtain proof of dumping because "one element" of dumping "must be found abroad," namely, the fair market value of goods in the country of manufacture.  1919 Report at 18.

The Commission also noted the effectiveness of Canada's administrative antidumping statute, which enabled Canadian officials, "even

---

[5] Dumping is the sale of foreign manufactured goods in this country at less than the fair market value of those goods in the country of manufacture. *See, e.g., Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1576 (Fed. Cir. 1993).

extra-territorially, to procure dependable information on values." *Id*. at 31.

The Commission contrasted Canada's "flexible" administrative regime with

the antidumping law of the United States in effect at that time. *See, e.g., id*.

at 32. The prevailing U.S. law was a criminal statute, which the

Commission found deficient because it "must be strictly construed." *Id*. at

33. The Commission stated that "administrative remedies to prevent

dumping are superior to criminal laws" and recommended that the U.S.

Congress adopt legislation to establish an administrative regime. *Id*. at 34.

The Commission renewed its recommendations from the 1919 report in its

1921 report. *See TianRui*, 661 F.3d at 1331.

In section 316 of the Tariff Act of 1922, Congress responded to the

Commission's recommendation by creating an administrative regime to

regulate "unfair methods of competition and unfair acts in the importation of

articles into the United States." *TianRui*, 661 F.3d at 1331. That Act

authorized the Tariff Commission to investigate allegations of such conduct

and to exclude articles that the Commission found to be in violation of that

provision. *Id.* The Senate report on the 1922 Act explained that "[t]he

provision relating to unfair methods of competition in the importation of

goods is broad enough to prevent every type and form of unfair practice and

is, therefore, a more adequate protection to American industry than any

antidumping statute the country has ever had." S. Rep. No. 67–595, pt. 1, at

3 (1922). Moreover, Senator Smoot, the Act's primary sponsor, declared

that Section 316 was to be "an antidumping law with teeth in it—one which

will reach all forms of unfair competition in importation." 62 Cong. Rec.

5874, 5879 (1922). He explained that the new statute "not only prohibits

dumping in the ordinary accepted meaning of that word; that is, the sale of

merchandise in the United States for less than its foreign market value or

cost of production; but also bribery, espionage, misrepresentation of goods,

full-line forcing, and other similar practices frequently more injurious to

trade than price cutting." *Id.*

The examples given by Congress in the legislative history show a

clear intent that the Commission be allowed to consider foreign conduct that

would taint goods presented for importation. The example of dumping, as

has been previously noted, requires consideration of pricing and sales in

foreign countries. 1919 Report at 18; *Zenith*, 988 F.2d at 1576. The

example of "espionage" also connotes actions that cross national borders.

After the enactment of the Tariff Act of 1922, the Commission advised

Congress that the new provisions "make it possible for the President to

prevent unfair practices, even when engaged in by individuals residing

outside the jurisdiction of the United States." U.S. Tariff Comm'n, *Sixth*

*Annual Report*, 4 (1922). When Congress subsequently enacted the Tariff Act of 1930, section 316 of the 1922 Act became section 337 of the new Act with some minor modifications not relevant here. Congress did not, however, disagree with the Commission's characterization of the prohibition on "unfair methods of competition" in the importation of articles into the United States, even though opponents criticized the Commission's broad authority to investigate acts of unfair competition with respect to goods imported into this country. *See Tariff Act of 1929, Vol. 17: Special and Administrative Provisions: Hearing on H.R. 2667 Before the S. Comm. on Finance*, 71st Cong. 77–79 (1929) (statement of James W. Bevans, representing the National Council of American Importers & Traders, Inc.).

The foregoing Commission and congressional reports reflect the understanding of those "charged with the responsibility of setting [the] machinery [of the statute] in motion." *See Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 315 (1933). The Supreme Court has stated that "peculiar weight" should be given to the Commission's early understanding of what it was empowered to do under the new trade statute. *See id.* (construing a related section of the Tariff Act). And this Court has concluded the legislative history of section 337 demonstrates that "Congress contemplated that, in exercising its new authority over unfair competition,

31

the Commission would consider conduct abroad in determining whether imports that were the products of, or otherwise related to, that conduct were unfairly competing in the domestic market." *TianRui*, 661 F.3d at 1331-32.

Sino Legend's argument that section 337 can reach only articles resulting from domestic misconduct is not only nonsensical for a statute governing "importation," it conflicts with the views and examples given by Congress.

## C.    *TianRui* Does Not Conflict with *Kiobel*

As noted above, *TianRui* definitively held that section 337(a)(1)(A) prohibits the importation of articles made using trade secrets misappropriated abroad.  *See TianRui*, 661 F.3d at 1334-35.  Sino Legend admits, as it must, that its central argument in this appeal is directly contradicted by *TianRui*.  Bl. Br. at 22-23.  To overcome that barrier, Sino Legend claims that the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co*. justifies abdication of *TianRui*, either by this panel or by the en banc Court.  Bl. Br. at 24.

This Court does not overturn its established precedent as lightly as Sino Legend suggests.  The panel hearing this appeal is "bound" by *TianRui* "unless and until [that decision is] overruled by an intervening Supreme Court or en banc decision."  *Deckers Corp. v. United States*, 752 F.3d 949,

964 (Fed. Cir. 2014).  Where a subsequent Supreme Court case "does not

bear on the precise question before" this Court, any decision "must be

consistent with the binding law of this circuit."  *See Conforto v. Merit Sys.

Prot. Bd.*, 713 F.3d 1111, 1119 (Fed. Cir. 2013); *see also Sioux Nation of

Indians v. United States*, 601 F.2d 1157, 1173 (Ct. Cl. 1979) (Nichols, J.

concurring) (the court is not required to extend Supreme Court decisions

"beyond their precise holdings").  As explained below, *Kiobel* has nothing to

do with section 337, and the principles of statutory construction applied in

*Kiobel* do not conflict with those this Court applied in *TianRui*.[6]

### 1.    *Kiobel* Interprets an Unrelated Statute in a Completely Different Factual Context

*Kiobel* was an action brought by Nigerian nationals in a New York

federal district court.  They sued Dutch, British, and Nigerian corporations

under the Alien Tort Statute, alleging that the foreign corporations aided and

abetted the Nigerian government in "beating, raping, killing, and arresting"

Nigerian residents and "destroying or looting property" in Nigeria.  *Kiobel*,

---

[6]  The en banc Court has already considered and rejected arguments identical to those raised by Sino Legend in this appeal.  *See TianRui Grp. Co. v. Int'l Trade Comm'n*, Appeal No. 2010-1395, Combined Petition for Rehearing and Rehearing En Banc of Appellants Tianrui Group Company Limited and Tianrui Group Foundry Company Limited, 2011 WL 6385951 (Nov. 23, 2011) and responses thereto; order denying petition (Feb. 1, 2012).  This Court need not conduct the same exercise again.

133 S.Ct. at 1662.  Following the alleged atrocities, the Nigerian nationals were granted political asylum in the United States and brought suit.  *Id*. at 1663.

The Supreme Court's decision makes clear that all of the conduct at issue in *Kiobel* occurred "in the territory of a foreign sovereign."  *Id*. at 1664.  The question, therefore, was whether Congress intended the Alien Tort Statute to regulate that foreign conduct.  *Id*.  The Supreme Court first examined the text of the Alien Tort Statute, which was enacted in 1789.  *Id*. at 1663.  The text provides, in full, that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  *Id.*  The Court concluded that the text of the Alien Tort Statute "does not directly regulate conduct or afford relief."  *Id.* at 1664.  Instead, it "allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law;" it is "strictly jurisdictional."  *Id*.  The Court explained that the Alien Tort Statute therefore does not raise a question about "what Congress has done but instead what courts may do."  *Id*.

With respect to the "torts" referred to in the Alien Tort Statute, the Supreme Court noted that such torts could theoretically be committed "either within or outside the United States."  *Id*. at 1665.  But the Court found

"nothing in the text" of the statute that indicated Congress necessarily meant the statute to afford a cause of action for torts committed "in the territory of a foreign sovereign." *Id*. at 1666. Accordingly, the Supreme Court found that Congress did not intend the Alien Tort Statute to provide a cause of action for conduct that occurred exclusively in Nigeria. *Id*.

As explained below, the conduct and the statute that this Court confronted in *TianRui* were entirely different than the conduct and the statute at issue in *Kiobel*.

First, as to the conduct in question, the appellant in *TianRui* had "imported TianRui wheels into the United States." *TianRui*, 661 F.3d at 1324. As noted above, importation is conduct squarely within the territory of the United States. *Cunard*, 262 U.S. at 122. Thus, the domestic conduct at issue in *TianRui* stands in sharp contrast to the atrocities considered in *Kiobel*, which were committed entirely in Nigeria. *See Kiobel*, 133 S.Ct. at 1662.

Second, the Alien Tort Statute at issue in *Kiobel* is not a trade statute. Section 337 is a trade statute, and its interpretation invokes different considerations. When a statute governs importation, the United States is applying its own laws to merchandise within its borders. For example, the restriction on importation of convict-made goods (19 U.S.C. § 1307) and the

35

restriction on the importation of endangered species (16 U.S.C.

§ 1538(a)(1)(A)) both prohibit importation of specific merchandise that can

be brought into the United States.  Both statutes allow, as a matter of logic,

consideration of conduct that occurred abroad.  There is nothing

"extraterritorial" about an agency of the United States government applying

United States law to restrict the importation of tainted or injurious foreign

goods.

Third, interpretation of the Alien Tort Statute at issue in *Kiobel*

involved concerns about the separation of constitutional powers; those

concerns were not present in *TianRui*.  As noted above, the Alien Tort

Statute confers certain jurisdiction on federal courts.  *Kiobel*, 133 S.Ct. at

1664.  The Court in *Kiobel* construed the statute narrowly to avoid the

judiciary "impinging on the discretion of the Legislative and Executive

Branches in managing foreign affairs."  *Id*. (quoting *Sosa v. Alvarez–

Machain,* 124 S.Ct. 2739 (2004)).  There are no such constitutional concerns

at issue in the construction of section 337(a)(1)(A) in *TianRui*.  Section

337(a)(1)(A) does not concern the judicial branch and presents no tension

between branches of government.  Section 337 is a delegation of

Congressional authority to an agency in the area of international trade.

Authority "To regulate Commerce with foreign Nations" is a power

expressly granted by the Constitution to Congress, and the Commission is a creature created by Congress within the scope of that authority. U.S. Const., Art. I, Sec. 8; *Akzo*, 808 F.2d at 1488.

Fourth, the Alien Tort Statute at issue in *Kiobel* lacks the textual expressions of clear congressional intent that are found in section 337(a)(1)(A). While the word "tort" in the Alien Tort Statute did not distinguish between torts committed "either within or outside the United States" (*Kiobel*, 133 S.Ct. at 1665), there is no such ambiguity in the text of section 337(a)(1)(A). Section 337 is expressly directed at unfair methods of competition and unfair acts "in the importation of articles" into the United States. 19 U.S.C. § 1337(a)(1)(A). The "importation of articles" cannot be interpreted to encompass articles that come from "either within or outside the United States," as the word "tort" in *Kiobel* could. Section 337(a)(1)(A) expressly applies only to articles that come from outside the United States. Such articles do not appear at the border *ex nilo*; they existed in a foreign jurisdiction first. Because Congress expressly stated that the importation of certain articles from outside the United States is "unfair," the language adopted by Congress necessarily includes consideration of foreign conduct that makes such importation unfair. *See TianRui*, 661 F.3d at 1329-30; *see also Akzo*, 808 F.2d at 1488 (section 337 addresses "unfair practices

37

beginning abroad and culminating in importation."). The Alien Tort Statute interpreted in *Kiobel* lacked an expression of Congressional intent as clear and unambiguous as that found in section 337. This is another significant reason that *Kiobel* does not disturb this Court's holding in *TianRui*.

A fifth distinction between the Alien Tort Statute analyzed in *Kiobel* and the subsection of the Tariff Act analyzed in *TianRui* is the significant legislative history associated with section 337. As discussed above, there is no similar legislative history for the Alien Tort Statute analyzed in *Kiobel*. The legislative history of section 337(a)(1)(A) provides significant insight into the intent of Congress. Where the legislative history indicates Congress has decided a question of interpretation "definitively," there is "no room for the agency to reach a contrary result." *See Home Concrete*, 132 S.Ct. at 1844. Nothing in *Kiobel* counterbalances the weighty Congressional intent shown in the legislative history of section 337.

Because the Supreme Court decision in *Kiobel* does not control the interpretation of section 337, the decision in this case "must be consistent with the binding law" of *TianRui*. *See Conforto*, 713 F.3d at 1119.

## 2.    *TianRui* Applies the Same Interpretive Canons as *Kiobel*

Sino Legend argues that *Kiobel* requires a court to determine whether a law "evince[s] a 'clear indication of extraterritoriality," and if it does not,

38

the court must assess whether the claims at issue "touch and concern the territory of the United States…with sufficient force to displace the presumption against extraterritorial application." Bl. Br. at 23 (quoting *Kiobel*, 1333 S.Ct. at 1665, 1669). Sino Legend claims that this Court did not undertake either of these inquires in *TianRui*. As explained below, Sino Legend is mistaken.

First, this Court *did* examine whether section 337 evinces a clear indication of the intent of Congress. The Court looked at the words of the statute, which govern the "importation of articles." *TianRui*, 661 F.3d at 1329. The Court found these words are "expressly directed" to an "international transaction" and therefore Congress "intended[ ] that the statute would apply to conduct (or statements) that may have occurred abroad." *Id*. The Court also found that the legislative history of section 337 supports a conclusion that Congress authorized the Commission to consider conduct that occurs abroad. *Id*. at 1330-32.

Second, this Court *did* address in *TianRui* the extent to which actions under section 337(a)(1)(A) touch and concern the territory of the United States. For example, the Court reasoned that section 337 "only sets the conditions under which products may be *imported into the United States*." *TianRui*, 661 F.3d at 1330 (emphasis added). The Court found that "the

39

determination of misappropriation was merely a predicate to the charge that TianRui committed unfair acts in *importing* its wheels *into the United States*." *Id*. (emphasis added). The Court held that because foreign conduct is used in section 337(a)(1)(A) proceedings "only to establish an element of a claim alleging a *domestic* injury and seeking a wholly *domestic* remedy, the presumption against extraterritorial application does not apply." *Id*. at 1329. The Court then went on to provide a detailed analysis of how trade secret misappropriation outside of the United States can injure an industry inside the United States through imported articles. *Id*. at 1335-37. Thus, contrary to Sino Legend's claim, this Court considered the extent to which the conduct in *TianRui* touched and concerned the territory of the United States.

Moreover, Sino Legend admits that where Congress has regulated "conduct that has some domestic nexus" Congress has allowed consideration of extraterritorial acts that are predicate to the regulation. Bl. Br. at 32. Specifically, Sino Legend argues that Congress authorized the Securities and Exchange Commission ("SEC") to act when, in part, the foreign conduct "has a foreseeable substantial effect within the United States." *Id*. at 34 (quoting 15 U.S.C. § 78aa(b)(2)).

Section 337 allows consideration of wrongful extraterritorial conduct for the same reasons that the SEC statute allows such consideration. Section 337(a)(1)(A) authorizes the Commission to investigate unfair acts in the importation of goods that will injure a domestic industry. 19 U.S.C. § 1337(a)(1)(A)(i). In view of the legislative history above, which describes certain articles as injurious precisely because of foreign conduct, there can be no doubt Congress intends the Commission to make determinations about that conduct. This case therefore has the same hallmarks of Congressional intent that Sino Legend identifies in the SEC statute and other statutes.

*TianRui* followed the same canons of statutory interpretation the Supreme Court followed in *Kiobel*. There is no conflict.

### D.     *TianRui* Does Not Conflict with *Amtorg*

Sino Legend also claims that *In re Amtorg Trading Corp.*, 75 F.2d 826 (C.C.P.A. 1935) and the amendment to section 337 following that decision demonstrate that section 337 precludes extraterritorial consideration. Bl. Br. at 46. Sino Legend misapprehends the issue in *Amtorg* and the meaning of the subsequent amendment.

The court in *Amtorg* was asked to determine whether the importation of a certain mineral from Russia constituted an "unfair act" within the meaning of section 337, as it read at the time. 75 F.2d at 828. The mineral

in question was mined in Russia and then separated from unusable substances by a process that was patented in the United States. The mineral itself was not covered by a U.S. patent. *Id*. at 832. The court applied longstanding patent law to conclude that practicing the separation process in Russia did not infringe any U.S. patent because patent rights are limited to the territory of the United States. *Id*. at 831-32. Because no patent rights were infringed in performing the separation process in Russia, the court found nothing unfair about importing the mineral. *Id*. at 834.

After *Amtorg* was decided, Congress amended section 337 to add a provision to declare that the importation of products made by a process patented in the United States "shall have the same status for the purposes of section [337]" as the importation of a patented product. 19 U.S.C. § 1337a (1940). The legislative history makes clear that the amendment was to reverse the result of *Amtorg* and restore the intent of Congress in passing section 337 originally. Specifically, the history states, "This bill is designed to correct the present problem *which was created* when the Court of Customs and Patent Appeals in the case *In re Amtorg Trading Corporation* reversed its former decisions" interpreting section 337. *See* S. Rep. No. 76-1903, 1 (1940) (emphasis added); *see also* H. Rep. No. 76–1781, 1–2

(1940). In other words, Congress did not believe that section 337 had an inherent flaw; it believed the court misapprehended the law's scope.

The foregoing history contradicts Sino Legend's argument that Congress intended to section 337 to be narrowly interpreted. The amendment of section 337 after *Amtorg* demonstrates that Congress "rejected that construction." *See TianRui*, 661 F.3d at 1334.

Moreover, section 337 "is broad enough to prevent every type and form of unfair practice." *See In re Orion Co.*, 71 F.2d 458, 467 (C.C.P.A. 1934) (applying legislative history of section 316 the Tariff Act of 1922 to section 337 of the Tariff Act of 1930). Even if patent laws have a territorial limit, there is no textual or historical support for the territorial limits Sino Legend would impose in this case. Sino Legend's arguments about *Amtorg* lack merit.

### E.    *TianRui* Does Not Conflict with *Villanueva*

Sino Legend claims that this Court erred in *TianRui* by relying on *United States v. Villanueva*, 408 F.3d 193, 199 (5th Cir. 2005) for the proposition that Congress was aware, and intended, that section 337 authorizes the Commission to consider conduct that may have occurred abroad. *See TianRui*, 661 F.3d at 1329. Sino Legend contends that amendments to the text of the immigration statute at issue in *Villanueva*

show an intention by Congress of extraterritorial effect that is not present in section 337.  Bl. Br. at 31.  As explained below, Sino Legend's argument has no merit for at least two reasons.

First, this Court cited *Villanueva* for the general proposition that "[i]t is natural to expect that Congress intends for laws that regulate conduct that occurs near international borders to apply to some activity that takes place on the foreign side of those borders."  *See TianRui*, 661 F.3d at 1329 (citing *Villanueva*, 408 F.3d at 199).  By referring to "laws" generally, the quoted principle is not tied to any particular statute; it is a statement of basic logic.  Sino Legend has not explained why the logic of the quoted statement in *Villanueva* does not apply to section 337, nor can it.  The logic is sound.

Second, the text and legislative history with respect to section 337 are at least as convincing in their demonstration of congressional intent as the text and legislative history interpreted in *Villanueva*.  As has been explained previously, articles presented for "importation" necessarily exist outside of the United States first.  If Congress intended the Commission to determine whether "importation" of those articles is "unfair," as it expressly did, it necessarily follows that Congress intends the Commission to consider relevant circumstances in foreign jurisdictions that could make such importation unfair.

44

**F.    The Commission's Application of Section 337(a)(1)(A) Presents No Foreign Policy Conflicts**

Sino Legend argues that interpreting section 337 to allow consideration of extraterritorial unfair acts would present foreign policy conflicts.  Bl. Br. at 43-47.  As explained below, Congress provided a solution to Sino Legend's concern through the process of Presidential review.

**1.    The Presidential Review Provision in Section 337(j) Negates Any Foreign Policy Concerns**

Section 337(j) provides that the Commission's remedy cannot become final without review by the President.  The President can disapprove of the Commission's remedy "for policy reasons," which include foreign policy issues.[7]  For example, in *Duracell, Inc. v. U.S. International Trade Commission*, this Court noted that section 337(j) allows the President to consider the impact the Commission's remedy could have "on United States foreign relations" and other trade conditions.  778 F.2d 1578, 1581-82 (Fed. Cir. 1985) (quoting S. Rep. No. 93-1298 at 199 (1974)).  The Court further explained that because section 337 concerns international trade, which is "intimately involved in foreign affairs," the congressional authorization of presidential power "should be given a broad construction."  *Id.* at 1582

---

[7] *See supra* n.4.

(quoting *American Ass'n of Exporters & Importers-Textile & Apparel Grp.*
*v. United States,* 751 F.2d 1239, 1248 (Fed. Cir. 1985)).  This provision for
Presidential review provides a check against potential foreign policy
conflicts.

In fact, the President previously has disapproved of the Commission's
remedy based on foreign policy concerns.  In disapproving of the
Commission's remedy in *Certain Welded Stainless Steel Pipe and Tube*
*Industry*, Inv. 337-TA-29, the President stated that he considered the
"detrimental effect of the imposition of the remedy on the international
economic relations of the United States."  43 Fed. Reg. 17789-91 (April 26,
1978).  The President further explained that the Commission's order:

> would be viewed by foreign governments as undesirable
> harassment of their producers and as an unjustified burden on
> international trade. It would invite retaliation against United
> States exports, would complicate our current efforts to negotiate
> revisions of the international trading rules, and would thus be
> detrimental to the national economic interest and to the
> international economic relations of the United States.

*Id.* at 17790.

As shown by the foregoing, Congress has already considered Sino
Legend's concern about potential foreign policy conflicts arising from
section 337 determinations and has provided a solution in the form of
Presidential review.  The President did not express any concern about the

46

Commission's determination in this investigation and allowed it to become final.  This Court should refrain from deciding this case on the basis of a supposed foreign policy conflict.  *See Duracell*, 778 F.2d at 1582.

### 2.    The Commission Did Not Impinge on the Sovereignty of China

Sino Legend argues that "[t]he range of conduct occurring in other countries that would be eligible for examination under U.S. legal standards would run the whole gamut of commercial activities—with correspondingly significant intrusion on other nations' sovereignty."  Bl. Br. at 44-45.  But there is no intrusion on the sovereignty of other nations in this case.  The Commission's orders do not hinder Sino Legend's ability to sell its products in China or in other countries, nor do Commission orders impinge upon China's internal regulation of trade secret misappropriation.  In all of Sino Legend's protests about China's national sovereignty, it has ignored the relevant sovereignty issue here: the sovereignty of the United States.  It is "the long-standing right of the sovereign" to restrict or regulate the entry of persons or property "across the border."  *United States v. Ramsey*, 431 U.S. 606, 616 (1977).  Sino Legend cannot "determine what articles of merchandise may be imported into this country," nor can it set "the terms upon which a right to import may be exercised."  *Buttfield v. Stranahan*, 192

U.S. 470, 493 (1904).  That authority belongs to the government of the

United States.  *Id.*

### G.    Sino Legend's Argument Against Deference to the Commission's Interpretation Is Irrelevant

Sino Legend argues that the Commission should not be given

deference in interpreting section 337(a)(1)(A) because the presumption

against extraterritoriality in statutory construction trumps deference to an

agency's interpretation.  Bl. Br. 36-37.  Sino Legend's argument is irrelevant

to this appeal.  As discussed above, section 337(a)(1)(A) governs domestic

conduct, the "importation of articles … into the United States."  *See* 19

U.S.C. § 1337(a)(1)(A); *Cunard*, 262 U.S. at 122.  Deference is unnecessary

because the statute is clear on this point.  *Chevron*, 467 U.S. at 842-43.

### H.    Sino Legend Did Not Adequately Preserve Its Statutory Interpretation Argument

Sino Legend waived any argument regarding whether section

337(a)(1)(A) applies to unfair conduct that occurred abroad by failing to

follow the Commission's rules.  Those rules require that a party petitioning

the Commission for review of an ALJ's determination "must present a

concise argument providing the reasons that review by the Commission is

necessary or appropriate to resolve an important issue of fact, law, or

policy."  19 C.F.R. § 210.43(b)(2).  The argument must identify any error of

law made by the ALJ and must be accompanied by a "statement of the facts material" to deciding the issue.  *Id.*  The Commission rules provide that any argument not preserved in a petition for review "will be deemed to have been abandoned."  *Id.*

In its petition seeking Commission review, Sino Legend contested the Commission's jurisdiction to adjudicate SI's claim of trade secret misappropriation.  A6859.  But Sino Legend did not identify any error of law made by the ALJ.  In fact, Sino Legend acknowledged that the ALJ applied the controlling precedent of *TianRui*.  A6859.  Sino Legend failed to provide a sound legal argument as to why the ALJ could disregard *TianRui*. Sino Legend also failed to adequately identify the facts relevant to its argument.  While Sino Legend attempted to incorporate by reference portions of its post-hearing briefing, it did so in direct violation of the Commission's rules.  *Id.* at § 210.43(b)(2) ("Petitions for review may not incorporate statements, issues, or arguments by reference.").  Sino Legend should not now be able to advance an argument that it did not adequately present to the Commission in its petition for review.  *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1363 (Fed. Cir. 1999).

**III.    The Commission was Not Required to Give Deference to the Chinese Court's Decisions**

Sino Legend contends that the Commission erred by declining to suspend or terminate its investigation in deference to a co-pending trade secret investigation conducted by a Chinese court.  As explained in this section, Sino Legend's arguments have no merit.  Not only has Sino Legend ignored the standard of review to this issue, it has misleadingly analogized comity to legal issues that are reviewed under an entirely different standard.  Moreover, Sino Legend's arguments on appeal were never similarly developed at the Commission and have been waived.  Even if the Court were to reach the merits of Sino Legend's comity argument, it should determine that the Commission acted appropriately.

**A.    The Commission's Comity Decision May Only Be Reviewed for Abuse of Discretion**

Sino Legend failed to inform the Court of the legal standard it should apply when reviewing the Commission's determination on comity.  Bl. Br. at 21-22.  In *Hilton v. Guyot*, the Supreme Court explained that comity is not "a matter of absolute obligation."  159 U.S. 113, 163-64 (1895).  This Court has similarly held that "comity remains a rule of 'practice, convenience, and expediency' rather than of law."  *Int'l Nutrition*, 257 F.3d at 1329 (quoting *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854

(2d Cir.1997)).  Accordingly, the Commission's determination on comity is reviewed for abuse of discretion.  *Id.*

Instead of arguing that the Commission abused its discretion in declining to extend comity, Sino Legend confuses the issue by asserting legal standards that do not control.  For example, Sino Legend implies that the legal principles of res judicata and claim preclusion "apply with equal force" in this case and that the Chinese government's decision is "dispositive."  Bl. Br. at 51.  Such arguments are inapt.  The *discretionary* doctrine of comity is *not* equivalent to res judicata and claim preclusion, which are matters of law.  *See, e.g., Sharp Kabushiki Kaisha v. Thinksharp, Inc.*, 448 F.3d 1368, 1370 (Fed. Cir. 2006) ("res judicata is a matter of law").  Because of this significant distinction, this Court reviews application of comity for abuse of discretion and reviews claim preclusion *de novo*.  *Int'l Nutrition*, 257 F.3d at 1329 ("extension of international comity is reviewed for abuse of discretion"); *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1323 (Fed. Cir. 2008) ("Whether a claim is barred by claim preclusion is a question of law that appellate courts review de novo.").

It is not surprising that Sino Legend has shied away from the abuse of discretion standard.  Judicial review under that standard is "narrow." *Bowman Transp. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285

51

(1974).  When reviewing for abuse of discretion, this Court will not

substitute its judgment for that of the Commission, even if the Commission's

decision has "less than ideal clarity."  *See id*. at 285-86.  Sino Legend is

asking this Court to do exactly what the standard of review will not allow:

it is asking the Court to substitute its judgment for the Commission's

determination on comity.  The Court should decline the invitation.[8]

### B.    Sino Legend Did Not Meet Its Burden to Prove Comity Is Warranted

"United States courts 'ordinarily refuse to review acts of foreign

governments and defer to proceedings taking place in foreign countries,

allowing those acts and proceedings to have extraterritorial effect in the

United States.'"  *Int'l Nutrition*, 257 F.3d at 1329 (quoting *Pravin*, 109 F.3d

at 854).  Before extending comity to a foreign court, a U.S. tribunal

considers whether the foreign court is of competent jurisdiction and whether

the court abides by fundamental standards of procedural fairness.  *Int'l

Nutrition*, 257 F.3d at 1329.  The U.S. tribunal also considers whether an

---

[8]  Moreover, as discussed above (*see infra* § II.E.1.), Congress has delegated to the President authority to consider any potential foreign policy conflicts arising from a Commission determination under section 337.  *See* 19 U.S.C. § 1337(j).  Sino Legend's argument that comity to the Chinese court in question will prevent foreign policy conflicts is undermined by that provision.  The provision of Presidential review also limits judicial review of Sino Legend's foreign policy argument.  *See Duracell*, 778 F.2d at 1581-82 (Fed. Cir. 1985).

extension of comity will violate U.S. laws, U.S. policies, or the rights of U.S. citizens. *Id.* Additionally, comity should only be extended where a foreign court addresses the same claims and the same parties as those before a U.S. tribunal. *See* Bl. Br. at 54-55. Since comity is an affirmative defense, Sino Legend had the burden of proving that comity was appropriate. *See Int'l Nutrition*, 257 F.3d at 1329. As explained below, Sino Legend did not address the foregoing comity considerations in its briefing to the Commission and therefore did not meet its burden.

### 1.    Sino Legend Failed to Show that the Chinese Court Abided by Fundamental Standards of Procedural Fairness

For Sino Legend to prevail with its comity argument, it was required to demonstrate to the Commission that the Chinese court in question abided by fundamental standards of procedural fairness. *Int'l Nutrition*, 257 F.3d at 1329.

In its petition to the Commission for review of the ALJ's determination, Sino Legend claimed a Chinese court had found that Sino Legend did not misappropriate SI's trade secrets. A6860. However, Sino Legend's comity argument in its petition was scant. Sino Legend never asserted that the Chinese court abided by the basic notions of fundamental fairness. *Id.* Under the Commission's rules, Sino Legend abandoned

reliance on such arguments by failing to adequately raise them in its petition. *See* 19 C.F.R. § 210.43(b). This Court also declines to review arguments not preserved at the Commission. *See, e.g.*, *Finnigan*, 180 F.3d at 1363.

After submitting a deficient petition for review, Sino Legend filed three other documents with the Commission that attempted to expand upon the meaning of the Chinese decision. *See* A4625-27; A4501-02; A7827-28; A6844. The arguments about the Chinese litigation in these submissions should not be considered at least because they were not included in Sino Legend's petition for review. *See* 19 C.F.R. § 210.43(b); *see also id.* § 210.43(d)(2) (barring submissions not ordered by the Commission). But even if the arguments were timely, they were not sufficiently developed to meet its burden to show that comity was warranted. Sino Legend cannot now try to meet its burden on appeal. *See Finnigan*, 180 F.3d at 1363.[9]

In contrast to Sino Legend's deficient briefing, SI proffered several arguments that the Chinese proceedings were unfair. For example, SI argued that the Chinese court failed to consider material facts (A7713-14), including the following:

---

[9] The ALJ also found Sino Legend's briefing on comity to be "a conclusory argument." A223-24.

- Former SI Shanghai general manager C.Y. Lai and SI Shanghai plant manager Jack Xu had full access to SI's trade secrets. A143; A596-A603.

- Before September 2006, Sino Legend could not make its process work. A607.

- In September 2006, Mr. Lai was consulting for Sino Legend about developing its competing process. A608.

- At least as early as December 2006, SI Shanghai's plant manager Mr. Xu was communicating with Sino Legend, on his SI laptop, about the pilot plan for Sino Legend's competing process. A605-08; A612.

- Sino Legend's laboratory notebooks in November 2006 and pilot study in December 2006 contained parameters identical to or substantially the same as SI's. A142-43; A145-48; A156; A607-12; A631-33; A655-56; A658; A669-71; A725; A781.

- The SI parameters allowed Sino Legend to finally produce a competing tackifier resin (SL-1801 and SL-1802). A607.

- Sino Legend later modified certain parameters, including the [[                        ]], based on other versions of SI's process, to which Mr. Lai and Mr. Xu had proven access. A605; A671; A148.

- Sino Legend engaged in misconduct in an attempt to hide the truth about its products. A610-12; A814-15.

*See* A7713-14. Sino Legend's cursory briefing never rebutted SI's assertion that it was unfair for the Chinese court to ignore the foregoing facts. *See* A7827-28.

Moreover, SI claimed it was unable to develop a fair record before the Chinese because Sino Legend destroyed and altered evidence. Specifically, the ALJ found that Sino Legend tore a page out of lab notebook that related

CONFIDENTIAL BUSINESS
INFORMATION DELETED

to Sino Legend's independent development arguments. A611-12; A814-15.

The ALJ also found that Sino Legend had whited out information on

numerous pages of the [[                                      ]] which was germane

to showing Mr. Xu's collusion with Sino Legend. A610-11; A814-15. Sino

Legend never rebutted SI's assertion that Sino Legend's destruction of

evidence made the Chinese proceedings unfair. *See* A7827-28.

SI cited reports from USTR describing the difficulty U.S. firms have

in obtaining trade secret relief in China. *See* A7713-14 (citing USTR 2013

Special 301 Report at 27, 31); *see also* A7942. Sino Legend failed to rebut

SI's allegation that the deficiencies identified in the USTR reports were also

present in the relevant Chinese proceedings. *See* A7827-28.

In view of the foregoing, Sino Legend has failed to show that the

Commission abused its discretion by declining to defer to the Chinese

litigation.

### 2.    Sino Legend Failed to Show the Chinese Action Involved the Same Parties

Sino Legend admits that courts considering comity should examine

whether the two competing actions involve substantially the same parties.

Bl. Br. at 55. Sino Legend failed to meet its burden to show the two actions

involved the same parties.

With respect to parties, Sino Legend's submissions to the Commission did not even compare the parties in the Chinese action and the Commission investigation.  A6859-60; A7827-28; A4625-26; A4501-02.  That is not surprising because such a comparison undermines Sino Legend's argument for comity.  The Chinese litigation involved a complaint by SI and its Chinese subsidiary SI Shanghai against Sino Legend ZJG and Mr. Xu.  In contrast, the Commission investigation involved a complaint by SI (and *not* SI Shanghai) against a number of respondents, including Precision Measurement International LLC; Sino Legend ZJG; Sino Legend Holding Group, Inc.; Shanghai Lunsai International Trading Company; Red Avenue Group Limited; Sino Legend Holding Group Inc.; and Sino Legend Holding Group Inc. of Marshall Islands.  Mr. Xu, a defendant in China, was *not* a respondent at the Commission.  Only one of the Commission respondents— Sino Legend ZJG—was also a party to the Chinese action.  A105-106, A4633.

The Commission made specific findings as to how the various respondents participated in the misappropriation and use of SI's trade secrets.  For example, the Commission found that respondent Shanghai Lunsai International Trading Company was involved in the misappropriation of SI's trade secrets.  A174-75.  The Commission further found that

respondent Red Avenue Group Limited employs Mr. Xu and used SI's misappropriated trade secrets to produce competing resins.  A174-75.  The Commission found other respondents imported products made using SI's trade secrets into the United States, including respondents Sino Legend Group Inc. of Marshall Islands; Sino Legend Holding Group Inc.; and Precision Measurement International LLC.  A174.  At the same time, the Commission found that the record would not support holding several other respondents liable for violating section 337, including several parent companies and two individuals.  A175-76.

In light of the disparate parties involved in the Commission investigation and the Chinese litigation, the Commission did not abuse its discretion in declining to defer to the Chinese litigation.

### 3.    Sino Legend Failed to Show the Chinese Action Involved the Same Claims

Sino Legend admits that courts considering comity should examine whether the two competing actions involve substantially the same claims.  Bl. Br. at 55.  Sino Legend failed to meet its burden to show the two actions concerned the same claims.  Sino Legend made cursory arguments to the Commission that the same trade secrets were at issue in both proceedings.  However, Sino Legend admitted that the ALJ allowed SI to modify the definition of the trade secrets at issue in the Commission investigation, while

the Chinese court did not allow any such modification.  A4625-26; A4501;

A6860.  In light of Sino Legend's failure to meet its burden on this point, the

Commission did not abuse its discretion when it declined to defer to the

Chinese litigation.

### 4.    Sino Legend Failed to Show the Chinese Action Involved the Same Accused Products

Sino Legend also failed to compare the products at issue in the

Chinese actions and the Commission investigation.  The Commission

adjudicated several of Sino Legend's products, while the Chinese action

only addressed one product.  *See e.g.,* A4635; A4506-64; A109.  In light of

this failure, the Commission did not abuse its discretion in declining to

extend comity to the Chinese court's decision.

### 5.    Sino Legend Failed to Show the Chinese Action Addressed Injury to a United States Industry

Investigations under section 337(a)(1)(A) concern the importation of

articles into the United States that cause injury to a U.S. industry.  19 U.S.C.

§ 1337(a)(1)(A)(i).  Sino Legend never argued to the Commission that the

Chinese action would address that inquiry.  Accordingly, Sino Legend has

not met its burden to prove that the Chinese determinations were in fact

duplicative and warrant deference.

CONFIDENTIAL BUSINESS
INFORMATION DELETED

**IV.    The Commission Did Not Abuse Its Discretion in Setting the
Duration of the Exclusion Order to 10 Years**

**A.    The Commission's Remedy Is Supported by the Record**

Sino Legend argues that the Commission's determination to set the

length of the limited exclusion order to 10 years was arbitrary and

capricious.  Bl. Br. at 61.  As detailed below, Sino Legend is wrong for at

least two reasons.  First, substantial evidence supports the Commission's

determination that it would take 10 years to independently develop the trade

secrets.  Sino Legend does not challenge this determination.  Second, Sino

Legend does not address a non-disclosure agreement between Mr. Xu and SI

[[                                                            ]].

With respect to the first issue, the Commission's determination to set

the duration of the limited exclusion order to 10 years was not an abuse of its

discretion and is supported by the record.  The Commission has broad

discretion to fashion its remedies.  *Viscofan,* 787 F.2d at 548 ("the

Commission has broad discretion in selecting the form, scope and extent of

the remedy, and judicial review of its choice of remedy necessarily is

limited.").  Generally, the Commission sets the length of an exclusion order

based on the period of time to develop the misappropriated trade secrets.  *Id.*

at 550 ("the Commission correctly recognized that 'the duration of relief in a

case of misappropriation of trade secrets should be the period of time it

CONFIDENTIAL BUSINESS
INFORMATION DELETED

would have taken respondent independently to develop the technology using

lawful means'").

   In the present investigation, the Commission considered evidence

from both parties and determined that the time it would take to

independently develop the asserted trade secrets was 10 years.  A183-84.

Specifically, the Commission stated:

> The Commission has determined to set a period of 10 years from the
> date of issuance of the exclusion order.  Complainant has adduced
> expert testimony that the totality of asserted trade secrets would take
> at least 10 years to independently develop given the time it took
> Complainant to develop the process, even if not all of the asserted
> trade secrets are protectable.  CX-1565C at QQ.99-100.  The
> Commission does not find credible the testimony adduced by
> Respondents that Complainant's process could be independently
> developed in 6 months….
>
> The Commission therefore concludes that the most reasonable
> duration of the exclusion order is a 10 year remedy.

A184; *see also* A911-12.  Sino Legend does not challenge these factual

findings.  Bl. Br. at 61-65.

   Instead, Sino Legend argues that the Commission arbitrarily failed to

limit the exclusion order to [[                    ]].  *Id.* at 61-62.  Sino Legend relies

on the labor contract between SI Shanghai and Mr. Xu to support its position

that Mr. Xu [[                                        ]].  *Id.*

   Sino Legend's argument asks the Court to ignore critical record

evidence:  the NDA that Mr. Xu signed with SI, the owner of the trade

61

secrets.  A1633-43; A253-54; *see also* A20291:6-15. The NDA specifically

states [[

]]  A1635

(emphasis original).  Mr. Xu's labor contract with SI Shanghai (the Chinese

subsidiary of SI) does not negate these obligations.

The ALJ cited Mr. Xu's NDA when determining that Mr. Xu

[[

]].  A320-21 (citing CX-0318C (A1633-43)).  This finding was

affirmed by the Commission.  A113.  The Commission's issuance of a 10-

year exclusion order therefore bears a reasonable relationship to the record

evidence of harm and should be affirmed.  *Ruberoid Co.*, 343 U.S. at 473.

### B.     Mr. Xu's Labor Contract Does Not Support Sino Legend's Argument

Sino Legend charges the Commission with three errors in its failure to

find Mr. Xu's labor contract to be controlling.  None have merit.

First, Sino Legend argues that the Chinese court, applying Chinese

law, found that Mr. Xu's confidentiality obligations lasted [[

]].  Bl. Br. at 63.  But Sino Legend ignores the Chinese court's express

finding that Mr. Xu's NDA required him [[

CONFIDENTIAL BUSINESS
INFORMATION DELETED

]].  A4649-50.  Thus, the Chinese court did not

hold that Mr. Xu was free to disclose SI's confidential information [[

]].

Second, Sino Legend argues that the Commission's decision ignores

Chinese law about the interpretation of employment agreements.  Bl. Br. at

64.  However, Sino Legend's argument focuses on Mr. Xu's labor contract;

it makes no mention of Mr. Xu's [[

]].  In fact, Sino Legend's opening brief to this Court fails to

address the NDA entirely.  Given that the NDA was drafted by SI, a U.S.

company, to protect its U.S. trade secrets, it is far from clear that Chinese

law is even relevant to its interpretation.  Because Sino Legend provides no

choice of law analysis for the interpretation of the NDA, Sino Legend's

argument is incomplete at best and need not be considered further by the

Court.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312,

1319 (Fed. Cir. 2006).

Third, Sino Legend argues that the ALJ's determination is wrong

under U.S. law.  Bl. Br. at 64.  Sino Legend has waived this argument by not

raising it in its petition to the Commission for review (A6839-45); it cannot

now raise it for the first time on appeal.  *Finnigan*, 180 F.3d at 1363; 19

C.F.R. § 210.43(b).

63

CONFIDENTIAL BUSINESS
INFORMATION DELETED

In addition, Sino Legend should not benefit from the [[

]] set forth in Article 6 of the labor contract when Mr. Xu violated that

provision.  The Commission found that Mr. Xu was misappropriating SI's

trade secrets on behalf of Sino Legend for at least five to six months while

he was *still employed* at SI Shanghai.  A604-07.  Sino Legend should not be

allowed to find refuge in an agreement that Mr. Xu blatantly disregarded.

The Commission's remedy of a 10-year limited exclusion order has

"reasonable relation to the unlawful practices found to exist" and is

supported by record evidence.  *See Viscofan,* 787 F.2d  at 548 (quoting

*Jacob Siegel Co. v. Federal Trade Comm'n,* 327 U.S. 608 (1946)).  The

Commission did not abuse its discretion and the Commission's remedy

should be affirmed.

## CONCLUSION

For the reasons set forth above, the Commission correctly determined

that section 337 prohibits the importation of articles made using trade secrets

that were misappropriated abroad and that the Chinese court's decision was

not due deference.  Moreover, the Commission did not abuse its discretion in

setting the duration of the limited exclusion order to be 10 years.  The Court

should affirm the Commission's final determination.

Respectfully submitted,

/s/ Amanda P. Fisherow
DOMINIC BIANCHI
   General Counsel
CLARK S. CHENEY
   Acting Assistant General Counsel
AMANDA P. FISHEROW
   Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW, Suite 707
Washington, DC 20436
tel. (202) 205-2737
fax (202) 205-3111
amanda.fisherow@usitc.gov

Date: April 6, 2015

## CERTIFICATE OF SERVICE

I, Amanda P. Fisherow, hereby certify on this 6th day of April 2015

that I am electronically filing the attached **CORRECTED NONCONFIDENTIAL**

**BRIEF OF APPELLEE INTERNATIONAL TRADE COMMISSION** using the

Court's CM/ECF system, which will send notification to the following:

**On behalf of SINO LEGEND (ZHANGJIAGANG) CHEMICAL CO.,
LTD., SINO LEGEND HOLDING GROUP, INC., SINO LEGEND
HOLDING GROUP LTD., PRECISION MEASUREMENT
INTERNATIONAL LLC, RED AVENUE CHEMICAL CO., LTD.,
SHANGHAI LUNSAI INTERNATIONAL TRADING COMPANY,
RED AVENUE GROUP LIMITED AND SINO LEGEND HOLDING
GROUP INC. OF MARSHALL ISLANDS**:
Andrew J. Pincus, Esq.
**MAYER BROWN, LLP**
1999 K Street, NW
Washington, DC 20006
apincus@mayerbrown.com

**On behalf of SI GROUP, INC.**:
Lawrence T. Kass, Esq.
**MILBANK, TWEED, HADLEY & MCCLOY, LLP**
One Chase Manhattan Plaza
New York, NY 10005
lkass@milbank.com

/s/ Amanda P. Fisherow
Amanda P. Fisherow
Attorney for Appellee
U.S. International Trade Commission
500 E Street, SW, Suite 707
Washington, DC  20436
tel. (202) 708-2301
fax (202) 205-2737
amanda.fisherow@usitc.gov

**CERTIFICATE OF COMPLIANCE**
**PURSUANT TO FED. R. APP. P. 32(a)(7)(C)**

Pursuant to Fed. R. App. P. 32(a)(7)(B), I hereby certify that the

attached brief contains 13,333 words, according to the word-count function

of the word-processing system used to prepare the brief (Microsoft Word

2010).

/s/ Amanda P. Fisherow
Amanda P. Fisherow

Dated:  April 6, 2015